**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHICAGO WOMEN IN TRADES,<br><br>Plaintiff,<br><br>v.<br><br>PRESIDENT DONALD J. TRUMP, DEPARTMENT OF LABOR, ACTING SECRETARY OF LABOR VINCENT MICONE, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE PAMELA BONDI,<br><br>Defendants. | Case No. 1:25-cv-02005<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## INTRODUCTION

1.      Diversity is not illegal.  Equity is not illegal.  Inclusion is not illegal.  Diversity, equity, and inclusion are aspirational ideals that have for centuries been fundamental to our progress as a nation.  Efforts to promote them do not violate federal civil rights laws.  *See Nat'l Assoc. of Diversity Officers in Higher Ed., et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764 at *1 (D. Md. Feb. 21, 2025) ("[E]nsuring diversity, equity, and inclusion has long been a goal, and at least in some contexts arguably a requirement, of federal anti-discrimination law.").  These efforts are achieving goals that many Americans believe are worth working for and that our Constitution and civil rights laws embody.

2.      Nonetheless, on January 20, 2025, President Donald J. Trump signed Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" (the "J20 EO").  The J20 EO declares programs promoting diversity, equity, and inclusion "illegal and immoral discrimination."  Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025).

3.      On January 21, 2025, President Trump signed Executive Order 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (the "J21 EO").  The J21 EO echoes the J20 EO, declaring programs supporting diversity, equity, and inclusion "that can violate the civil-rights laws of this Nation" as "dangerous, demeaning, and immoral."  Exec. Order No. 14173, 90 Fed. Reg. 8663 (Jan. 21, 2025).

4.      The J20 and J21 EOs (collectively, the "anti-diversity EOs") brazenly seek to eliminate ***any*** efforts to promote diversity, equity, or inclusion, regardless of what they are, how they are undertaken, who they impact, or the sources of funding used to support them.

2

5.      The anti-diversity EOs make one thing abundantly clear—the goal is the "Ending" or extinction of any effort aimed at achieving the goals of diversity, equity, and inclusion.  To that end, the anti-diversity EOs:

- Order all executive agencies to "terminate . . . 'equity-related' grants or contracts" (J20 EO, § 2(b)(i)) (the "J20 Termination Provision");

- Order the OMB Director, with the assistance of the Attorney General, to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate" (J21 EO, § 3(c)(iii)) (the "J21 Termination Provision," referred to with the J20 Termination Provision as the "Termination Provisions");

- Order all executive agencies to "include in every contract or grant award" a certification, enforceable through the False Claims Act[1], that the contractor and grantee "does not operate any programs *promoting DEI* that violate any applicable Federal anti-discrimination laws" (J21 EO, § 3(b)(iv)) (the "Certification Provision"); and

- Order the Attorney General to take "appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify . . . potential civil compliance investigations" to accomplish such "deter[rence]" (J21 EO, § 4(b)(iii)) (the "Enforcement Threat Provision").

6.      Moreover, the J21 EO, *inter alia*, directs the Director of the Office of Management and Budget (OMB), to "[e]xcise references to DEI and DEIA principles" from, *inter alia*, "contracting" and "grants" and also "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities[.]"  J21 EO, § 3(c)(ii-iii).

---

[1] The False Claims Act directs that a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" is "liable to the United States government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1)(G).

7. The Certification Provision further directs the U.S. Office of Federal Contract Compliance Programs within the Department of Labor to "immediately cease . . . [p]romoting diversity." *See* Certification Provision, J21 EO, § 3(b)(iv).

8. The anti-diversity EOs declare all diversity, equity, and inclusion programs illegal, and identify the lengths to which the federal government will go to end them. But the anti-diversity EOs offer no explanation as to what types of programs to promote diversity, equity, and inclusion "violate any applicable Federal anti-discrimination laws," or how. The anti-diversity EOs offer no guidelines to understand the diversity, equity, and inclusion initiatives they prohibit, and some provisions of the anti-diversity EOs—such as the J20 EO's reach to control programs "misleadingly labeled" and "under whatever name"—have no bounds at all.

9. In the absence of such explanation, contractors, grantees, and private institutions are at a loss as to whether the programs they administer to promote diversity, equity, and inclusion "violate any applicable Federal anti-discrimination laws" that could result in termination of their grants or contracts, or subject them to civil investigations and/or liability under the False Claims Act.

10. The inscrutability and indeterminacy of the anti-diversity EOs is intentional. As President Trump's Deputy Chief of Staff Stephen Miller declared, "[a]ll [Diversity, Equity, and Inclusion] must be abolished nationwide."[2]

11. Indeed, the inscrutability and indeterminacy of the anti-diversity EOs, coupled with the potential financial consequences of violating these edicts, has had a predictable chilling effect, and has led to incongruous actions undertaken due to fear of facing the administration's

---

[2] Stephen Miller (@StephenM), X (Jan. 12, 2025, 9:36 AM), https://x.com/StephenM/status/1878450912621994410.

4

retribution.  For example, following issuance of the anti-diversity EOs, the U.S. Air Force removed from its website "training courses with videos of its storied Tuskegee Airmen and Women Airforce Service Pilots" in order "to comply with the Trump administration's crackdown on diversity, equity, and inclusion initiatives."[3]  (Thankfully, those videos were later restored.) Similarly, a week after the anti-diversity EOs' issuance, the website of a federally funded observatory named after Vera C. Rubin, a pioneering female researcher on dark matter, removed a section of Rubin's online biography titled, "She advocated for women in science."[4]  And at the National Science Foundation, officials were reportedly instructed to manually remove grants flagged by a software algorithm that included the terms "institutional," "underappreciated," "women," "bias," and "polarization."[5]

12.     Against this backdrop, Plaintiff Chicago Women in Trades ("CWIT") brings this lawsuit.  CWIT is a non-profit organization working toward the goal of preparing women across the country to enter and remain in high-wage skilled trades, including carpentry, electrical work, welding, plumbing, and others.  Approximately 70% of participants in CWIT's programs identify as Black and Latina.  In other words, CWIT is an organization **dedicated** to promoting diversity, equity, and inclusion within the skilled trades industry, given the reality of discrimination and occupational segregation, as set forth below.

---

[3] *See* Tara Copp, *More DEI fallout: Air Force scraps course that used videos of Tuskegee Airmen and Female WWII pilots* (Jan. 26, 2025), https://apnews.com/article/air-force-dei-tuskegee-women-wwii-pilots-ecdeac68dc7696535d093c7690ab73bc.

[4] Lisa Song, *The Rewriting of a Pioneering Female Astronomers, Legacy Shows How Far Trump's DEI Purge Will Go*, ProPublica (Jan. 30, 2025), https://www.propublica.org/article/vera-rubin-astronomer-dei-trump.

[5] Katrina Miller & Roni C. Rabin, *Ban on D.E.I. Language Sweeps Through the Sciences*, New York Times (Feb. 9, 2025), https://www.nytimes.com/2025/02/09/science/trump-dei-science.html?unlocked_article_code=1.yk4.uFGS.0SEDfvYpG32k&smid=url-share.

13.     CWIT's work is vital for women, including for Black and Latina women who disproportionately face deeply entrenched barriers to accessing jobs in the skilled trades.  CWIT seeks to promote equal opportunity, an effort that plainly does not run afoul of federal anti-discrimination laws.  But given the broad, vague language of the anti-diversity EOs, CWIT simply does not know whether the administration believes this work constitutes "illegal DEI."

14.     CWIT is also a recipient of multiple federal grant awards.  As a result of the anti-diversity EOs, CWIT had its grant funding frozen.  Although it was made available again following a temporary restraining order entered by a different District Court in separate litigation, CWIT's grants remain under threat of termination given the J20 Termination Provision.

15.     And the Certification Provision of the J21 EO requires CWIT to certify that it "does not operate any programs promoting [diversity, equity, or inclusion] that violate any applicable Federal anti-discrimination laws" under threat of False Claims Act liability.  But CWIT (and scores of other similarly situated grant recipients) cannot know whether the Trump administration will construe any of the diversity, equity, or inclusion programs it administers—or indeed its very existence—to "violate any applicable Federal anti-discrimination laws."  This is both because the anti-diversity EOs do not reference or comport with relevant precedent interpreting federal anti-discrimination laws and because the broad, vague language of the anti-diversity EOs suggests the Trump administration believes *any* diversity, equity, and inclusion is prohibited and must be eliminated.  Indeed, the clear purpose of the anti-diversity EOs is to prevent organizations like CWIT from doing any work at all.

16.     Women and tradeswomen-led organizations across the country turn to CWIT for assistance, guidance, and as a model of what is possible.  The harm resulting from CWIT's

6

inability to provide education, training, support, and guidance for women in trades—building both personal and economic growth—would be immeasurable.  CWIT's impact extends far beyond the women they individually serve: it shapes the trades industry, communities, and the future of the nationwide workforce.  Ultimately, the harm resulting from CWIT's inability to promote equity is not just financial—it is a loss of opportunity, empowerment, and progress.

17.    The anti-diversity EOs trample CWIT's right to free speech under the First Amendment of the U.S. Constitution.  The anti-diversity EOs impose restrictions on CWIT that are overbroad, impossibly vague, discriminate against CWIT (and other similarly situated entities) based on the administration's preferred anti-diversity viewpoint, and condition CWIT's receipt of federal funding upon the stifling of CWIT's protected speech, trampling CWIT's due process rights.

18.    Moreover, it is the Constitution's separation of powers that protects these free speech and due process rights.  In the words of James Madison, "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."  The Federalist No. 47 (James Madison).  As a result, it has long been the law in this country that "a President does not 'stand exempt from the general provisions of the constitution.'"  *Trump v. United States*, 603 U.S. 593, 612 (2024) (quoting *United States v. Burr*, 25 F. Cas. 30, 33-34 (C.C.D. Va. 1807)).

19.    The "Termination Provisions," "Certification Provision," and the "Enforcement Threat Provision" of the anti-diversity EOs violate the First and Fifth Amendments and Article I, § 8 (Spending Clause and Separation of Powers) of the U.S. Constitution.  They are unlawful and unconstitutional.

7

20.     The Executive Branch of Government cannot punish CWIT for espousing viewpoints with which the administration disagrees.  But the Termination Provisions, Enforcement Threat Provision, and the Certification Provision under the threat of liability confirm this is the plain purpose of the anti-diversity EOs.  CWIT therefore brings this suit and requests that the Court declare unconstitutional and enjoin enforcement of the J20 Termination Provision (§ 2(b)(i) of the J20 EO), the J21 Termination Provision (§ 3(c)(iii) of the J21 EO), the Certification Provision (§ 3(b)(iv) of the J21 EO), and the Enforcement Threat Provision (§ 4(b)(iii)) of the J21 EO).[6]

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a), and because the Defendants are United States officials, 28 U.S.C. § 1346(a)(2).

22.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) because Plaintiff CWIT is based in Chicago, Illinois, and each defendant is an agency or officer of the United States sued in his or her official capacity.  CWIT is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within this District.

## THE PARTIES

**A.      Plaintiff Chicago Women in Trades**

23.     CWIT is a not-for-profit 501(c)(3) organization based in Chicago, Illinois.

---

[6] On February 21, 2025, the United States District Court for the District of Maryland issued a nationwide injunction of the requirement in the J20 EO that all "DEI"-related grants and contracts be terminated, and the certification requirement and enforcement threats contained in the J21 EO.  *See Nat'l Assoc. of Diversity Officers in Higher Ed., et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764 at *2 (D. Md. Feb. 21, 2025).

24.     CWIT receives funding from a range of private and public sources.  This includes federal grants from the U.S. Department of Labor ("DOL") to improve and expand foundational skill training programs for underrepresented populations, particularly women in pre-apprenticeships, with a focus on the building, manufacturing, and transportation industries.

**B.      Defendants**

25.     Defendant Donald J. Trump ("President Trump") is the President of the United States of America.  He issued the anti-diversity EOs.  He is sued in his official capacity.

26.     Defendant DOL is directed to implement the Executive Orders in various ways and DOL has proceeded to do so.  DOL provides grant funding to CWIT.

27.     Defendant Vincent Micone is the Acting Secretary of Labor.  He is sued in his official capacity.  Acting Secretary Micone and DOL have begun implementing the anti-diversity EOs.

28.     Defendant Office of Management and Budget ("OMB") is directed to implement the Executive Orders in various ways, which OMB has proceeded to do.

29.     Defendant Russell Vought is the Director of the Office of Management and Budget.  He is sued in his official capacity.  Director Vought and OMB have begun implementing the anti-diversity EOs.

30.     Defendant Department of Justice ("DOJ") is directed to implement the Executive Orders in various ways, which DOJ has proceeded to do.

31.     Defendant Pamela Bondi is the Attorney General of the U.S. Department of Justice.  She is sued in her official capacity.  Attorney General Bondi and DOJ have begun implementing the anti-diversity EOs.

## FACTUAL ALLEGATIONS

**A.      CWIT's Background, Programming, and Federal Funding**

**1.      CWIT Promotes the Goals of Diversity, Equity, and Inclusion in the Skilled Trades to Combat Occupational Segregation and Strengthen the Nation's Economy**

32.      CWIT was established in 1981 by tradeswomen leaders in Chicago, with a goal of creating more equitable opportunities for women to enter high-wage employment in the skilled trades, including carpentry, electrical work, welding, and plumbing, among others.  CWIT has a rich 44-year history of tradeswomen advocacy: creating women-focused trades pipeline programs, establishing women-focused pre-apprenticeship programs, developing best practices to recruit and retain tradeswomen, and implementing innovative approaches to gender equity work in nontraditional occupations nationwide.

33.      CWIT's mission and day-to-day work are based on the reality that women face gender-based structural barriers, often compounded by race, to entering and staying in the skilled trades occupations, including carpentry, electrical work, welding, and plumbing.  CWIT does not know whether this critical work, or any of its critical work described in this section, is prohibited under the anti-diversity EOs.

34.      Women make up only 3.9% of the skilled trades workforce in the United States, despite comprising half of the population, even though these are in-demand jobs with competitive wages and benefits that can rival or exceed those of professions requiring a four-year degree.  Women are disproportionately excluded from the skilled trades in part because of lack of opportunities for pre-apprenticeship training, bias in the recruitment process, and a hostile work environment.

35. CWIT's extensive programming (ranging from pre-apprenticeship training to mentorship cohorts across the country) is centered on equity—ensuring meaningful access to opportunity and making the workplace safer for women in the skilled trades.

36. CWIT's programming also focuses on providing gender equity training for industry stakeholders in the skilled trades nationwide. In short, CWIT seeks to reduce and eliminate sex- and race-based discrimination, as they poses a barrier to women and women of color entering the skilled trades. Demand for CWIT's equity training has substantially increased over the past four years because there is a reported shortage of 650,000 skilled tradespeople in the U.S. and companies are actively recruiting to fill these vacancies. CWIT's gender equity training helps employers address this shortage by more effectively recruiting and retaining women in the skilled trades to ensure a stronger economy for all Americans.

37. While the majority of CWIT's work in the past 40 years has been in Chicago, the organization has a national reach, and its programming and impact is nationwide. CWIT has provided technical assistance and gender equity training to industry stakeholders in nearly all fifty states. For example, CWIT has implemented mentorship programs for co-ed apprenticeship programs in Illinois, New York, and Michigan. CWIT has also worked with new and emerging tradeswomen organizations in Texas, Pennsylvania, and Ohio to start their women-focused pre-apprenticeship training programs.

38. In addition, CWIT's policy team works at the local, state, and federal levels to "advocate for the implementations of best practices and legal interventions to counteract cultural biases and historic discrimination against women and people of color in the construction industry."[7] Further, CWIT's work under various grant programs supports its mission in a variety

---

[7] *See* https://cwit.org/policy-and-advocacy/.

of localities, cities, and states across the country. CWIT's WANTO grant work covers projects in Pennsylvania, Texas, and Ohio. CWIT's work under its IDOL Tradeswomen Building Infrastructure Initiative targets projects in Illinois, Pennsylvania, Missouri, Ohio, Texas, and West Virginia. And CWIT's work under its JFF subaward covers programs in Minnesota, Michigan, Wisconsin, and Illinois.

39.     CWIT also focuses on addressing specific barriers faced by Black and Latina women and assisting them as they navigate unique challenges arising from the underrepresentation, harassment, and discrimination they face in the trade industries. CWIT's efforts in this respect—which may be prohibited by the anti-diversity EOs to the extent they fall within those EOs' definitions of diversity, equity, and inclusion—are particularly important because Black and Latina women are disproportionately underrepresented group in the industry.[8] Indeed, a study from the Institute for Women's Policy Research found one in five women of color in the construction industry reported "always" or "frequently" experiencing racial discrimination and sexual harassment on the job—the highest of any demographic group in the study.[9]

40.     The work CWIT performs is vital. A 2021 study commissioned by the City of Chicago concluded that "women continue to suffer from significant discriminatory barriers to full and fair access to City construction contracts," and that women in the Chicago construction

---

[8] *See e.g.*, Report of Chair Charlotte A. Burrows (U.S. E.E.O.C.), *Building for the Future: Advancing Equal Employment Opportunity in the Construction Industry* (May 2023), https://www.eeoc.gov/sites/default/files/2023-05/Building%20for%20the%20Future.pdf

[9] *See e.g.,* Ariane Hegewisch and Eve Mefferd, *A Future Worth Building: What Tradeswomen Say about the Change They Need in the Construction Industry*, Institute for Women's Policy Research (2009), https://iwpr.org/wp-content/uploads/2022/02/A-Future-Worth-Building_What-Tradeswomen-Say_FINAL.pdf

industry reported having "experienced sex discrimination, ranging from gender bias to hostile work environments to outright sexual harassment."[10] But CWIT does not know if its work to address these injustices is now prohibited by the anti-diversity EOs (such that CWIT's grants could be subject to termination) because of the broad, vague language of those EOs.

41.     CWIT's mission has proven successful. For example, CWIT's pre-apprenticeship training programs prepare individuals with the essential skills and knowledge, ranging from math and test preparation to hands-on experience, to enter a registered apprenticeship of their choosing. These programs also identify and address unconscious bias, systemic barriers, and discriminatory practices that Black and Latina women disproportionately experience to create a more inclusive and fair work environment for women in the skilled trades. Addressing the racial and gender bias Black and Latina women experience in the skilled trades industry is essential to the success of the pre-apprenticeship programs. For example, data shows that two-thirds of minority and women apprentices drop out of union apprentice programs that do not explicitly address racial and gender bias prior to completion.

### 2.     CWIT's Federal Grant and Contract Funding

42.     Approximately 40% of CWIT's annual budget originates with the federal government. CWIT operates as a federal grantee, sub-grantee, and sub-contractor. The remainder of CWIT's activities are funded by private donors and grants from non-federal sources.

---

[10] Colette Holt & Associates, City of Chicago Disparity Study for Construction Contracts 2021 at 9 (2021), https://www.chicago.gov/content/dam/city/depts/dps/Outreach/City%20of%20Chicago%20Disparity%20Study%20for%20Construction%20Contracts%202021.pdf

43.     CWIT currently receives federal funding through five federal programs that are directly affected by the anti-diversity EOs.

44.     The first grant is a Women in Apprenticeship and Nontraditional Occupations ("WANTO") Grant from DOL.  It funds CWIT's "Transforming the Workforce System to Ensure Gender Equity in Infrastructure" program, which provides services in three states outside of Illinois.  The program has four goals: (1) provide technical assistance to workforce development board staff to help more women enter the skilled trades and embed gender equity into their workforce systems; (2) develop women-focused pre-apprenticeship programs; (3) develop workforce equity plans for infrastructure projects run by public agencies; and (4) create women-focused cohorts for co-educational pre-apprenticeship programs.  CWIT does not know if this work is prohibited by the anti-diversity EOs such that the grant will be terminated.  Nor could CWIT comply with the certification requirement that it does not "operate programs promoting DEI that violate any applicable Federal anti-discrimination laws," because "promoting" is vague and undefined and the anti-diversity EOs offer no guidance as to what types of DEI programs "violate any applicable Federal anti-discrimination laws."  Diversity, equity, and inclusion, as aspirational goals, do not violate federal anti-discrimination laws.

45.     The WANTO grant is authorized by the Women in Apprenticeship and Nontraditional Occupations Act.  Pub. L. No. 102-530, 106 Stat 3465 § 2 (1992).  The WANTO Act requires the Secretary of Labor to "make grants to community-based organizations to provide technical assistance to employers and labor unions."  29 U.S.C. § 2503.  This technical assistance includes, *inter alia*, "developing outreach and orientation sessions to recruit women into the employers' apprenticeable occupations and nontraditional occupations."  *Id*.

14

46.     In enacting this law, Congress found that "women face significant barriers to their full and effective participation in apprenticeable occupations and nontraditional occupations." Pub. L. No. 102-530, 106 Stat 3465 § 2.

47.     The "purpose" of the Act, *inter alia*, is "to encourage employment of women in apprenticeable occupations and nontraditional occupations." *Id*.  To achieve this purpose, the Act, *inter alia*, "provid[es] grants to community-based organizations to deliver technical assistance to employers and labor unions to prepare them to recruit, train, and employ women in apprenticeable occupations and nontraditional occupations." *Id*.

48.     The WANTO Act also requires the Secretary of Labor to give priority to grant applications from community-based organizations that, *inter alia*, "demonstrate experience preparing women to gain employment in apprenticeable occupations or other nontraditional occupations" and "demonstrate experience working with the business community to prepare them to place women in apprenticeable occupations or other nontraditional occupations."  29 U.S.C. § 2504.

49.     The Further Consolidated Appropriations Act of 2024 directs that "funds available to the [DOL's] Women's Bureau may be used for grants to serve and promote the interests of women in the workforce:  Provided further, that of the amounts made available to the Women's Bureau, not less than $5,000,000 shall be used for grants authorized by the Women in Apprenticeship and Nontraditional Occupations Act."  Pub. L. No. 118-47, 138 Stat. 460, 641.

50.     CWIT's second grant is an Apprenticeship Building America ("ABA") grant, also from DOL.  CWIT's ABA grant partially funds two pre-apprenticeship programs.  These programs provide math and test preparation, workplace readiness, physical conditioning, basic construction, and hands-on trade-specific experience in partnership with apprenticeship

programs.  Graduates also earn nationally recognized credentials, such as OSHA 10 and First Aid/CPR.  CWIT does not know if this work is prohibited by the anti-diversity EOs such that the grant will be terminated.  Nor could CWIT comply with the certification requirement that it does not "operate programs promoting DEI that violate any applicable Federal anti-discrimination laws," because "promoting" is vague and undefined and the anti-diversity EOs offer no guidance as to what types of DEI programs "violate any applicable Federal anti-discrimination laws." Diversity, equity, and inclusion, as aspirational goals, do not violate federal anti-discrimination laws.

51.     The ABA grant is authorized by the National Apprenticeship Act and the American Competitiveness and Workforce Improvement Act.  The funds from this grant were appropriated in the Consolidated Appropriations, 2021, Public Law 116-260, Division H, Title I, which provides that "any grant funds used for apprenticeships shall be used to support only apprenticeship programs registered under the National Apprenticeship Act."  Pub. L. No. 116-260, 134 Stat. 1182, 1548 (2020).

52.     The National Apprenticeship Act, in turn, authorizes DOL to "bring together employers and labor for the formulation of apprenticeship."  29 U.S.C. § 50.

53.     The ABA grant is also authorized by the American Competitiveness and Workforce Improvement Act § 414(c), which requires the Secretary of Labor to use funds and "award grants" "to establish demonstration programs or projects to provide technical skills training for workers, including both employed and unemployed workers."  Pub. L. No. 105-277, 112 Stat. 2681-641, 653 (1998).  This is statutorily authorized work promoting equity.

54.     CWIT's third source of federal funding is a subcontract from Jobs for the Future's ("JFF") Improving Diversity and Equity in Apprenticeship for Manufacturing ("IDEA-M")

16

program. CWIT is a subcontractor to JFF under this contract, which requires CWIT to provide services to increase the number of women entering and retained in advanced manufacturing apprenticeship programs, with a focus on providing online and in-person diversity, equity, and inclusion training to sponsors of apprenticeship programs. CWIT does not know if this work is now prohibited under the anti-diversity EOs. Nor could CWIT comply with the certification requirement that it does not "operate programs promoting DEI that violate any applicable Federal anti-discrimination laws," because "promoting" is vague and undefined and the anti-diversity EOs offer no guidance as to what types of DEI programs "violate any applicable Federal anti-discrimination laws." Diversity, equity, and inclusion, as aspirational goals, do not violate federal anti-discrimination laws.

55.     CWIT's fourth source of federal funding is again a grant where CWIT is a subrecipient, this time to JFF's Apprenticeship USA grant from DOL. Pursuant to the terms of the grant, CWIT must: (1) contribute to written resources and conduct virtual training to facilitate the inclusion of women in pre-apprenticeship and apprenticeship programs; (2) serve as subject matter experts at events; (3) research and document best practices for the recruitment, outreach and mentoring, and retention of women; and (4) lead efforts to improve and expand foundational skills training to include women in pre-apprenticeships. CWIT does not know if this work is prohibited by the anti-diversity EOs such that the grant will be terminated. Nor could CWIT comply with the certification requirement that it does not "operate programs promoting DEI that violate any applicable Federal anti-discrimination laws," because "promoting" is vague and undefined and the anti-diversity EOs offer no guidance as to what types of DEI programs "violate any applicable Federal anti-discrimination laws." Diversity, equity, and inclusion, as aspirational goals, do not violate federal anti-discrimination laws.

17

56.     Finally, CWIT's fifth source of federal funding is the Tradeswomen Building Infrastructure Initiative ("TBII") grant program, where CWIT is performing a subaward through the Illinois Department of Labor ("IDOL"). The TBII grant program is authorized by the Workforce Innovation and Opportunity Act, Pub. L. No. 113-128, 128 Stat. 1425 (2014).

57.     Under the TBII grant, CWIT's scope of work as a subrecipient to IDOL includes: (i) intensive support for local community investments in four identified cities, including meetings with key policymakers and state agencies to identify resources, design state, municipal or project-wide campaigns to promote, create, and sustain inclusive and diverse infrastructure worksites; (ii) best practice training and convening to gain stakeholder acceptance for the Framework for Workforce Equity for Women and People of Color; (iii) promoting respectful and harassment-free workplaces; and (iv) state-level support and data evaluation, performed jointly with IDOL. CWIT does not know if this work is prohibited by the anti-diversity EOs such that the grant will be terminated. Nor could CWIT comply with the certification requirement that it does not "operate programs promoting DEI that violate any applicable Federal anti-discrimination laws," because "promoting" is vague and undefined and the anti-diversity EOs offer no guidance as to what types of DEI programs "violate any applicable Federal anti-discrimination laws." Diversity, equity, and inclusion, as aspirational goals, do not violate federal anti-discrimination laws.

**B.      The Implementation of the Anti-Diversity EOs**

      **1.      President Trump Signs Executive Order 14151 "Ending Radical and Wasteful DEI Programs and Preferencing"**

58.     On January 20, 2025, President Trump signed Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." The J20 EO is attached as **Exhibit A** to this Complaint.

59.     The stated "Purpose and Policy" of the J20 EO is to reverse "[t]he Biden Administration['s] forced illegal and immoral discrimination programs, going by the name 'diversity, equity and inclusion' (DEI), into all aspects of the Federal Government" and to "end[]" "DEIs [sic] infiltration of the Federal Government."  J20 EO, § 1.

60.     The J20 EO directs the Director of OMB, assisted by the Attorney General and the Director of the Office of Personnel Management (OPM), to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear."  J20 EO, § 2(a).

61.     The J20 EO instructs, *inter alia*, "[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM" to within sixty days of the order "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions (including but not limited to 'Chief Diversity Officer' positions); all 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees."  J20 Termination Provision, J20 EO, § 2(b)(i).

62.     The J20 EO does not define "DEI," "DEIA," "diversity," "equity," "equity-related," "inclusion," or "accessibility."

63.     The J20 EO also requires that each executive agency, department, or commission head provide the OMB Director with a list of all:

> (A) Agency or department DEI, DEIA, or "environmental justice" positions, committees, programs, services, activities, budgets, and expenditures in existence on November 4, 2024, and an assessment of whether these positions, committees, programs, services, activities, budgets, and expenditures have been misleadingly

relabeled in an attempt to preserve their pre-November 4, 2024 function;

(B) Federal contractors who have provided DEI training or DEI training materials to agency or department employees; and

(C) Federal grantees who received Federal funding to provide or advance DEI, DEIA, or "environmental justice" programs, services, or activities since January 20, 2021.

*Id.* § 2(b)(ii).

64.     In sum, the J20 EO prohibits (1) "diversity, equity, and inclusion" programs, mandates, policies, preferences, factors, goals, requirements, and activities; (2) "diversity, equity, inclusion, and accessibility" programs, mandates, policies, preferences, factors, goals, requirements, and activities; (3) "environmental justice" offices and positions; (4) "equity" actions, initiatives, or programs; (5) "equity-related" grants or contracts; and (6) "DEI" or "DEIA" performance requirements.  In addition to the above prohibitions, the J20 EO states that any such programs are "illegal and immoral" and "discriminatory."  J20 EO §§ 1, 2.

### 2.     President Trump Signs Executive Order 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity"

65.     On January 21, 2025, President Trump signed Executive Order 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."  The J21 EO is attached as **Exhibit B** to this Complaint.

66.     The purported "[p]urpose" of the J21 EO is to address "'diversity, equity, and inclusion' (DEI) or 'diversity, equity inclusion, and accessibility' (DEIA) that can violate [United States] civil-rights laws."  J21 EO § 1.

67.     The J21 EO states that "diversity, equity, and inclusion," "DEI," "diversity, equity, inclusion, and accessibility," or "DEIA" policies are "illegal," "dangerous," and "immoral."  J21 EO § 1.

20

68.     The J21 EO further claims that "[i]llegal DEI and DEIA policies . . . undermine our national unity" and "threaten the safety of American men, women, and children." *Id.*

69.     The J21 EO declares:

> It is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work. I therefore order all executive departments and agencies (agencies) to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements. I further order all agencies to enforce our longstanding civil rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities.

J21 EO § 2.

70.     Section 2 of the J21 EO directs "all executive departments and agencies . . . to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements" to "protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work" and "to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.*

71.     Section 3(b) of the J21 EO instructs the Office of Federal Contract Compliance Programs within the Department of Labor to "immediately cease: . . . [p]romoting 'diversity'" and "[h]olding Federal contractors or subcontractors responsible for taking 'affirmative action'"; and "[a]llowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin." *Id.* § 3(b).

72.     The Certification Provision of the J21 EO also requires every agency head to "include in every contract or grant award: (A) a term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section

3729(b)(4) of title 31, United States Code,'" and "(B) a term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *See* Certification Provision, J21 EO, § 3(b)(iv).

73.     The J21 EO further orders the OMB Director, with the Attorney General's assistance, to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." *Id*. § 3(c)(ii-iii).

74.     Section 4(a) of the J21 EO directs the heads of all agencies to "take all appropriate action with respect to the operations of their agencies to advance in the private sector the policy of individual initiative, excellence, and hard work," which the J21 EO implies is inconsistent with the principles of diversity, equity, inclusion, and accessibility. *Id.* § 4(a).

75.     The J21 EO contains a variety of directives aimed at ending whatever is meant by "DEI" and "DEIA." These directives include calling for executive branch officials to, among other things:

- require all federal contractors or grantees to "certify that [they do] not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws;"

- take "all appropriate action with respect to the operation of their agencies to advance in the private sector" the policy positions outlined in the EO, including by creating a "proposed strategic enforcement plan;"

- create a list of "[t]he most egregious and discriminatory DEI practitioners in each sector of concern;"

- create a "plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise);"

- identify "up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500

million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars;" and

- identify "[l]itigation that would be potentially appropriate for Federal lawsuits, intervention, or statements of interest."  J21 EO, § 4(b).

76.     In sum, the J21 EO directs subordinate executive officials to "recommend actions . . . to align agency or department" enforcement, litigating positions, and other regulations to conform with the viewpoint that promoting ideas of diversity, equity, inclusion, and accessibility or environmental justice are "illegal and immoral."  *See, e.g.*, J21 EO §§ 1; 2(b)(ii); and 2(b)(iii).

### C.     The Application of the Anti-Diversity EOs Across All Federal Agencies, and Specifically to CWIT's Grants

77.     On January 21, 2025, OPM's Acting Director issued a memorandum to all "heads and acting heads of departments and agencies" providing "Initial Guidance Regarding DEIA Executive Orders."[11]  Among other things, OPM's January 21, 2025, Memorandum directed agency heads to, by January 22, 2025, "terminate any DEIA-related contractors," and by January 23, 2025, provide OPM with "a complete list of all DEIA-related agency contracts **as of November 5, 2024.**"[12]

78.     On January 22, 2025, the White House released a fact sheet entitled "President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI."[13] That fact sheet states that the J21 EO "expands individual opportunity by terminating radical DEI

---

[11] *See* https://www.opm.gov/media/e1zj1p0m/opm-memo-re-initial-guidance-regarding-deia-executive-orders-1-21-2025-final.pdf

[12] *Id.*

[13] *See* https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-protects-civil-rights-and-merit-based-opportunity-by-ending-illegal-dei/

preferencing in federal contracting," and "terminates 'diversity, equity, and inclusion' (DEI) discrimination . . . in federal contracting and spending."[14]

79.     Consistent with the instructions in OPM's January 21, 2025, Memorandum, on January 22, 2025, CWIT received an email from the grant administrator at the DOL Women's Bureau charged with dispersing the WANTO grant.  The email instructed that "effective immediately, all recipients of federal financial assistance are directed to cease all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under their federal awards, consistent with the requirements of the [anti-diversity EOs]." CWIT did not know, and still does not know, whether this email applies to their work under the WANTO grant.  DOL's email further stated that the agency was "reviewing all active federal awards and will take appropriate action, including terminating the awards, consistent with the [anti-diversity EOs]."  CWIT did not know, and still does not know, how this statement applies to their WANTO grant work.

80.     IDOL received an identical email from the DOL Women's Bureau on January 22, 2025, in regard to the TBII grant program, and forwarded it to CWIT the same day.  CWIT did not know, and still does not know, whether this email applies to their work under the TBII grant. Further, CWIT did not know, and still does not know, whether (and if so, how) the DOL email's statement about termination applies to its work on the TBII grant.

81.     Also on January 22, 2025, CWIT received Training and Employment Notice ("TEN") No. 21-24 from DOL Acting Deputy Assistant Secretary Michelle Paczynski with the subject "Immediate Implementation of [the anti-diversity EOs]."  TEN No. 21-24 instructed that "[e]ffective immediately, all recipients of federal financial assistance awards are directed to cease

---

[14] *Id.*

all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under their federal awards, consistent with the requirements of [the anti-diversity EOs]."[15]  CWIT did not know, and still does not know, whether this notice applies to their work.

82.     On January 23, 2025, CWIT received an email from JFF, the prime grant recipient for DOL's Apprentice USA grant and its IDEA-M grant.  The JFF email directed CWIT to cease work on any so-called "DEI" or "DEIA" requirements in accordance with TEN No. 21-24. CWIT did not know, and still does not know, whether this email applies to their work.

83.     On January 23, 2025, President Trump declared at the World Economic Forum that his Administration "has taken action to abolish all discriminatory diversity, equity, and inclusion nonsense . . . through the government and the private sector."[16]  CWIT did not know, and still does not know, whether this declaration applies to their work.

84.     On January 27, 2025, OMB issued Memorandum M-25-13, instructing all federal agencies, as of January 28, 2025, to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal."[17] CWIT did not know, and still does not know, whether this memorandum applies to their work.

---

[15] *See* https://www.dol.gov/sites/dolgov/files/ETA/advisories/TEN/2024/TEN%2021-24/TEN%2021-24%20%28Accessible%20PDF%29.pdf

[16] *See* https://www.whitehouse.gov/remarks/2025/01/remarks-by-president-trump-at-the-world-economic-forum/

[17] *See* https://s3.documentcloud.org/documents/25506186/m-25-13-temporary-pause-to-review-agency-grant-loan-and-other-financial-assistance-programs.pdf

85.     On January 28, 2025, the White House issued a "Fact Sheet" entitled "OMB Q&A Regarding Memorandum M-25-13," which confirmed that the pause called for in the memorandum applied to "programs, projects, and activities implicated by the President's Executive Orders, such as ending DEI."[18]  CWIT did not know, and still does not know, whether its work is covered by this fact sheet.

86.     On January 29, 2025, OMB's Acting Director, in response to a federal district court order prohibiting OMB from implementing the pause outlined in Memorandum M-25-13, rescinded that memorandum.  But later that day, the White House Press Secretary explained the rescission was "NOT a rescission of the federal funding freeze," and that the "President's EO's [sic] on federal funding remain in full force and effect and will be rigorously implemented."[19] CWIT did not know, and still does not know, whether this statement applies to their work.

87.     On January 31, 2025, CWIT received an email from ETA stating the "OMB's memo has been rescinded.  DOL grants can continue in accordance with TEN 21-24."

88.     The anti-diversity EOs, however, have not been rescinded.  And upon information and belief, CWIT's grants remain under threat of termination pursuant to the J20 Termination Provision, and False Claims Act liability under the J21 EO.

89.     On February 5, 2025, the Attorney General issued a memorandum that cited the J21 EO and stated that DOJ's Civil Rights Division "will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private

---

[18] *See* https://web.archive.org/web/20250129143354/https://www.whitehouse.gov/fact-sheets/2025/01/omb-q-a-regarding-memorandum-m-25-13/

[19] Karoline Leavitt (@PressSec), X (Jan. 29, 2025, 1:30 p.m.), https://x.com/PressSec/status/1884672871944901034

sector and in educational institutions that receive federal funds."[20]  CWIT did not know, and still

does not know, whether this memorandum applies to its work.

> **D.** **The Anti-Diversity EOs Provide No Guidance or Clarity to CWIT as to Prohibited "DEI"-Related Activities**

90.      Despite prohibiting various so-called "DEI"-related activities, declaring them

illegal, and requiring certification not to promote so-called "DEI" on threat of government civil

action, the anti-diversity EOs make no effort to define or describe the prohibited activities that

would subject CWIT to penalty in the termination of its grants or contracts.  Nowhere do they

define (1) "diversity, equity, and inclusion;" (2) "diversity, equity, inclusion, and accessibility;"

(3) "environmental justice;" (4) "equity;" (5) "equity-related;" or (6) "promoting DEI."  Nor do

they define or describe the standards by which these activities will be analyzed to determine

permissibility.  Though the anti-diversity EOs allude to "illegal" "DEI," they provide no

explanation as to what that means.  CWIT is thus at a loss regarding the extent of the threats

against it, forcing it to choose between potential legal liability or self-censorship in the face of

confusion and lack of guidance.

91.      The failure of the anti-diversity EOs to define the individual terms and/or phrases

used, such as (1) "diversity, equity, and inclusion;" (2) "diversity, equity, inclusion, and

accessibility;" (3) "environmental justice;" (4) "equity;" (5) "equity-related;" or "(6) "promoting

DEI" has created significant confusion and caused harm to federal contractors and grantees like

CWIT.  This indeterminacy places CWIT in fear of loss of federal funding, and potential

monetary penalties, if it promotes "equitable" treatment of anyone under the law—even if that

---

[20] *See* https://www.justice.gov/ag/media/1388501/dl?inline

means nothing more than advocating for objectively fair treatment, equal opportunity, or compliance with federal civil rights law.

###    E.    The Adverse Impacts of the Anti-Diversity EOs on CWIT

92.    The anti-diversity EOs and the emails, memoranda, and statements referenced above implicate CWIT's programs in their entirety, all of which use terms like equity, inclusion, and diversity. Indeed, CWIT's ***purpose*** is to ensure that women have the skills to obtain employment in the skilled trades and are not discriminated against.

93.    The anti-diversity EOs have had a significant chilling effect on CWIT's First Amendment rights and the diversity, equity, and inclusion efforts it promotes in the skilled trades industry. CWIT's mission is to achieve gender equity in male-dominated industries. Equity is the throughline across everything CWIT does. Equity—in terminology and spirit—is included in the research publications, trainings, reports on countering sexual harassment, information sessions to new pre-apprenticeship participants, and grant agreements CWIT prepares. But, because of the anti-diversity EOs, CWIT has lost its ability to do and promote its work without fear of violating these EOs. Put simply, the programs CWIT supports, and the work it does, is threatened for its speech promoting women in the skilled trades and its speech for stating facts, such as acknowledging that women face discrimination in the skilled trades.

94.    This includes CWIT's fears of exercising its free speech rights during internal and external training sessions, in employee handbooks, or between employees and outside entities, and during day-to-day organizational governance.

95.    CWIT also had to spend hundreds of hours overhauling its existing budget to devise an emergency budget in case it loses federal funding, which would necessarily require CWIT to repurpose private funding, cut programs, and potentially furlough or lay off employees.

96.     Additionally, CWIT has lost partnerships with other organizations because of the anti-diversity EOs and their chilling of CWIT's free speech rights.  For example, prior to the issuance of the anti-diversity EOs, CWIT was preparing to partner with and sub-award to an organization in the Southwest, to provide technical assistance, create a pre-apprenticeship program, and embed gender equity into the workforce development board in the Southwest.  But after the release of the anti-diversity EOs, one of their new partners abruptly decided to end a collaboration for fear of being associated with CWIT.[21]  CWIT believes that this is because CWIT decided to not change its equity-driven mission and approach to collaborations and even though CWIT is not even certain that its programs fall under the anti-diversity EOs.

97.     Moreover, CWIT currently has fourteen grants from sources other than the federal government.  Many of these grants direct CWIT to perform work related to diversity, equity, inclusion, or accessibility initiatives.

98.     Even though these grants are not federal funds, and even though the work done pursuant to these grants is not related to federal funding, CWIT's ongoing ability to benefit from these grants is in jeopardy due to the anti-diversity EOs.  This is so even though CWIT does not know whether its performance under these grants is prohibited under the anti-diversity EOs.

99.     One such grant, which makes up approximately 4% of CWIT's total budget in 2025, is provided by a commercial bank.  This private grant funds research on childcare needs for tradeswomen in order to improve retention of women in the trade industry.

---

[21] CWIT is not including more identifying information because its sub-awardees fear being included in the legal process, and any attendant retribution.

100.    Another non-federal grant, which makes up approximately 3% of CWIT's total 2025 budget, supports the policy and advocacy work that CWIT completes on behalf of the women in welding programs.

101.    In total, approximately 20% of CWIT's 2025 funding is based on private grants that have no relation to federally funded projects and that require CWIT to perform work that may or may not relate, as understood by the anti-diversity EOs, to diversity, equity, inclusion, and accessibility.  Because of the anti-diversity EOs, all of this work is threatened.

## CAUSES OF ACTION[22]

### Count I
### U.S. Constitution, First Amendment
### Free Speech Clause (Overbreadth and Vagueness)

102.    CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.  CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

103.    The First Amendment to the United States Constitution provides that the government "shall make no law . . . abridging the freedom of speech."  U.S. CONST. AMEND. I.

104.    Under the First Amendment overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech."  *United States v. Williams*, 553 U.S. 285, 292 (2008). *See also Brown v. Kemp*, 86 F.4th 745, 711-78 (7th Cir. 2023).

105.    The anti-diversity EOs prohibit protected speech because of their failure to properly identify or define the specific speech and expressive conduct that is prohibited.  For

---

[22] Although CWIT does not currently assert any claim under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"), it reserves the right to amend this Complaint to include APA claims.

example, they purport to ban "equity" programs and mandates even if those programs seek to ensure that all have an equal opportunity based on merit, free from discrimination.

106.     The Termination Provisions prohibit CWIT's constitutionally protected speech and also chill CWIT's willingness to engage in constitutionally protected speech out of a credible concern that the vital work CWIT does will be terminated based on what it says.

107.     The Certification Provision prohibits CWIT's constitutionally protected speech and also chills CWIT's willingness to engage in constitutionally protected speech out of a credible concern that CWIT will be subject to civil liability based on what it says.

108.     The Enforcement Threat Provision prohibits CWIT's constitutionally protected speech and also chills CWIT's willingness to engage in constitutionally protected speech out of a credible concern that CWIT will be subject to a DOJ investigation and enforcement based on what it says.

109.     Accordingly, the challenged provisions of the anti-diversity EOs are unconstitutional because they violate the First Amendment and the overbreadth doctrine.

### Count II
### U.S. Constitution, First Amendment
### Free Speech Clause (Viewpoint Discrimination)

110.     CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.  CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

111.     The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech."  U.S. CONST. AMEND. I.

112. The Termination Provisions violate the Free Speech Clause of the First Amendment because they impermissibly chill the exercise of CWIT's constitutionally protected speech, based on its content and viewpoint.

113. The Certification Provision violates the Free Speech Clause of the First Amendment because it impermissibly chills the exercise of CWIT's constitutionally protected speech, based on its content and viewpoint.

114. The Enforcement Threat Provision violates the Free Speech Clause of the First Amendment because it impermissibly chills the exercise of CWIT's constitutionally protected speech, based on its content and viewpoint.

115. Content based regulations "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

116. The Termination Provisions, Certification Provision, and Enforcement Threat Provision violate the Free Speech Clause of the First Amendment because they impermissibly chill the exercise of CWIT's constitutionally protected speech based on its viewpoint, specifically the viewpoint that seeking to improve diversity, equity, inclusion, accessibility, and economic justice is *not* immoral, illegal, dangerous, demeaning, corrosive, or pernicious.

117. The Termination Provisions, Certification Provision, and Enforcement Threat Provision do so by calling for the denial of federal funds to anyone espousing that viewpoint; by ordering executive officials to begin listing and tracking individuals and organizations that espouse those viewpoints; and by ordering executive officials to begin taking enforcement actions to punish individuals and organizations that espouse such viewpoints. The anti-diversity EOs also require anyone who wants federal funds to certify that they will not promote such viewpoints.

32

118.     In doing so, the Termination Provisions, Certification Provision, and Enforcement Threat Provision chill CWIT's speech by silencing it from discussing issues core to its mission.

119.     Accordingly, the Termination Provisions, Certification Provision, and Enforcement Threat Provision penalize CWIT's specific content and viewpoints and violate the First Amendment.

**<u>Count III</u>**
**U.S. Constitution, First Amendment**
**Free Speech Clause (Unconstitutional Condition)**

120.     CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.  CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

121.     The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech."  U.S. CONST. AMEND. I.

122.     Conditioning federal funds on the grantee's agreement not to engage in protected speech even when engaging in activities that are not funded by the federal government is a violation of the First Amendment.  *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548-49 (2001); *FCC v. League of Women Voters*, 468 U.S. 364, 400 (1984).

123.     The J21 EO requires the heads of each agency to include in every contract or grant a requirement to certify that the grantee "does not operate *any* programs promoting DEI that violate any applicable Federal anti-discrimination laws," Certification Provision, J21 EO, § 3(b)(iv)(B) (emphasis added), while also declaring that "DEI" programs are illegal and immoral, *id.* § 1.

33

124.     In other words, the Certification Provision conditions the receipt of federal funds on a certification not to operate or promote "DEI" programs purportedly in violation of "Federal anti-discrimination laws" that the J21 EO neither identifies nor explains.

125.     Promoting the concepts of diversity, equity, and inclusion does not violate any federal anti-discrimination law and is protected speech.  Conditioning federal funds on the grantee's agreement not to engage in protected speech even where the protected speech is not federally funded is a violation of the First Amendment.  *Agency for Int'l Dev.*, 570 U.S. at 214-15; *Legal Servs. Corp.*, 531 U.S. at 548-49; *FCC*, 468 U.S. at 400.  But that is exactly what the challenged provisions of the J21 EO do.

126.     For example, approximately 60% of CWIT's funding comes from non-federal sources; CWIT utilizes that funding in furtherance of its mission—supporting equality amongst the sexes in the skilled trades.  Absent any explanation of what constitutes illegal "DEI," in order to obtain federal grant funding, CWIT would have to forgo its underlying purpose entirely.

127.     Accordingly, the challenged provisions of the J21 EO are unconstitutional because they violate the First Amendment.

### Count IV
### U.S. Constitution Fifth Amendment
### Due Process Clause (Vagueness)

128.     CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.  CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

129.     The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. V.

34

130.    Due process requires that parties "know what is required of them so they may act accordingly." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Clear guidance ensures "those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

131.    The anti-diversity EOs provide no guidance as to what is required of contractors and grantees to allow them to "act accordingly."

132.    The anti-diversity EOs do not define or describe the prohibited activities that would subject CWIT to penalty in the termination of grants, claw-back of funds, civil investigation, civil enforcement, or other enforcement actions by the government, nor do they define or describe the standards by which these activities will be analyzed to determine their permissibility.

133.    The anti-diversity EOs are so vague and indeterminate that it is impossible for CWIT to determine what conduct is prohibited. For example, the J20 EO does not define "DEI," "DEIA," "equity-related," "equity action plans," or "environmental justice," or provide examples of "DEI, DEIA, or 'environmental justice' positions, committees, programs, services, activities, budgets, and expenditures" that may have been "misleadingly relabeled," or that appear "under whatever name." But the J20 EO nevertheless orders the termination of "DEI, DEIA, and 'environmental justice' offices and positions (including but not limited to 'Chief Diversity Officer' positions); all 'equity action plans,' 'equity' actions, initiatives or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees." *See* J20 Termination Provision, J20 EO, § 2(b)(i).

134.    Likewise, the J21 EO does not define "DEI," "DEIA," "equity," equitable decision-making," "equitable deployment of financial and technical assistance," "advancing equity," or "like mandates, requirements, programs or activities." In a similarly vague manner,

35

the J21 EO also requires the termination of "grants" for "all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate," all without definition or guidance as to what these terms mean or any specific activities that are actually prohibited. J21 Termination Provision, J21 EO, § 3(c)(iii).

135. Additionally, the J21 EO requires certification, enforceable through the False Claims Act, that a contractor and grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," all without definition or guidance as to what these terms mean or any specific activities that are actually prohibited. *See* Certification Provision, J21 EO, § 3(b)(iv).

136. And the J21 EO orders the Attorney General to take "appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify . . . potential civil compliance investigations" to accomplish such "deter[rence]." *See* Enforcement Threat Provision, J21 EO, § 4(b)(iii).

137. The vagueness of the anti-diversity EO's terminology requires subjective interpretation by government agencies and therefore lends itself to discriminatory enforcement. By the anti-diversity EOs' terms (or lack thereof), each agency head is authorized to exercise unfettered discretion to determine whether a federal grant, training or program is "equity-related."

138. Accordingly, CWIT has not received fair (or any) notice of what is prohibited under the anti-diversity EOs, making it impossible for CWIT to adjust its activity to come into compliance with the anti-diversity EOs.

36

139.     The challenged provisions of the anti-diversity EOs are, therefore, unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment.

**Count V**
***Ultra Vires* – U.S. Const., Article I, § 8 (Spending Clause)**
**Regarding Section 2 of J20 EO**

140.     CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.  CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

141.     Article I of the United States Constitution exclusively grants Congress the federal spending powers.  U.S. Const. art. I § 8, cl. 1; *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

142.     The J20 Termination Provision purports to direct subordinate executive branch officials to unilaterally "terminate, to the maximum extent allowed by law, all 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts."  *See* J20 Termination Provision, J20 EO, § 2(b)(i).

143.     The Constitution does not permit the President or his subordinate executive branch officials to unilaterally terminate "'equity-related' grants and contracts" without express statutory authority.

144.     Though the J20 EO purports to limit terminations "to the maximum extent allowed by law," President Trump and his subordinate agencies have already acted contrary to that limitation.

145.     A general statement about nominal adherence to the law does not suffice to evade judicial review.

146. The Constitution does not give the President nor any agencies the authority to take the actions challenged in this Complaint.

147. Accordingly, the J20 EO is *ultra vires* and unconstitutional.

**Count VI**
***Ultra Vires* – U.S. Const., Article I, § 8 (Spending Clause)**
**Regarding Section 3 of the J21 EO**

148. CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs. CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

149. Article I of the United States Constitution exclusively grants Congress the federal spending powers. U.S. Const. art. I § 8, cl. 1; *see also Dole*, 483 U.S. at 206.

150. The Certification Provision of the J21 EO requires the head of each executive agency to "include in every contract or grant award" *inter alia* "[a] term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *See* Certification Provision, J21 EO, § 3(b)(iv).

151. The Constitution does not permit the President or his subordinate executive branch officials to exercise the spending power and condition grant awards on requiring a compliance condition.

152. Further, the J21 Termination Provision requires the OMB Director to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." J21 Termination Provision, J21 EO, § 3(c)(iii).

38

153. Congress has authorized and appropriated funds of which CWIT is a recipient. The President does not have unilateral authority to refuse to spend those funds on the basis that the funds are "programs" or "activities" that constitute "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," or "advancing equity."

154. The Constitution does not give the President nor any agencies the authority to take the action challenged in this Complaint.

155. Accordingly, the J21 EO is *ultra vires* and unconstitutional.

**Count VII**
**Violation of Separation of Powers**
**Regarding Section 2 of the J20 EO**

156. CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs. CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

157. The J20 EO violates constitutional separation of powers.

158. The President and executive branch have no authority to dictate government spending or place conditions on the spending power that is vested in the legislative branch.

159. Article I of the United States Constitution exclusively grants Congress the federal spending powers. U.S. Const. art. I § 8, cl. 1; *see also Dole*, 483 U.S. at 206.

160. The J20 EO aims to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." J20 EO § 2(a).

161.    The J20 Termination Provision orders Executive Branch agencies, departments, and commission heads, in consultation with the Attorney General, the OMB Director, and the OPM Director, to "terminate," *inter alia*, "all 'equity action plans,' 'equity' actions, initiatives, or programs, [and] 'equity-related' grants or contracts."  *See* J20 Termination Provision, J20 EO, § 2(b)(i).

162.    Congress has not authorized the Executive Branch to withhold, withdraw, or terminate federal grant moneys from grant recipients like CWIT, on the basis that the grants involve "equity action plans," "equity actions, initiatives, or programs" or that they are considered "'equity-related' grants or contracts."

163.    On the contrary, Congress has authorized the federal moneys granted to CWIT. The Executive Branch does not have the power to unilaterally veto federal statutes and block congressionally-authorized and appropriated funding to the extent the grant and its respective programming is deemed an "equity action plan," "equity action, initiative[], or program," or a "equity-related grant or contract."

164.    The J20 EO imposes a sweeping funding restriction (and threat of termination) on grantees like CWIT.  This violates constitutional separation of powers principles and amounts to an unconstitutional exercise of executive authority over federal appropriations.

165.    The J20 EO is contrary to the federal interests advanced by the funding statutes applicable to CWIT, including the Women in Apprenticeship and Nontraditional Occupations Act, the Further Consolidated Appropriations Act of 2024, The National Apprenticeship Act, and the American Competitiveness and Workforce and Improvement Act.

166.     The J20 EO requires the Executive Branch to terminate grants based on conditions wholly unrelated to and antithetical to the purpose and intent of the laws authorizing these grants.

167.     "[T]he Executive Branch does not [] have the inherent authority . . . to condition the payment of [] federal funds on adherence to its political priorities." *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018).  "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effect its own policy goals." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).  When "Congress [does] not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers." *Id*.

168.     Accordingly, the challenged provisions of the J20 EO are unconstitutional because they violate the constitutional separation of powers.

**Count VIII**
**Violation of Separation of Powers**
**Regarding Section 3 of the J21 EO**

169.     CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.  CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

170.     The J21 EO violates constitutional separation of powers.

171.     The President and executive branch, absent Congressional authorization, have no authority to dictate government spending or place conditions on the spending power that is vested in the legislative branch.

172.     Article I of the United States Constitution exclusively grants Congress the federal spending powers.  U.S. Const. art. I § 8, cl. 1; *see also Dole*, 483 U.S. at 206.

173.     The J21 EO's stated purpose is to "enforce[e] [] civil-rights laws" and address "dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA)."  *See* J21 EO, § 1.

174.     Accordingly, the Certification Provision of the J21 EO purports to impose a condition on the receipt of federal funds by requiring recipients of contracts or grants to certify that they "do[] not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."  *See* Certification Provision, J21 EO, § 3(b)(iv)(B).

175.     The President and Executive Branch lack statutory authority to impose this blanket condition on all federal funds received by grantees.

176.     While the J21 EO claims to limit itself to "programs promoting DEI" that violate "any applicable Federal anti-discrimination laws," those limitations are undefined and conflict with the rest of the order.  *Id*.

177.     A general statement about nominal adherence to the law does not suffice to evade judicial review.

178.     No delegation of Congress's power under the Spending Clause is constitutionally permitted, nor did Congress delegate any spending power to the President with respect to the particular federal programs and funds at issue here.

179.     Further, the J21 Termination Provision requires the OMB Director to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and

technical assistance,' advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." J21 Termination Provision, J21 EO, § 3(c)(iii).

180.     The termination of any grants pursuant to this provision also violates the Separation of Powers because the President lacks statutory authority to withhold funding that has been appropriated by Congress on the basis that such funding involves "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," and "advancing equity."

181.     Congress has authorized the federal grant moneys for CWIT. The Executive Branch does not have the power to unilaterally veto federal law and block congressionally-authorized and appropriated funding to the extent the grant and its respective programming is deemed an "equity action plan," "equity action, initiative[], or program," or an "equity-related grant or contract."

182.     The J21 EO imposes a sweeping funding restriction on grantees like CWIT. This violates constitutional separation of powers principles and amounts to an unconstitutional exercise of executive authority over federal appropriations.

183.     The J21 EO is contrary to federal interests as set out by Congress in the funding statutes applicable to CWIT, including the Women in Apprenticeship and Nontraditional Occupations Act, the Further Consolidated Appropriations Act of 2024, The National Apprenticeship Act, and the American Competitiveness and Workforce and Improvement Act.

184.     The J21 EO requires the Executive Branch to terminate grants based on conditions wholly unrelated to and antithetical to the purpose and intent of the laws authorizing these grants.

185.    "[T]he Executive Branch does not [] have the inherent authority . . . to condition the payment of [] federal funds on adherence to its political priorities." *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018).  "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effect its own policy goals." *City & Cnty. of San Francisco*, 987 F.3d at 1235.  When "Congress [does] not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers." *Id.*

186.    The Constitution does not give the President or any agencies the authority to take the actions challenged in this Complaint.

187.    Accordingly, the challenged provisions of the J21 EO are unconstitutional because they violate the constitutional separation of powers.

## PRAYER FOR RELIEF

WHEREFORE, CWIT respectfully requests the Court enter an order:

a.  Declaring that the Termination Provision of the J20 EO, § 2(b)(i), is unlawful and unconstitutional;

b.  Declaring that the Certification Provision (§ 3(b)(iv)), the J21 Termination Provision (§ 3(c)(iii)), and the Enforcement Threat Provision (§ 4(b)(iii)), of the J21 EO are unlawful and unconstitutional;

c.  Granting a preliminary and permanent injunction enjoining Defendants other than the President from enforcing those sections of the anti-diversity EOs that the Court finds unlawful and unconstitutional;

d.  Awarding CWIT its reasonable attorneys' fees and costs;

e.  Issuing such other relief as the Court may deem appropriate.

CWIT requests a trial by jury on all issues so triable.

44

Dated: February 26, 2025

Respectfully Submitted,

/s/ *Jason P. Stiehl*
Jason P. Stiehl
CROWELL & MORING LLP
455 N Cityfront Plaza Dr.
Suite 3600
Chicago IL 60611
Tel: (312) 840-3108
jstiehl@crowell.com

/s/ *Meshach Y. Rhoades*
Meshach Y. Rhoades*
CROWELL & MORING LLP
1601 Wewatta Street
Suite 815
Denver, CO 80202
Tel: (303) 524-8660
mrhoades@crowell.com

/s/ *Elizabeth E. Theran*
Elizabeth E. Theran*
Adrienne DerVartanian*
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
etheran@nwlc.org
adervartanian@nwlc.org

/s/ *Lourdes M. Rosado*
Lourdes M. Rosado*
Rafaela Uribe*
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Telephone: (212) 739-7583
lrosado@latinojustice.org
ruribe@latinojustice.org

/s/ *Anuj Vohra*
Anuj Vohra
Keith J. Harrison*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
avohra@crowell.com
kharrison@crowell.com

/s/ *Warrington Parker*
Warrington Parker*
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800
wparker@crowell.com

/s/ *Sabrina A. Talukder*
Sabrina A. Talukder*
Kathryn J. Youker*
Adria J. Bonillas*
Olivia Sedwick*
Gillian Cassell-Stiga*
Lawyers' Committee for Civil Rights Under Law
1500 K Street, N.W. Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
stalukder@lawyerscommittee.org
kyouker@lawyerscommittee.org
abonillas@lawyerscommittee.org
osedwick@lawyerscommittee.org
gcassell-stiga@lawyerscommittee.org

/s/ *Aneel L. Chablani*
Aneel L. Chablani (No. 6242658)
Ami D. Gandhi (No. 6282924)
Chicago Lawyers' Committee for Civil Rights
100 N. LaSalle St., Ste. 600
Chicago, IL 60602
Telephone: (312) 630-9744

Facsimile: (312) 630-1127
achablani@clccrul.org
agandhi@clccrul.org

*Attorneys for Chicago Women in Trades*

*\*Pro hac vice motion forthcoming*