UNITED STATES DISTRICT COURT OF THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO WOMEN IN TRADES,<br><br>     Plaintiff,<br><br>v.<br><br>PRESIDENT DONALD J. TRUMP, DEPARTMENT OF LABOR, ACTING SECRETARY OF LABOR VINCENT MICONE, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE PAMELA BONDI,<br><br>     Defendants. | Case No. 1:25-cv-02005<br><br>Judge: Hon. Matthew F. Kennelly<br><br>JURY TRIAL DEMANDED |

## **SUPPLEMENTAL DECLARATION OF JAYNE VELLINGA**

I, Jayne Vellinga, hereby declare upon penalty of perjury that the following statements are true and correct to the best of my knowledge and belief.

1.  I am the Executive Director of Chicago Women in Trades ("CWIT"), a not-for-profit 501(c)(3) based in Chicago, Illinois. I have served in this capacity since 2010.

2.  This declaration supplements the March 5, 2025 declaration I previously submitted in support of Plaintiff's Motion for Preliminary Injunction. Both this and my March 5, 2025 declaration support Plaintiff's Motion for Temporary Restraining Order to prevent Defendants from enforcing certain provisions of Executive Order No. 14151 titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" and Executive Order No.

1

14173 titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (collectively, the "Executive Orders").

### Status of and Funding for CWIT's Current Federally Supported Programs

3. As described in my March 5, 2025 declaration, five of the programs under which CWIT receives federal funding are impacted by the Executive Orders.

4. The four grant programs (the Women in Apprenticeship and Nontraditional Occupations ("WANTO") grant program; the Apprenticeship Building America ("ABA") grant program; Jobs for the Future ("JFF") HUB- Apprenticeship USA grant (subaward), and the Illinois Department of Labor ("IDOL") Tradeswomen Building Infrastructure Initiative ("TBII") grant program (subaward)) are operated on a cost reimbursement structure, where the federal agency or contractor will reimburse CWIT for the costs *after* CWIT has incurred the costs for performing work under the grant.

5. Under CWIT's subcontract through JFF Improving Diversity and Equity in Apprenticeship for Manufacturing ("IDEA-M") contract (subcontract), CWIT receives payment on a fixed-fee basis, according to a budget.

6. When my March 5, 2025 declaration was prepared, it was my understanding that relevant provisions of the Executive Orders were not enforceable because a federal court in Maryland had issued a nationwide injunction which effectively stayed the Executive Orders. As a result, CWIT believed that the five grants and contracts under which CWIT receives federal funds could not be terminated while the injunction remained in place.

7. But I learned that on March 14, 2025, a federal appeals court overturned that preliminary injunction which means that the Department of Labor ("DOL") and other agencies can now enforce the terms of the Executive Orders.

8. CWIT, therefore, expects its grants, subgrants, and subcontract to be terminated at any moment.

9. If that happens, CWIT further expects that DOL would not reimburse CWIT, IDOL, or JFF for the work already performed in meeting the required grant deliverables. If IDOL or JFF's grants or contracts are not reimbursed, then CWIT's subawards or subcontract work will also not be reimbursed.

10. CWIT is also concerned that even if its grants, subgrants, and subcontract are not terminated, CWIT will not be reimbursed for any work that DOL decides is within the scope of the Executive Orders.

11. As discussed in my March 5, 2025 declaration, DOL informed both CWIT and CWIT's pass-through entities that all "DEI"[1] related costs in the performance of the grants were no longer allowable after January 22, 2025 under the Executive Orders.[2] However, DOL did not provide any additional details about what grant-related work or incurred costs qualified as "DEI" that would therein fall within the scope of the Executive Orders.

**Recent Threats to Punish and Suppress CWIT's Speech Regarding "DEI" and "DEIA"**

12. CWIT's core mission is to dismantle racial- and gender-based barriers to recruiting and retaining women in the skilled trades. The Executive Orders convey a threat of harm and retaliation by the government if we use terms like "DEI" and "DEIA"[3] to describe our work. CWIT has already been told that under the Executive Orders we cannot describe ourselves as an organization involved in advancing our core principles of "Diversity and Equity." As a result, we are being required to self-censor our program descriptions or lose our grant funding.

---

[1] "DEI" commonly refers to diversity, equity, and inclusion.
[2] *See* March 5, 2025 Declaration of Jayne Vellinga ("March 5, 2025 Vellinga Decl.") ¶¶ 39-44.
[3] "DEIA" commonly refers to "diversity," "equity," "inclusion," and "accessibility."

3

Given our core mission, it is hard to imagine how we can describe our mission, promote our mission, or carry out our mission and comply with the Executive Orders.

13. In the last week, even before the preliminary injunction was lifted, CWIT's federal funding was in jeopardy due to the way CWIT described its programs and effectuated its equity-related work. There is a risk that CWIT will not be reimbursed for grant-related work that CWIT undertakes to meet grant deliverables.

14. Specifically, one of the pass-through entities with which CWIT works informed CWIT that subsequent to the Executive Orders, its contract with DOL had been unilaterally modified to remove all references to "DEI" and "DEIA."

15. Under the guise of that amendment, the pass-through entity threatened to terminate CWIT's subgrant unless it self-censored and amended the content, title, and audience questions to eliminate any references to "DEI" and "DEIA" for an upcoming technical assistance program done through CWIT's Equity Resource Center. However, CWIT's training materials center on the need to recruit and retain women in the male-dominated skilled trades, which inherently promotes diversity, equity, inclusion, and accessibility. To date, our pass-through entity has rejected CWIT's proposed training materials that retained the words "Diversity and Equity" in the title, though the materials did not otherwise mention diversity, equity, or inclusion.

16. Despite several attempts, CWIT has not been able to get clarity from the pass-through entity about how to change its training to comply with the amended contract requirement.

17. Given that the preliminary injunction is no longer in place, CWIT expects its grants and contracts to be terminated or, at best, to receive no further information about how to self-censor its speech to comply with the Executive Orders.

**Impact to CWIT if Executive Orders are not Enjoined**

18. Cumulatively, and as described in further detail below, CWIT is planning to seek reimbursement for approximately $460,000 in costs incurred in the performance of the five grants and contracts through which CWIT receives federal funding.

*The WANTO Grant*

19. CWIT is planning on submitting a reimbursement request in April 2025 for costs already and to-be-incurred in March 2025 under the WANTO program which is funded by DOL.

20. In light of the decision overturning the preliminary injunction related to the Executive Orders, CWIT expects this WANTO grant to be terminated at any moment. Even if it is not outright terminated, if DOL enforces the Executive Orders as expected, CWIT is concerned that DOL will not reimburse CWIT for work already performed that the DOL views to be in furtherance of diversity, equity, and inclusion. Thus, CWIT is concerned these costs will not be paid if the grant is terminated or if CWIT's work is deemed "unallowable" because the work relates to diversity, equity, and inclusion.

*The ABA Grant*

21. The ABA Grant, which is supported by DOL Employment and Training Administration ("ETA"), allows grantees, including CWIT, to request reimbursement for incurred grant-related costs at any time. CWIT is planning to submit a reimbursement request in April 2025 for costs incurred in March 2025.

22. CWIT now fears that the ABA grant will be terminated as well. Even if it is not outright terminated, if DOL enforces the Executive Orders as expected, CWIT is concerned that DOL will not reimburse CWIT for work already performed that the DOL views to be in furtherance of diversity, equity, and inclusion. Thus, CWIT is concerned these costs will not be

paid if the grant is terminated or if CWIT's work is deemed "unallowable" because the work relates to diversity, equity, and inclusion.

*The JFF IDEA-M Contract*

23. CWIT submits reimbursement requests on a monthly basis under the JFF-IDEA-M subaward contract, which is also funded by DOL ETA. CWIT is planning on submitting a reimbursement request in April 2025 for work undertaken in March 2025.

24. CWIT again expects the IDEA-M Contract to be terminated due to the lifting of the preliminary injunction, and as a consequence, CWIT's subcontract would be terminated as well. Even if it is not outright terminated, CWIT expects DOL not to reimburse JFF for work that CWIT has already performed, and that JFF will not be able to pay CWIT for work it has performed that the DOL views to be in furtherance of diversity, equity, and inclusion. Thus, CWIT is concerned these costs will not be paid if the grant is terminated or if CWIT's work is deemed "unallowable" because the work relates to diversity, equity, and inclusion.

*The JFF HUB-Apprenticeship USA Grant*

25. CWIT submits quarterly reimbursements requests for costs incurred in the performance of the JFF HUB- Apprenticeship USA subaward, also supported by DOL ETA. CWIT is planning on submitting a reimbursement request in April 2025 for costs incurred from January through March 2025.

26. However, CWIT again expects that the JFF HUB- Apprenticeship USA subaward will be terminated due to the lifting of the preliminary injunction. Whether or not this grant is outright terminated, CWIT further expects DOL not to reimburse JFF for work already performed, and that JFF will not be able to pay CWIT for work it has performed that the DOL views to be in furtherance of diversity, equity, and inclusion. Thus, CWIT is concerned these

costs will not be paid if the grant is terminated or if CWIT's work is deemed "unallowable" because the work relates to diversity, equity, and inclusion.

*The Tradeswomen Building Infrastructure Initiative Grant*

27. CWIT receives quarterly reimbursements for costs incurred in the performance of the TBII sub-grant, per the terms of CWIT's subrecipient agreement with IDOL.

28. CWIT expects that the TBII sub-grant will be terminated due to the lifting of the preliminary injunction. Whether or not this subaward is terminated, CWIT further expects DOL not to reimburse IDOL for work CWIT already performed, and that IDOL will not be able to pay CWIT for work it has performed.

29. CWIT is planning on submitting a reimbursement request in April 2025 for costs incurred from January through March 2025, which it is concerned would not be paid if the grant were terminated or if CWIT's work is deemed "unallowable" because it promotes diversity, equity, and conclusion.

**CWIT Will Suffer Immediate and Profound Harm if Its Grants or Subcontract are Terminated Pursuant to the Mandates of the Executive Orders.**

30. CWIT will suffer additional immediate and profound harm if its federal grants or the subawards it holds under federal grants, or the subcontract it holds under a federal contract are terminated.

31. Although CWIT will attempt to implement an emergency budget that reduces its total budget by approximately $1,000,000, CWIT will still have to take immediate action to simply keep its doors open, including laying off employees, terminating its trade specific apprenticeship programs, and reducing its support services fund.

32. These drastic actions are harmful to CWIT's core mission to place women, including women of color, in the traditionally male-dominated skilled trades by addressing race and gender-based barriers.

*CWIT would lose crucial full-time staff members that drive CWIT's national reach*

33. CWIT would be forced to immediately begin the process of terminating three full-time staff members that work exclusively on the Training and Technical Assistance Program ("TTA") across the country. This work is funded by the five federal grants and contracts. CWIT would be unable to keep the work portfolios of the three full-time staff members. CWIT's TTA workforce would be reduced from five to two full time staff members. We will have no choice but to tap into our emergency reserves in order to retain these two full time staff members.

34. The TTA work includes the implementation of mentorship cohorts for women in male-dominated skilled trade occupations, developing new women-focused pre-apprenticeship programs, individual technical assistance for industry stakeholders in the skilled trades, mentoring of emerging tradeswomen organizations, and more.

35. A significant portion of the training and technical assistance work occurs outside of Illinois. The work of the three dedicated TTA staff members reaches all 50 states. Losing the federal grants and subcontract would effectively eliminate CWIT's national presence.

36. The remaining two staff members could no longer sustain the TTA program as it is currently structured. The federal funding dedicated to TTA enables CWIT to provide these much-needed services for free. To continue the program, CWIT would have to swiftly develop a new "service for fee" model where industry stakeholders would have to pay for CWIT's services.

37. The immediate loss of staff members and national reach of the TTA program will have ripple effects across the country. CWIT has a rich 44-year history of successfully

developing and implementing innovative approaches to dismantle race- and gender-based barriers in the skilled trades.  CWIT has spent years developing relationships with a range of stakeholders, from public agencies to national construction companies, to support them in their capacity to recruit and retain tradeswomen.

38. Without our federal funding, we will no longer be able to provide trainings which remain essential to successfully addressing the national worker shortage of 650,000 in the skilled trades.

*The trade-specific apprenticeship program would immediately be terminated*

39. If the ABA grant were terminated, CWIT would have no choice but to immediately stop the new trade-specific apprenticeship program because it is solely funded by the ABA grant.  CWIT's emergency budget cannot cover any of the expenses associated with the trade-specific apprenticeship program.

40. The trade-specific apprenticeship program is done in partnership with union apprenticeship programs like ironworkers, painters, or carpenters.  These skill-specific union apprenticeships are highly competitive to get in to.  There are few skill-specific apprenticeships that exist with even fewer job openings available.  CWIT facilitates and matches the interests of the program participant with the mentorship and specialized training of the union apprenticeship program.

41. In 2024, almost all participants in the trade-specific apprenticeship program obtained employment in union apprenticeship programs in the skilled trades. These were high-wage unionized jobs with full benefits and pensions.

42. Losing the trade-specific apprenticeship program directly equates to fewer women getting high quality jobs in the skilled trades that historically have been shut off to women.

9

*The Support Service Fund would be dramatically reduced*

43. CWIT's emergency budget would not be able to fully maintain CWIT's Support Service Fund, which supports CWIT participants in overcoming the steep financial barriers to successful job placement in the skilled trades.

44. The Support Service Fund helps program graduates with expensive fees that arise after someone is placed into a skilled trades position. For example, the skilled trade with one of the steepest financial barriers is the electrician trade. New electricians are required to pay a $500 union initiation fee and a $750 new tool fee on top of completing a full-time 11-week apprenticeship program without pay. The Support Service Fund is used to cover these additional fees.

45. CWIT participants also rely on the Support Service Fund as a stipend to cover costs associated with attending the programs, like paying for transportation or childcare, which is sometimes a non-negotiable for women to even consider participating in any apprenticeship program.

46. Losing any of the Support Service Funds would be harmful to CWIT participants, who are generally low-income. Almost one-third of all new CWIT participants are unemployed and the average monthly income of a new CWIT participant is approximately $2,000. Fewer women will be able to move forward in a skilled trades position that they worked hard to qualify for without the Support Service Fund.

*A significant share of assistant instructors would be immediately laid off*

47. Assistant instructors in CWIT's pre-apprenticeship programs are funded largely through the ABA grants. Assistant instructors are essential to the successful training and placement of women in the skilled trades.

48. CWIT has a high placement rate for our program graduates because they receive individualized attention from assistant instructors during their pre-apprenticeship training. This individualized instruction is critical for participants to pass the multiple exams required to join a registered apprenticeship.

49. The loss of this essential staff and the ability to partner with apprenticeship programs would negatively impact CWIT's success rate because it would increase the instructor-to-participant ratio.

## CONCLUSION

50. The government's message is that any programs advancing diversity, equity, and inclusion are "dangerous, demeaning, and immoral," and the mere use of terms like "diversity, equity, and inclusion" will be punished. We are under constant fear that we must censor the descriptions of our programs or suffer the loss of federal funding.

51. CWIT is requesting emergency relief because this chilling effect currently inhibiting our free speech and each loss resulting from the potential termination of federal grants and contracts will each have long-term detrimental impacts for CWIT and the women we strive to serve. Cumulatively, these losses will weaken our ability to discuss and promote, much less carry out our core mission to dismantle gender- and race-based structural barriers to recruiting women in the skilled trades.

52. Our beloved staff, the women we serve, and the industry stakeholders we work alongside to improve the skilled trades simply deserve better.

Executed this 18th day of March 2025 at Chicago, Illinois.

Jayne Vellinga