UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHICAGO WOMEN IN TRADES,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　　No. 25 C 2005
　　　　　　v.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　　Judge Kennelly
PRESIDENT DONALD J. TRUMP, *et al*.,　)
　　　　　　　　　　　　　　　　　)
　　　Defendants.

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 6

ARGUMENT ................................................................................................................ 8

I.      Plaintiff Is Not Likely To Establish Article III Jurisdiction. ................................. 9

     A.      Plaintiff lacks standing. ...................................................................... 9

     B.      Plaintiff's claims are unripe for review. ........................................... 13

II.      Plaintiff Is Not Likely To Succeed on the Merits of Its Claim. ........................ 14

     A.      Plaintiff's Fifth Amendment challenge fails. ...................................... 14

         i.      Plaintiff's facial challenge under the Due Process Clause to presidential directives is categorically improper. ...................... 15

         ii.      Plaintiff's Due Process claims fail on the merits. ..................... 16

     B.      Plaintiff's First Amendment challenges fail. ...................................... 22

     C.      Plaintiff's separation-of-powers challenges fail. ................................ 31

III.      The Remaining Factors Counsel Against Granting the Requested Relief. ...................... 33

     A.      Plaintiff haS not shown irreparable injury attributable to the EOs. ...................... 33

     B.      The balance of the equities and public interest weigh squarely against relied. .... 34

IV.      Any Injunctive Relief Should Be Narrowly Tailored and Permit Lawful Agency Activity. ................................................................................................................ 35

     A.      Injunctive relief should be limited to the CWIT and DOL .................................. 35

     B.      Relief should clarify that it preserves the Executive's discretionary authority. ................................................................................................................ 38

V.      Any injunctive relief should be stayed pending appeal and Accompany a Bond ............ 39

CONCLUSION ................................................................................................................ 39

ii

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner,*
　　387 U.S. 136 (1967) .................................................................................................. 13

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
　　570 U.S. 205 (2013) ............................................................................................. 23, 27

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC,*
　　103 F.4th 765 (11th Cir. 2024) .............................................................................. 30

*Am. Cargo Transp., Inc. v. United States,*
　　625 F.3d 1176 (9th Cir. 2010) ............................................................................... 30

*Bd. of Regents of State Colls. v. Roth,*
　　408 U.S. 564 (1972) ........................................................................................... 17, 18

*Bell v. Keating,*
　　697 F.3d 445 (7th Cir. 2012) ................................................................................. 10

*Bevis v. City of Naperville, Illinois,*
　　85 F.4th 1175 (7th Cir. 2023) ............................................................................... 8, 9

*Califano v. Yamasaki,*
　　442 U.S. 682 (1979) ............................................................................................... 35

*City of Chicago v. Barr,*
　　961 F.3d 882 (7th Cir. 2020) ............................................................... 6, 33, 37, 38

*City of Chicago v. Sessions,*
　　888 F.3d 272 (7th Cir. 2018) ........................................................................... 33, 37

*City & Cty. of San Francisco v. Trump,*
　　897 F.3d 1225 (9th Cir. 2018) ............................................................................... 33

*Clapper v. Amnesty Int'l USA,*
　　568 U.S. 398 (2013) ........................................................................................... 10, 11

*Columbus Reg'l Hosp. v. United States,*
　　990 F.3d 1330 (Fed. Cir. 2021) ............................................................................. 13

*Construction Trades Department, AFL-CIO v. Allbaugh,*
　　295 F.3d 28 (D.C. Cir. 2002) ......................................................... 5, 14, 32, 33

*Cutter v. Wilkinson,*
　　544 U.S. 709 (2005) ............................................................................................... 28

*Doe v. Village of Crestwood, Illinois*,
 917 F.2d 1476 (7th Cir. 1990) ............................................................. 39

*FCC v. Fox Television Stations, Inc.*,
 567 U.S. 239 (2012) ............................................................................... 15

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
 602 U.S. 367 (2024) ............................................................................... 11

*Franklin v. Massachusetts*,
 505 U.S. 788 (1992) ............................................................................... 29

*Frederick Douglass Found., Inc. v. District of Columbia*,
 82 F.4th 1122 (D.C. Cir. 2023) ............................................................. 31

*Freedom Republicans, Inc. v. Fed. Election Comm'n*,
 13 F.3d 412 (D.C. Cir. 1994) ........................................................... 12, 13

*FW/PBS, Inc. v. City of Dall.*,
 493 U.S. 215 (1990) ............................................................................... 10

*Gizzo v. Ben-Habib*,
 44 F. Supp. 3d 374 (S.D.N.Y. 2014) ...................................................... 17

*G.L. Christian & Assoc. v. United States*,
 160 Ct. Cl. (1963) ................................................................................... 18

*Goldberg v. Kelly*,
 397 U.S. 254 (1970) ............................................................................... 17

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972) ......................................................................... 15, 20

*Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*,
 463 U.S. 582 (1983) ............................................................................... 26

*Hein v. Freedom From Religion Found., Inc.*,
 551 U.S. 587 (2007) ............................................................................... 12

*Johnson v. United States*,
 576 U.S. 591 (2015) 16

*Labrador v. Poe ex rel. Poe*,
 144 S. Ct. 921 (2024) ............................................................................... 6

*Laird v. Tatum*,
 408 U.S. 1 (1972) ................................................................................... 31

*Leathers v. Medlock*,
    499 U.S. 439 (1991) ................................................................ 24

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................ 14

*LSP Transmission Holdings II, LLC v. Huston*,
    ----F.4th----, 2025 WL 798079, at *11 (7th Cir. Mar. 13, 2025) ............ 12

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................ 9, 12, 36

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................ 5, 34

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
    367 F.3d 68 (1st Cir. 2004) .......................................................... 10

*Maynard v. Cartwright*,
    486 U.S. 356 (1988) ............................................................ 15, 16

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ........................................................ 19

*Mississippi v. Johnson*,
    71 U.S. 475 (1866) ................................................................ 38

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ................................................................ 22

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    ---F. Supp. 3d---, 2025 WL 573764 (D. Md. Feb. 21, 2025) ............ 7, 18, 29

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    ---F. Supp. 3d---, 2025 WL 750601 (D. Md. Mar. 10, 2025) .................. 7, 8

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (*Diversity Officers*)
    No. 25-1189, ECF No./Doc. No. 29 (4th Cir. Mar. 14, 2025) ........................ *passim*

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ........................................................ 3, 19, 24

*New Vision Photography Program, Inc. v. District of Columbia*,
    54 F. Supp. 3d 12 (D.D.C. 2014) .................................................... 17

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................ 9, 34

*Norfleet v. Illinois Dep't of Corr.*,
    2017 WL 2623946 (S.D. Ill. May 4, 2017) .............................................................. 39

*Northrop Grumman Corp. v. United States*,
    46 Fed. Cl. 622 (2000) ............................................................................................ 18

*Osborn* v. *Bank of United States*,
    22 U.S. 738 (1824). .................................................................................................. 36

*Planned Parenthood of Indiana & Kentucky, Inc. v. Marion Cnty. Prosecutor*,
    7 F.4th 594, 606 (7th Cir. 2021) ................................................................... 4, 21, 22

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ................................................................................................. 17

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
    421 F.3d 1 (1st Cir. 2005) ....................................................................................... 17

*Regal Knitwear Co.* v. *N.L.R.B.*,
    324 U.S. 9 (1945) ..................................................................................................... 36

*Regan v. Tax'n With Representation of Wash.*,
    461 U.S. 540 (1983) ................................................................................................... 4

*Reno v. Flores*,
    507 U.S. 292 (1993) ........................................................................................... 14, 33

*Rice v. Paladin Enters., Inc.*,
    128 F.3d 233 (4th Cir. 1997) .................................................................................. 30

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995) ................................................................................................. 24

*Rust v. Sullivan*,
    500 U.S. 173 (1991) .......................................................................................... *passim*

*S & D Maintenance Co. v. Goldin*,
    844 F.2d 962 (2d Cir. 1988) ................................................................................... 18

*San Juan City Coll. v. United States*,
    391 F.3d 1357 (Fed. Cir. 2004) ........................................................................ 13, 14

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ................................................................................................. 15

*Six Star Holdings, LLC v. City of Milwaukee*,
    821 F.3d 795 (7th Cir. 2016) .................................................................................... 9

*Sossamon v. Lone Star State of Tex.*,
  560 F.3d 316 (5th Cir. 2009) ......................................................................... 30

*Speech First, Inc. v. Killeen*,
  968 F.3d 628 (7th Cir. 2020) ...................................................................... 9, 10

*Texas v. United States*,
  523 U.S. 296 (1998) .................................................................................. 3, 14

*Town of Castle Rock v. Gonzalez*,
  545 U.S. 748 (2005) ...................................................................................... 17

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .................................................................................. 38, 39

*Trump v. New York*,
  592 U.S. 125 (2020) .................................................................................. 3, 14

*Trustees of Indiana Univ. v. Curry*,
  918 F.3d 537, 541 (7th Cir. 2019) ............................................................. 4, 22

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
  2025 WL 763738 (D.D.C. Mar. 11, 2025) ...................................................... 13

*U.S. ex rel. Purcell v. MWI Corp.*,
  807 F.3d 281 (D.C. Cir. 2015) ....................................................................... 27

*U.S. Postal Serv. v. Gregory*,
  534 U.S. 1 (2001) .......................................................................................... 30

*United States v. Am. Library Ass'n*,
  539 U.S. 194 (2003) ...................................................................................... 24

*United States v. Hansen*,
  599 U.S. 762 (2023) ................................................................................. 22, 30

*United States v. Williams*,
  553 U.S. 285 (2008) ...................................................................................... 19

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ...................................................................................... 37

*Wadsworth v. Kross, Lieberman & Stone, Inc.*,
  12 F.4th 665 (7th Cir. 2021) .......................................................................... 10

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982) ...................................................................................... 21

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015)....................................................................... 4, 25

*Whole Woman's Health v. Jackson*,
   595 U.S. 30 (2021)............................................................................ 36

*Ysursa v. Pocatello Educ. Ass'n*,
   555 U.S. 353 (2009).......................................................................... 24

**STATUTES**

20 U.S.C. § 954.................................................................................... 19

42 U.S.C. § 2000d-1............................................................................ 26

**RULES**

Fed. R. Civ. P. 65........................................................................... 35, 39

**REGULATIONS**

2 C.F.R. § 200.340 .............................................................................. 18

48 C.F.R. § 31.205-42 ......................................................................... 34

48 C.F.R. § 49.201 .............................................................................. 34

*Ending Radical and Wasteful Government DEI Program and Preferencing*,
   Executive Order 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025)............................ *passim*

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*,
   Executive Order 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025)............................ *passim*

**OTHER AUTHORITIES**

11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2956 (3d ed. 2012) ....... 36, 37

**INTRODUCTION**

The President is permitted to have policy priorities. He is further permitted to align federal funding and enforcement strategies with those policy priorities to the extent permitted by law. To that end, the President issued two Executive Orders (EOs), which, among other things, directed federal agencies to terminate—to the extent "allowed by law"—"equity-related" grants or contracts (Termination Provision); directed the Attorney General to coordinate with other federal agencies to produce a report recommending a plan of action for deterring diversity, equity, inclusion (DEI) and diversity, equity, inclusion, accessibility (DEIA) programs that constitute "illegal discrimination or preferences" (Reporting Provision); and required agencies to ensure that their grantees/contractors certify that they do not operate any DEI programs that "violate any applicable Federal antidiscrimination laws" (Certification Requirement).

The EOs also instructed federal agencies to "provide the Director of the [Office of Management and Budget (OMB)] with a list of all . . . agency or department DEI, DEIA, or 'environmental justice'" positions and programs, among others, "and an assessment" regarding whether those positions and programs "have been misleadingly relabeled in an attempt to preserve their pre-November 4, 2024 function"; and further, directed the OMB Director to terminate government-wide diversity and equity "mandates, requirements, programs, [and] activities" (together, Government DEI Provisions).

Chicago Women in Trades (CWIT) brings facial challenges to these provisions in a lawsuit that is heavily modeled after an action brought in the United States District Court for the District of Maryland, which raised almost identical challenges to provisions of the two EOs. There, although the district court initially granted plaintiffs' motion for a preliminary injunction, the Fourth Circuit unanimously stayed the injunction in full. In doing so, "the judges on th[e] panel

1

unanimously agree[d] that . . . . the government is likely to succeed in demonstrating that the challenged provisions of the Executive Orders—all of which are directives from the President to his officers—do not violate the First or Fifth Amendments." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump* (*Diversity Officers*), No. 25-1189, ECF No./Doc. No. 29, at 9 (4th Cir. Mar. 14, 2025) (Rushing, J., concurring).

Much like *Diversity Officers*, this suit suffers from a fundamental flaw: although it identifies specific agency actions, it does not challenge any of those actions in a discrete, as-applied posture; instead, it sets its sight on the Executive Orders themselves. But the Executive Orders are merely directives from the President to his own subordinates; they do not directly regulate any primary conduct. As such, Plaintiff's challenge is fundamentally misdirected. *See id.* ("[T]his case does not challenge any particular agency action implementing the Executive Orders. Yet, in finding the Orders themselves unconstitutional, the district court relied on evidence of how various agencies are implementing, or may implement, the Executive Orders. That highlights serious questions about the ripeness of this lawsuit and plaintiffs' standing to bring it as an initial matter."); *id.* at 8 (Harris, J., concurring) ("This case, however, does not directly challenge any [agency enforcement] action, and I therefore concur."); *id.* at 5 n.2 (Diaz, CJ., concurring) (joining Judge Harris' concurrence and further noting that "the Orders only purport to direct executive policy and actors").

Predictably, Plaintiff's novel challenge to Presidential directives to subordinates is inherently riddled with jurisdictional defects and hinges on far-fetched applications of the law. As an initial matter, Plaintiff lacks standing to bring its claims. Plaintiff advances four theories of standing—regulatory uncertainty, chilling effect, harm to its organizational mission, and potential loss of funding—but none withstand scrutiny. Plaintiff's harms are either too speculative or might

not be remedied by the sought injunction. For similar reasons, Plaintiff's claims are not ripe for review. At bottom, Plaintiff's claims depend on a series of future Executive actions that "may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

Plaintiff's claims—all facial—also fail on the merits. This is in part because, "on their face, [the Executive Orders] are of distinctly limited scope. The Executive Orders do not purport to establish the illegality of all efforts to advance diversity, equity or inclusion, and they should not be so understood." *Diversity Officers*, at 7 (Harris, J., concurring).

Plaintiff's Fifth Amendment vagueness challenge is premised on a fundamental misapplication of the Due Process vagueness doctrine—which is generally reserved for criminal statutes—to presidential directives to subordinates. *See id.* at 5 n.2 (Diaz, CJ, concurring) ("[W]here the Orders only purport to direct executive policy and actors, [the panel] do[es] [not] find vagueness principles outcome determinative"). Even if the Fifth Amendment vagueness standard was applicable, Plaintiff's claims would still fail. With respect to the Termination and Government DEI Provisions, Plaintiff fails to assert a protectable property interest under the Due Process Clause, which generally does not apply to routine federal contracts/grants. Moreover, these three provisions pertain to government funding, and as the Supreme Court has held, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998). The Certification and Reporting Provisions pertain to the government's actions as "sovereign"—but even there, the vagueness doctrine has no bite because the provisions do not declare any *new* conduct unlawful. "Instead, the so-called 'Certification' and '[Reporting]' provisions apply only to conduct that violates *existing* federal anti-discrimination law." *Diversity Officers*, at 7 (Harris,

3

J., concurring) (emphasis added). And even if those provisions purported to identify any new legal obligations, any injunction on vagueness grounds would be premature in this pre-enforcement posture. Federal agencies are still in the process of evaluating and implementing the President's EOs, and have already issued additional guidance. The Court should not "'blot[] the [provisions] from the books' before [the government] has an opportunity to issue administrative guidance and enforce the law in a manner consistent with the Constitution." *Planned Parenthood of Indiana & Kentucky, Inc. v. Marion Cnty. Prosecutor*, 7 F.4th 594, 606 (7th Cir. 2021) (quoting *Trustees of Indiana Univ. v. Curry*, 918 F.3d 537, 541 (7th Cir. 2019)).

Plaintiff's First Amendment arguments are similarly meritless. As for the Termination Provision, the Supreme Court has long held that when it comes to what the government affirmatively chooses to fund, a "decision not to subsidize the exercise of a fundamental right does not infringe the right." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549 (1983)). The EOs do not "authorize the termination of grants based on a grantee's speech or activities outside the scope of the funded activities. "Rather, the 'Termination' provision directs the termination of grants, subject to applicable legal limits, based only on the nature of the grant-funded activity itself." *Diversity Officers*, at 7 (Harris, J., concurring). Such funding decisions based on policy priorities have long been constitutionally permissible. As for Plaintiff's First Amendment challenge to the Government DEI Provisions, that is a nonstarter. Those provisions pertain to the government's *own* speech, and "[w]hen [the] government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Plaintiff's First Amendment challenges to the Reporting and Certification Provisions also fail for the simple reason that neither provision targets constitutionally protected speech—they both

"apply only to conduct that violates existing federal anti-discrimination law." *See Diversity Officers*, at 7 (Harris, J., concurring).

Plaintiff also argues that the Termination and Government DEI Provisions violate separation of powers. Plaintiff advanced this argument mainly in its PI brief, with a passing reference to it in its TRO brief. To the extent that Plaintiff seeks any emergency relief based on this claim, none is warranted. Plaintiff fails to show—as it must in a facial posture—that these provisions are "unconstitutional in all of [their] applications." *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011). With respect to the Government DEI Provisions, Plaintiff has no colorable argument that there are no instances in which the government can terminate its own DEI programs or positions without congressional approval. Plaintiff's argument with respect to the Termination Provision is similarly futile. It is clear that, at least in some instances, the Executive may terminate contracts/grants for its own convenience. Doing so here—as the Executive has done for decades in innumerate contexts—does not violate the separation of powers. *See Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

Beyond the merits, Plaintiff also fails to satisfy the remaining prongs for injunctive relief. Plaintiff's irreparable-harm argument is derivative of its First Amendment claim and fails for similar reasons. Moreover, Plaintiff's requested relief is neither in the public interest nor equitable. While Plaintiff's purported harms are purely speculative, the government will indisputably suffer an irreparable harm if it "is enjoined by a court from effectuating [the law]." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).

Lastly, if the Court is inclined to grant Plaintiff's requested relief, Defendants respectfully request that it be appropriately narrowed to just Plaintiff and DOL. Specifically, this Court should reject any request by Plaintiff to craft an injunction "that purport[s] to enjoin *nondefendants* from

taking action against *nonplaintiff*." *See Diversity Officers*, at 9 (Rushing, J., concurring). Such a universal injunction does not accord with Rule 65(d), Article III, principles of equity, or instructions from the Supreme Court and the Seventh Circuit regarding the limitations on injunctive relief. *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024); *see also City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020) ("[I]njunctions that extend beyond the parties before the court . . . . present real dangers, and will be appropriate only in rare circumstances.").

## BACKGROUND

On January 20, 2025, the President issued Executive Order 14,151, 90 FR 8339, *Ending Radical and Wasteful Government DEI Program and Preferencin*g (EO 14,151). As relevant here, this EO includes the Termination Provision, which directs that within 60 days of the EO's issuance, each "agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM" shall "terminate, to the maximum extent *allowed by law*, . . . 'equity-related' grants or contracts." *Id.* § 2(b)(i) (emphasis added).

On January 21, 2025, the President issued Executive Order 14,173, 90 FR 8633, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (EO 14,173). This second EO's "purpose" is to ensure that the federal government is "enforcing our civil-rights laws" by "ending *illegal* preferences and discrimination." *Id.* § 1 (emphasis added). As relevant here, the EO includes the Reporting and Certification Provisions. The Reporting Provision directs the Attorney General, in consultation with agencies, "to submit a *report* to the Assistant to the President for Domestic Policy containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end *illegal* discrimination and preferences." *Id.* § 4(b) (emphases added). That report will include a "proposed strategic enforcement plan," *id.*, with, among other things, a plan of action "to deter DEI programs or

6

principles" that "*constitute illegal discrimination or preferences*" wherein agencies will identify, as part of that plan of action, "potential civil compliance investigations" of certain large entities, *id.* § 4(b)(iii) (emphasis added). Moreover, the Certification Provision provides that the "head of each agency shall include in every contract or grant award" a "term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that *violate* any applicable *Federal anti-discrimination laws*." *Id.* § 3(b)(iv)(B) (emphases added). That certification will be material to government payment decisions. *Id.* § 3(b)(iv)(A).

The EOs also included the Government DEI Provisions, which together instruct federal agencies to "provide the Director of the OMB with a list of all . . . agency or department DEI, DEIA, or 'environmental justice'" positions and programs, among others, "and an assessment" regarding whether those positions and programs "have been misleadingly relabeled in an attempt to preserve their pre-November 4, 2024 function," *see* EO 14,151 § 2(b)(ii)(A); and further, direct the OMB Director to terminate government-wide diversity and equity "mandates, requirements, programs, [and] activities," *see* EO 14,173 § 3(c)(iii).

On February 21, 2025, before Plaintiff filed its complaint, a United States District Court for the District of Maryland issued a nationwide preliminary injunction on the implementation of the Termination, Certification, and Reporting Provisions. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764 (D. Md. Feb. 21, 2025).[1] The court later entered an order stating that the injunction applied to all federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions. *Nat'l Ass'n of Diversity Officers*

---

[1] The court enjoined the implementation of the Termination and Certification Provisions in full, and the Reporting Provision in part. The court did not enjoin the Attorney General (or any agency) from identifying "'[a] plan of specific steps or measures to deter DEI programs or principles . . . that constitute illegal discrimination or preferences.'" *Id.* at *24 n.13 (quoting EO 14,173 § 4(b)(iii)).

*in Higher Educ. v. Trump*, ---F. Supp. 3d---, 2025 WL 750601 (D. Md. Mar. 10, 2025).

On February 26, 2025, Plaintiff brought this action challenging the EOs. Dkt. 1 (Compl.). On March 5, 2025, Plaintiff filed its Motion for a Preliminary Injunction, claiming that all five provisions violate the First and Fifth Amendments. Dkt. 26 (PI), 8-11. Plaintiff also argued that the Termination and Government DEI Provisions violate separation of powers. *Id.* at 12-13.

On March 14, 2025, a three-judge panel of the Fourth Circuit granted the government's motion to stay the preliminary injunction. *Diversity Officers*, No. 25-1189. As Judge Rushing explained in her concurrence, the panel "unanimously agree[d] that the entire substance of the preliminary injunction must be stayed, not just trimmed back in scope," because "the government has made a 'strong showing' that it 'is likely to succeed on the merits,'" and "that the challenged provisions of the Executive Orders—all of which are directives from the President to his officers—do not violate the First or Fifth Amendments." *Id.* at 9.

On March 18, 2025, Plaintiff filed its motion for a TRO. Dkt. 41 (TRO). In the first instance, Plaintiff's motion asks that any relief be "nationwide in scope," *id.* at 16, and encompass all "federal executive branch agencies, departments, and commissions, and their heads, officers, agents, subdivisions, contractors, and grant recipients," *id.* at 2. In the alternative, Plaintiff asks for relief directed only at Plaintiff itself and the U.S. Department of Labor (DOL). *Id.* at 18.

## ARGUMENT

Plaintiff is not entitled to any emergency relief. A preliminary injunction (or a TRO) is "'an extraordinary remedy never awarded as of right.'" *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). The movant "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

and that an injunction is in the public interest.'" *Bevis*, 85 F.4th at 1188 (quoting *Winter*, 555 U.S. at 20). For the first factor, the movant must make a "'strong' showing that reveals how it proposes to prove its case." *Id.* For the second factor, "a mere possibility of irreparable harm will not suffice." *Id.* Finally, when "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiff cannot satisfy these requirements.

## I. PLAINTIFF IS NOT LIKELY TO ESTABLISH ARTICLE III JURISDICTION.

### A. Plaintiff lacks standing.

To establish standing, a plaintiff must show an "injury in fact," a causal connection between the injury and the defendant's conduct, and a likelihood that "the injury will be redressed by a favorable decision." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). A plaintiff's "burden to demonstrate standing in the context of a preliminary injunction motion is 'at least as great as the burden of resisting a summary judgment motion.'" *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (quoting *Lujan*, 497 U.S. at 97 n.8). The plaintiff must "'set forth' by affidavit or other evidence 'specific facts,' rather than 'general factual allegations of injury.'" *Id.* (quoting *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 801-02 (7th Cir. 2016)). Plaintiff fails to meet its burden.

At the outset, Plaintiff does not even assert speculative (let alone Article III) harm with respect to the Government DEI Provisions, which are directives to the OMB Director to collect a list and engage in an assessment of the government's *own* DEI programs and positions, *see* EO 14,151 § 2(b)(ii)(A); and to terminate the government's *own* DEI programs and activities. EO 14,173 § 3(c)(iii); *see also id.* § 3(c)(i) (providing that the OMB Director "[r]eview and revise, as appropriate, all Government-wide processes, directives, and guidance"). The Government DEI

Provisions do not purport to regulate private programs or positions. Plaintiff does not allege that it provides any relevant government-wide programs. As such, this Court should reject Plaintiff's challenges to those two provisions outright. *See FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 230 (1990) (refusing to reach the merits of certain provisions "because petitioners ha[d] failed to show they ha[d] standing to challenge them").

With respect to the remaining three provisions, Plaintiff attempts to assert standing by raising four different theories of injury in fact: (1) regulatory uncertainty, (2) chilled speech, (3) frustration of mission, and (4) potential loss of federal funds. None withstand scrutiny.

***Regulatory uncertainty.*** Plaintiff's chief complaint is that it must "do [its] work in a climate of fear and uncertainty," and therefore "urgently needs clarity." Vellinga Decl., ¶¶ 47, 48. But allegations of uncertainty do not establish injury in fact. As the Seventh Circuit has made clear, "a plaintiff's state of confusion . . . is not a concrete injury." *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 668 (7th Cir. 2021) (citation omitted). For good reason—because "if it were, then everyone would have standing to litigate about everything." *Id*. At bottom, regulatory uncertainty necessarily follows many new policy announcements, and an injunction "should not issue merely to calm the imaginings of the movant." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004).

***Chilled speech.*** Relatedly, Plaintiff also alleges an impending "chilling" effect on speech. TRO, 2. But "a plaintiff's notional or subjective fear of chilling is insufficient to sustain a court's jurisdiction under Article III." *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012). Instead, an Article III injury arising from "a chilling effect" exists only when the plaintiff shows that the chilling effect "is objectively reasonable, and that he self-censors as a result." *Speech First*, 968 F.3d at 638; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013) (explaining that

"[a]llegations of a subjective 'chill' are not an adequate substitute" in the standing inquiry).

Plaintiff's alleged "chilling effect" based on its fear of future prosecution is not objectively reasonable. The Certification and Reporting Provisions "apply only to conduct that violates existing federal anti-discrimination law." *Diversity Officers*, at 7 (Harris, J., concurring). Thus, for instance, Plaintiff's fear that it must self-censor to properly certify that it does "not operate any programs that promote DEI," Vellinga Decl., ¶ 58, is plainly based on a misreading of the Certification Provision, which only requires recipients to certify that any DEI programs it operates do not violate *existing* antidiscrimination law.

Additionally, with respect to the Termination Provision, Plaintiff fails to show that the provision has caused it to *actually* self-censor. Plaintiff alleges, for instance, that "an entity from which Plaintiff receives federal grant money as a sub-recipient, *instructed* Plaintiff to scrub all diversity, equity, and inclusion initiatives and related language from its programming"—without alleging that it actually did so. TRO, 2 (emphasis added).

**Frustration of mission.** Plaintiff further attempts to establish standing on the ground that the EOs generally frustrate its organizational mission. *E.g.*, Vellinga Decl., ¶ 74 ("The Executive Orders frustrate our core mission."). But as the Supreme Court reiterated this past term, to establish organizational standing, a plaintiff "must show far more than simply a setback to the organization's abstract social interests," and impairment to a plaintiff's "ability to provide services and achieve" its "organizational mission" does not satisfy standing. *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (citation omitted). As such, Plaintiff's general assertions of frustration are insufficient for purposes of Article III standing.

**Potential loss of federal funding.** To the extent that Plaintiff attempts to allege that it will suffer harm in the future due to federal funding cuts, those allegations are too speculative to satisfy

Article III standing. *See Clapper*, 568 U.S. at 409 (explaining that any allegation of "threatened injury must be certainly impending" (citations omitted)). Plaintiff mostly asserts in broad terms that it does, in fact, receive federal funds. *See* Vellinga Decl., ¶ 16 (explaining that approximately 40% of the organization's funding comes from the federal government). But the mere fact that it receives federal funding is not nearly "concrete and particularized" enough to challenge *specific* funding decisions (let alone announcement of specific funding priorities). *See Lujan*, 504 U.S. at 560-61; *cf. Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007) ("[I]f every federal taxpayer could sue to challenge any Government expenditure, the federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus.").

While Plaintiff does identify some specific grants/contracts, it mostly fails to allege any imminent disruption of these grants/contracts. *See, e.g.*, Vellinga Decl., ¶¶ 39-46 (explaining that CWIT has received emails asking it to stop its work on DEI, without alleging that any of its grants/contracts have been disrupted). Plaintiff alleges potential disruption of only one forthcoming partnership with an unnamed organization in the Southwest. *Id.* ¶ 56. According to Plaintiff, this organization has communicated that it "want[s] to end the partnership with [Plaintiff] for fear of triggering the Executive Order and losing federal funding." *Id*. But any such injury stems from the actions of the unnamed organization, which is not a party to this action. So, even if Plaintiff's allegation satisfies the injury in fact and causation elements of Article III standing, it fails at the redressability prong because this Court cannot order the unnamed third-party organization to put aside its "fear" and enter into a contract with Plaintiff. *See LSP Transmission Holdings II, LLC v. Huston*, ----F.4th----, 2025 WL 798079, at *11 (7th Cir. Mar. 13, 2025) ("[A] federal court cannot redress injury that results from the independent action of some third party not before the court."). Consequently, neither Plaintiff nor this Court can "begin to predict on this

record what impact," if any, invalidating the EOs would have. *Freedom Republicans, Inc. v. Fed. Election Comm'n*, 13 F.3d 412, 419 (D.C. Cir. 1994).

### B. Plaintiff's claims are unripe for review.

Plaintiff's claims are also unripe for review. "A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (citation omitted).

Plaintiff's suit is based on speculations regarding *possible* actions that agencies *might* take under the EOs. To the extent that Plaintiff identifies conduct by the defendants, none shows concrete or imminent action directed at Plaintiff. Beginning with the Termination Provision, Plaintiff fails to identify any terminated grant/contract. And even if a termination *might* occur, *how* it occurs remains uncertain. This matters because the specific way that a grant or contract is terminated can define—or even eliminate—the proper causes of action, requests for relief, preconditions for suit, forum, and jurisdictional bases for a lawsuit challenging the termination.

Indeed, if Plaintiff sustained harm from a future unlawful funding decision, it is unclear whether jurisdiction would lie in this Court. If the dispute is contractual, the Tucker Act would vest exclusive jurisdiction in the Court of Federal Claims. 28 U.S.C. § 1491(a); *see also U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (denying preliminary injunction because the motion sought was, in essence, a purely contractual dispute and therefore needed to be resolved in the Court of Federal Claims under the Tucker Act), *appeal filed*, No. 25-5066 (D.C. Cir.). The same would likely be true for a grant termination, as "grant agreements [are] contracts when the standard conditions for a contract are satisfied." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); *see also San Juan City Coll. v. United States*, 391 F.3d 1357, 1360-62 (Fed. Cir. 2004) (treating certain grants under

the Higher Education Act as contracts). The funding decision may also preclude APA review if, for example, it is committed to agency discretion. *Lincoln v. Vigil*, 508 U.S. 182 (1993). Plaintiff should not be permitted to skirt potential jurisdictional limits by bringing an unripe challenge to a termination that may never occur.

Moreover, by their own terms, the EOs provide that when an agency takes steps to implement the EOs' directives, it must only take appropriate actions permitted "by law." EO 14,151 §§ 2(b)(i); *see also* EO 14,173 § 4 (targeting "illegal DEI discrimination"). Indeed, the EOs underscore that limitation by using "illegal" 14 times. Plaintiff's claims, therefore, are contingent upon several layers of future actions that are not only hypothetical but also contradictory; all claims assume that agencies will not only take actions that will adversely affect Plaintiff but will do so both in service of the EOs' directives *and* in violation of the EOs' directives to stay within the confines of the law. These "contingent future events that may not occur as anticipated, or indeed may not occur at all," render Plaintiff's claims unripe. *Trump*, 592 U.S. at 131 (quoting *Texas*, 523 U.S. at 300). When "the Executive Order itself instructs the agency to follow the law," the "mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that" is "above suspicion in the ordinary course of administration." *Allbaugh*, 295 F.3d at 33 (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)). Ultimately, this suit is merely a broad, unripe challenge to a change in the Executive's policy priorities.

## II. PLAINTIFF'S CHALLENGES LACK MERIT.

### A. Plaintiff's Due Process Clause claims fail.

Plaintiff asserts facial void-for-vagueness challenges to the provisions under the Fifth Amendment's Due Process Clause. Plaintiff argues that these provisions allow the government to

14

enforce the EOs in an "arbitrary and discriminatory" way and fail to give fair notice to Plaintiff about what conduct is prohibited. These challenges fail at the threshold and on the merits.

> i.  *Plaintiff's facial challenge under the Due Process Clause to Presidential directives is categorically improper.*

As a preliminary matter, the void-for-vagueness doctrine under the Fifth Amendment is inapplicable here. As Chief Judge Diaz explained in his concurrence in *Diversity Officers*, "where the Orders only purport to direct executive policy and actors . . . vagueness principles [are not] outcome determinative." *Diversity Officers*, 5 n.2 (Diaz, CJ, concurring). This conclusion makes sense. The vagueness doctrine traditionally "guarantees that ordinary people have 'fair notice' of the conduct *a statute* proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality) (emphasis added). And while courts have applied the doctrine outside of the statutory context, they have done so with respect to direct regulations of primary conduct. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (citation omitted)). There is good reason for the doctrine's limited reach. The Due Process Clause prohibits uneven enforcement, and ensures notice, of requirements with which the public must comply. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). No such concerns arise when the President gives his subordinates an unclear directive. That is true whether the directive is made informally (in a conversation) or formally (in an Executive Order).

But even putting aside the inapplicability of the Due Process Clause to presidential directives to subordinates, Plaintiff's challenge suffers from yet another threshold flaw: it is facial in nature. The appropriate posture for Due Process vagueness challenges is as-applied. That is

because "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).

The Supreme Court carved out a limited exception to the general rule against Fifth Amendment facial challenges in *Johnson v. United States*, where it upheld a facial vagueness challenge to the violent-felony residual clause of the Armed Career Criminal Act. 576 U.S. 591 (2015). But the *Johnson* exception is exceedingly narrow. Indeed, the Supreme Court has only applied *Johnson* once outside the criminal context, and even there, it justified the extension of *Johnson* to a civil-removal statute by explaining that "deportation is a particularly severe penalty, which may be of greater concern to a convicted alien than any potential jail sentence." *Dimaya*, 584 U.S. at 157 (citation omitted). Whatever *Johnson*'s reach may be, it surely has no application to presidential directives to subordinates.

Simply put, Plaintiff's facial Fifth Amendment challenge demands a stunning expansion of the doctrine. Not only does Plaintiff's theory lack basis in the law but it also raises serious separation-of-powers concerns. Opening the door to such challenges would allow courts to engage in searching judicial review of all presidential policy directives, which by their nature often necessarily outline policy initiatives and priorities in broad terms. Under Plaintiff's theory, however, courts can effectively prohibit the President from directing executive officials unless he can do so with the same degree of specificity required of a criminal statute. This Court should reject Plaintiff's invitation to scrutinize presidential policy directives under the demanding standard traditionally reserved for statutes and regulations that proscribe primary conduct.

ii.     *Plaintiff's Due Process claims fail on the merits.*

Even if the Court reaches the merits of Plaintiff's facial Due Process claims, it should reject them. Plaintiff asserts its Due Process challenges to the provisions by invoking two categories of

16

protected interests with respect to the various provisions: (1) potential loss of contracts/grants (Termination and Government DEI Provisions), and (2) potential enforcement action (Certification and Reporting Provisions). Both sets of claims fail.

**Loss of contracts/grants.** In order to assert a claim under the Due Process Clause, Plaintiff must identify a liberty or property interest that is protected by the Fifth Amendment in the first place. With respect to the Termination and Government DEI Provisions, Plaintiff fails to establish that its purported contracts/grants are protected by the Due Process Clause.

"The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted). Applying these principles, the Supreme Court has identified a narrow set of government benefits—so-called "new property"—that are protected under the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collected cases). But the protections afforded to this narrow set have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process." (citation omitted)).

17

The distinction makes sense. As the Second Circuit explained in *S & D Maintenance Co. v. Goldin*, in the new-property line of cases "the Due Process Clause [was] invoked to protect something more than an ordinary contractual right. Rather, procedural protection [was] sought in connection with a state's revocation of a status, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure." 844 F.2d 962, 966 (2d Cir. 1988). The same logic does not extend to "contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor." *Id.* at 967. Indeed, "the doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns." *Id.* at 966. And yet, that is exactly what the district court did in *Diversity Officers* via a passing reference to *Roth*, seemingly assuming that the new-property line of cases was freely applicable to all government contracts/grants. *See Diversity Officers*, 2025 WL 573764 at *20 n.10. That is an unprecedented expansion of the doctrine, and this Court should refrain from following suit.

Here, Plaintiff has not shown that it has any constitutionally protected entitlement-like contracts/grants that will be subject to termination. Indeed, government contracts generally allow for "[t]ermination at the convenience of the Government," 48 C.F.R. § 49.502, as do many government grants, *see* 2 C.F.R. § 200.340(a)(4) (authority to terminate award "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities"). In fact, courts have upheld the government's right to terminate a contract for convenience even absent a termination clause. *See G.L. Christian & Assoc. v. United States*, 160 Ct. Cl. (1963) (reading a termination for convenience clause into the contract by operation of law); *see also Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad."). That is the antithesis of a constitutionally

18

protected entitlement.

Finally, Plaintiff's vagueness argument fails on the substance. Plaintiff argues that the Termination Provision is unconstitutionally "vague" because it purports to limit government funding based on criteria it does not define—such as, "equity-related." PI, 3, 8. In scrutinizing this text, Plaintiff improperly invokes the vagueness standard that pertains to government enforcement actions. *See, e.g.*, *id*. at 12 (relying heavily on *United States v. Williams*, 553 U.S. 285 (2008), which involved a criminal statute). That is the wrong standard. In *Finley*, the Supreme Court rejected application of any demanding vagueness standard to government funding decisions. 524 U.S. 569. There, plaintiffs brought vagueness challenges under the First and Fifth Amendments to a funding provision that required the National Endowment for the Arts to "take[] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (quoting 20 U.S.C. § 954(d)(1)). The Supreme Court acknowledged that "[t]he terms of the provision are undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns." *Id.* at 588. But, the Court reasoned, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589; *see also id.* (cautioning that "[t]o accept [plaintiffs'] vagueness argument would be to call into question the constitutionality of . . . valuable Government programs and countless others like them" that "award[] scholarships and grants on the basis of subjective criteria such as 'excellence'"). This court should similarly reject Plaintiff's invitation to impose a demanding vagueness standard on the government when it "is acting as patron rather than as sovereign." *Id.*; *see also Meriwether v. Hartop*, 992 F.3d 492, 518 (6th Cir. 2021) ("There is substantially more room for imprecision in regulations bearing only civil, or employment, consequences, than would be tolerated in a criminal code." (citation omitted)).

*Potential Future Enforcement.* Plaintiffs bring Due Process Clause challenges to the Certification and Reporting Provisions by alleging that the provisions fail to give proper notice of prohibited conduct and provide for arbitrary future enforcement. These claims fail on the merits.

The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108. As discussed above, while this doctrine demands scrutiny of statutes and regulations that identify a *new* conduct for punishment, the provisions do no such thing. "Instead, the so-called 'Certification' and '[Reporting]' provisions apply only to conduct that violates *existing* federal anti-discrimination law." *Diversity Officers*, at 7 (Harris, J., concurring) (emphasis added); *see also* EO 14,173 § 3(b)(iv)(B) (Certification Provision demands that Plaintiff certify that it does not operate programs that "violate federal antidiscrimination laws") *and* EO 14,173 § 4(b) (Reporting Provision only concerns "illegal discrimination or preferences"). Neither penalize any new conduct; they merely prioritize the enforcement of existing antidiscrimination laws, which Plaintiff does not challenge as unconstitutionally vague. Thus, Plaintiff has no legitimate concern that it will not be given a "reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108.

Arguing otherwise, Plaintiff maintains that these federal-law qualifiers are not helpful because the government has not specified which DEI programs *it* considers illegal. PI, 8-9. Once again, Plaintiff's argument erroneously assumes that the provisions purport to penalize conduct *beyond* those prohibited by existing antidiscrimination laws. They do not. As such, all Plaintiff must do is comply with federal law itself—longstanding federal statutes that are not challenged here on vagueness or any other grounds. As such, Plaintiff cannot show—as it must in asserting a

facial Fifth Amendment claim—that these provisions, which are tied to federal antidiscrimination laws, lack "a discernable core." *Planned Parenthood*, 7 F.4th at 605. Moreover, any lack of clarity over when DEI runs afoul of those statutes is not attributable to the EOs and would not be remedied by its invalidation. And in any future enforcement, Plaintiff is free to defend itself by maintaining that its conduct is lawful. *See* TRO, 5 ("CWIT's activities do not violate any law. . . ."). But none of that is remotely ripe, let alone a sound basis for preemptively enjoining the government from enforcing antidiscrimination laws.

Accordingly, even if the Court were inclined to demand more specificity than the EOs provide, any injunction on due process grounds would be premature in this pre-enforcement posture where courts must not "assume that the [government] will take no further steps to minimize the dangers of arbitrary enforcement." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 504 (1982). To the contrary, courts must consider the possibility that, prior to enforcement, the government "will sufficiently narrow potentially vague or arbitrary interpretations of the [directives]." *Id.* Indeed, federal agencies have already began providing guidance on the scope of the EOs. For instance, on February 5, 2025, OPM issued *Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives*, in which it expanded on the type of activity that constitutes "unlawful discrimination related to DEI." *See* OPM Guidance at 1 (attached hereto as Ex. A).[2] And on March 19, 2025, the U.S. Department of Justice (DOJ) and the U.S. Equal Employment Opportunity Commission (EEOC) provided additional guidance on

---

[2] The Guidance provides that "[u]nlawful discrimination related to DEI includes taking action motivated, in whole or in part, by protected characteristics. To be unlawful, a protected characteristic does not need to be the sole or exclusive reason for an agency's action. Among other practices, this includes ending unlawful diversity requirements for the composition of hiring panels, as well as for the composition of candidate pools (also referred to as 'diverse slate' policies)." Ex. A at 1.

the types of DEI activities that could violate Title VII. *See* EEOC Memorandum (attached hereto as Ex. B).[3] This Court should reject Plaintiff's invitation "to 'blot[] the [provisions] from the books' before [the government] has an opportunity to issue administrative guidance and enforce the law in a manner consistent with the Constitution." *Planned Parenthood*, 7 F.4th at 606 (quoting *Curry*, 918 F.3d at 541).

### B. Plaintiff's First Amendment claims fail.

"Even in the First Amendment context, facial challenges are disfavored." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024). Plaintiffs fail to establish that the EOs "prohibit[] a substantial amount of protected speech relative to [their] plainly legitimate sweep," as required to establish facial unconstitutionality. *United States v. Hansen*, 599 U.S. 762, 770 (2023). As such, Plaintiff is not likely to succeed on the merits of its First Amendment facial challenges.

***Termination Provision.*** Plaintiff argues that Termination Provision violates the First Amendment because it is vague, overbroad, and amounts to viewpoint discrimination. Plaintiff's claims fail because this provision pertains to government's sponsorship of speech—not regulation of it.

It is well established that government spending is not subject to traditional First-Amendment scrutiny. The Supreme Court has long been clear that First Amendment concerns are far less pronounced when the government acts as patron to subsidize speech, as opposed to when it acts as sovereign to regulate it. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . .

---

[3] This memorandum explains that "[u]nder Title VII, DEI initiatives, policies, programs, or practices may be unlawful if they involve an employer or other covered entity taking an employment action motivated—in whole or in part—by an employee's or applicant's race, sex, or another protected characteristic." Ex. B.

. . In so doing, the government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust*, 500 U.S. at 193. Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AID*), 570 U.S. 205, 214 (2013) (collecting cases).

While government funding is not free from the First Amendment in all respects, the relevant First Amendment limitation is the prohibition against an unconstitutional "condition." *Id.* at 213-15. Under this limitation, the government may "specify the activities [it] wants to subsidize," but it cannot "leverage funding to regulate speech *outside* the contours of the programs itself." *Id.* at 214-15 (emphasis added). For example, limitations on the use of federal funds for a specific purpose—such as "promot[ing] or advocat[ing] [for] the legalization or practice of prostitution or sex trafficking"—is constitutionally permissible, *id.* at 217-18 (citation omitted), but outright conditioning federal funds on a pledge to a policy "explicitly opposing prostitution or sex trafficking" is not, *id.* at 210 (citation omitted). The latter amounts to an unconstitutional condition because it regulates speech even on the recipients' "own time and dime." *Id.* at 218-19.

But, as Judge Harris explained in her concurrence in *Diversity Officers*, the provision does not "authorize the termination of grants based on a grantee's speech or activities outside the scope of the funded activities." *Diversity Officers*, at 7 (Harris, J., concurring). As such, it does not impose an unconstitutional condition on Plaintiff's speech or amount to viewpoint discrimination; rather, as permitted under *Rust* and *AID*, the provision aligns the government's sponsorship of activities with its policy priorities. In doing so, the Termination Provision does not seek to regulate a grantee's speech "outside the contours of" any such policy initiatives—*i.e.*, it does not prohibit

23

entities from engaging in protected speech on their "own time and dime." *AID*, 570 U.S. at 218. The Supreme Court has repeatedly held that the government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "'decision not to subsidize the exercise of a fundamental right does not infringe the right'" (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights"). Simply put, the government is permitted to have policy priorities, and it does not violate the First Amendment by not affirmatively funding programs that do not align with those policies.[4]

To the extent Plaintiff argues that the Termination Provision is "vague," and therefore imposes a "chilling" effect on protected speech, *see* TRO, 6-7, any such argument is foreclosed by the Supreme Court's decision in *Finley* for the same reasons outlined above. *See supra* II.A. Indeed, in *Finley*, the Court expressly considered, and rejected, the same argument Plaintiff makes here—namely, that it must "self-censor . . . under threat of losing funding." TRO, 11. As the Court explained in *Finley*, no First Amendment concern exists even though, "as a practical matter, [government-funding recipients] may conform their speech to what they believe to be the . . . decisionmaking criteria in order to acquire funding." 524 U.S. at 588. At bottom, when the government acts "as patron," it does not infringe on constitutionally protected speech even when it articulates funding standards with "imprecision." *Id*. at 589; *see also id.* at 599 (Scalia, J.,

---

[4] In support of its challenge, Plaintiff invokes *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995). But *Rosenberger* is inapposite; there, the Supreme Court "found the viewpoint discrimination unconstitutional, not because funding of 'private' speech was involved, but because the government had established a limited public forum." *Finley*, 524 U.S. at 598-99 (Scalia, J., concurring). Here, Plaintiff makes no showing.

concurring) ("Insofar as it bears upon First Amendment concerns, the vagueness doctrine addresses the problems that arise from government *regulation* of expressive conduct . . . not government grant programs.").

**Government DEI Provisions.** As explained above, Plaintiff plainly lacks standing to challenge these two provisions because it has not shown that it provides any government-wide DEI programs. *See supra* I.A. But in any event, any First Amendment challenge to these provisions also fails on the merits because the provisions merely regulate the government's own speech. *See Walker*, 576 U.S. at 207 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.").

**Certification Provision.** Plaintiff argues that the Certification Provision violates the First Amendment because it is overbroad, vague, amounts to viewpoint discrimination, and imposes an unconditional condition. Plaintiff's First Amendment challenge to the Certification Provision suffers from a fatal flaw: Plaintiff has no First Amendment right to violate federal antidiscrimination laws in the first place. The provision merely requires Plaintiff to certify that it does not operate any DEI programs that "violate any applicable Federal antidiscrimination laws." EO 14,173 § 3(b)(iv)(B). As such, the Certification Provision is "distinctly limited scope." *Diversity Officers*, at 7 (Harris, J., concurring). And the EO expressly makes clear that it "does not prevent" entities "from engaging in First Amendment-protected speech." EO 14,173 § 7(b). There is nothing unlawful about requiring recipients of federal contracts or grants to affirm that any DEI programs that they operate comply with antidiscrimination laws and further requiring recipients to acknowledge that the government considers compliance with such laws material to its payment decisions. Importantly, this provision imposes no new requirements on primary conduct. Rather, it simply requires recipients to certify their compliance with existing legal obligations under the

"applicable" federal civil rights laws such as Title VI of the Civil Rights Act of 1964, which apply to all recipients of federal assistance, 42 U.S.C. § 2000d-1—laws that are binding independent of any certification requirement. There is no First Amendment problem with instructing agencies to require a certification that these existing legal obligations are being honored.

That is not novel. It has been true for decades that "[e]very application for Federal financial assistance must, 'as a *condition* to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title VI *and* with all requirements imposed pursuant to the executive regulations issued under Title VI." *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629-30 & n.22 (1983) (Marshall, J., dissenting) (citing regulations from Departments of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Housing and Urban Development, Interior, Justice, Labor, State, Transportation, and Treasury). These "assurances" of compliance are "given in consideration of" federal aid, "and the federal government extends assistance in reliance on the assurance of compliance"—but the obligations of Title VI apply regardless of any certification. *Id.* (citation omitted). The requirement here is no different: while the provision addresses unlawful DEI programs specifically—a subset of the potential ways in which federal funding recipients might violate antidiscrimination law—that limitation merely renders it narrower than scores of certifications signed by recipients of federal assistance attesting that they are complying with Title VI in every respect. Plaintiff neither argues that these longstanding requirements are unconstitutional nor explains why their breadth is constitutionally required. At bottom, the certification "does not place upon a recipient any unanticipated burdens because any recipient must anticipate having to comply with the law." *Id.*

Plaintiff, however, argues that the clause concerning 'Federal anti-discrimination laws'

26

does not appear to limit the scope of the Certification Provision because the EOs appears to declare that all DEI programs are illegal. TRO, 13-14. But as two judges on the *Diversity Officers'* Fourth Circuit panel expressly recognized, "[t]he Executive Orders do not purport to establish the illegality of all efforts to advance diversity, equity or inclusion, and *they should not be so understood.*" *Diversity Officers*, at 7 (Harris, J., concurring) (emphasis added); *see also id.* at 4 (Diaz, CJ., concurring) (joining Judge Harris' concurrence). At a very fundamental level, Plaintiff's assertions are irreconcilable with the provision's text, which neither adopts any new construction of antidiscrimination law nor declares all DEI to be illegal; rather, it requires entities to certify that they are not operating DEI programs that violate antidiscrimination laws—not that they are not operating any DEI programs.[5]

Plaintiff's reliance on *AID* to argue that the provision amounts to an unconstitutional condition is similarly unpersuasive. PI, 10-11. In *AID*, under the relevant policy requirement, "[a] recipient [could not] avow the belief dictated by the Policy Requirement when spending [federal] funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime." 570 U.S. at 213. Here, unlike in *AID*, the Certification Provision does not limit Plaintiff's Free Speech by compelling or restricting its speech. Plaintiff remains free to engage in protected speech that espouses any viewpoint it wants, including advocating for whatever DEI activities it prefers. *See* EO 14,173 § 7(b). The provision simply restricts the recipient's ability to engage in illegal discrimination while also securing federal

---

[5] For similar reasons, requiring recipients to sign this certification provision for purposes of the False Claims Act, EO 14,173 § 3(b)(iv)(B), does not raise First Amendment concerns. As the D.C. Circuit has explained, the False Claims Act "does not reach an innocent, good-faith mistake about the meaning of an applicable rule," nor "claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015). That provides ample protection against the sort of unfair liability that may worry Plaintiff.

funding—discrimination that would be illegal even without federal funding. Such restrictions on illegal conduct do not amount to an unconstitutional condition.

On this score, the Sixth Circuit's decision in *Cutter v. Wilkinson* is particularity informative. 423 F.3d 579 (6th Cir. 2005). Following reversal and remand from the Supreme Court on a separate First Amendment challenge to the Religious Land Use and Institutionalized Persons Act (RLUIPA), the Sixth Circuit examined whether the government imposed an unconstitutional condition on federal funds under *Rust* when it conditioned funds to state prison officials on compliance with the RLUIPA. *Id.* at 588. The court reasoned that the condition did not violate the *Rust* standard because recipients had "no constitutional right, much less a fundamental constitutional right, to limit the exercise of religion by inmates" in the first instance. *Id.* Similarly, here, requiring recipients to certify that they are in compliance with the law does not amount to an unconstitutional "condition."

***Reporting Provision.*** Plaintiff's First Amendment challenge to the Reporting Provision also fails. The provision directs the Attorney General to submit a report to "inform and advise" the President "so that [the] Administration may formulate appropriate and effective civil-rights policy." EO 14,173 § 4(b). That report shall "contain[] recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI." *Id.* Among other things, the report shall identify "steps or measures to deter DEI programs or principles . . . that constitute illegal discrimination or preferences" and identify "potential civil compliance investigations" of large corporations, associations, foundations, and institutions of higher education. *Id.* § 4(b)(iii).

First, Plaintiff's challenge to this provision is woefully unripe. The Provision merely compels the submission of a report regarding how to address a particular category of unlawful

action. There is no live case or controversy involving any such potential enforcement action stemming from that report, which is far too inchoate to be challenged at this time. Indeed, the Attorney General has not yet neared the end of the 120-day internal deadline (May 21, 2025) to submit her written report to the President—let alone launch potential enforcement action against Plaintiff. Even the district court in *Diversity Officers* denied in part plaintiffs' request to enjoin the Reporting Provision "to the extent it is merely a directive from the President to the Attorney General to identify '[a] plan of specific steps or measures to deter DEI programs or principles . . . that constitute illegal discrimination or preferences.'" 2025 WL 573764 at *24 n.13 (alterations in original) (quoting EO 14,173 § 4(b)(iii)). That denial makes sense; it is hard to see how anyone would have standing to challenge the drafting of a DOJ report, or how a directive to draft a report could be unconstitutional. But that is all the Reporting Provision does. It does not authorize, or require, any enforcement action. It merely directs the Attorney General to draft a report regarding how the President's policies can be achieved by enforcing existing law. Enforcement is left to agency (or presidential) discretion. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (explaining that "report to the President [that] carries no direct consequences" for parties is "not final and therefore not subject to review" under the APA).

Plaintiff's claim also fails on the merits. To sustain a First Amendment claim in this pre-enforcement posture, Plaintiff must make two showings: (1) that "[its] conduct includes expressive activity protected by the First Amendment," and (2) and its self-censorship is based on "'an actual and well-founded fear' of enforcement proceedings against" it. *Brown*, 86 F.4th at 761 (citation omitted). Plaintiff fails to make either showing.

To begin with, the provision does not purport to target a First Amendment right at all. As two judges on the Fourth Circuit's *Diversity Officers* panel expressly recognized, the provision

"appl[ies] only to conduct that violates existing federal anti-discrimination law." *Diversity Officers* at 7 (Harris, J., concurring); *see also id.* at 4-5 (Diaz, CJ., concurring) (joining Judge Harris' concurrence). Plaintiffs have no First Amendment right to engage in illegal *conduct. See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 243-44 (4th Cir. 1997); *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777-79 (11th Cir. 2024).

Thus, Plaintiff's argument—premised on the assumption that future enforcement action will erroneously target legal DEI—is belied by the provision's text. Once again, "[t]he Executive Orders do not purport to establish the illegality of all efforts to advance diversity, equity or inclusion, and they should not be so understood." *Diversity Officers*, at 7 (Harris, J., concurring). Moreover, Plaintiff's argument relies on the unfavored presumption that the government will execute the EOs' directive in bad faith and ignore its own declaration to only target illegal conduct. Plaintiff provides no factual basis for this assumption other than mere speculations about bad-faith future enforcement action, which cannot sustain a facial challenge. *Cf. Hansen*, 599 U.S. at 782, 785 (rejecting First Amendment overbreadth challenge because plaintiff relied on "hypotheticals" and "speculative shot at the bad"). And in any event, such speculations are contrary to the presumption of good faith that courts routinely accord the government. *See, e.g.*, *U.S. Postal Serv.* v. *Gregory*, 534 U.S. 1, 10 (2001) (referring to the "presumption of regularity" that "attaches to the actions of Government agencies"); *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("[U]nlike in the case of a private party, [the courts] presume the government is acting in good faith."); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) ("[G]overnment actors . . . are accorded a presumption of good faith because they are public servants, not self-interested private parties."), *aff'd*, 563 U.S. 277 (2011).

Relatedly, any argument that enforcement actions would be motivated by something other

than targeting unlawful discrimination amounts to a selective-enforcement claim, which arises in an as-applied posture. *See Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1137-38 (D.C. Cir. 2023) (explaining that to assert a selective-enforcement claim, a plaintiffs must "demonstrate he was singled out for enforcement from among others similarly situated," which is "a fact-intensive and case-specific comparative inquiry" (citation omitted)).

In short, Plaintiff has failed to identify a credible threat that the government will enforce antidiscrimination laws by improperly targeting constitutionally protected speech. As such, any alleged "chilling" effect is wholly subjective and insufficient to establish standing. *See Laird v. Tatum,* 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").

Plaintiff's challenge to the Reporting Provision is nothing more than an attempt to halt the Executive's pronouncement of its enforcement priorities based on Plaintiff's fear that the Executive might not stick to its word when it says that it will only pursue illegal actions. At a very fundamental level, Plaintiff's theory would kneecap the Executive's enforcement authority. Under Plaintiff's theory, even when the Executive announces that its enforcement priorities will target only illegal conduct, Plaintiff could nevertheless preemptively halt any investigation and enforcement by speculating that the Executive may also impressibility target legal conduct. The Court should reject Plaintiff's invitation to encroach on the Executive's Article II authority to set its enforcement priorities under the guise of protecting Free Speech.[6]

### C.  Plaintiff's separation-of-powers challenges fail.

---

[6] In any potential individual enforcement action, Plaintiff would, of course, have the opportunity to argue its conduct does not violate the law. But it cannot halt an announcement of enforcement priorities at the outset based on the possibility that a hypothetical future enforcement may target legal conduct.

In its PI Motion, Plaintiff argues that the Termination and Government DEIA Provisions violate separation of powers by exceeding the President's Article II powers and improperly infringing on Congress's spending powers. PI, 12-13. In its TRO Motion, however, Plaintiff does not press this argument—rightly so. Plaintiff's challenge is a facial one; as such, it must prove that each of the provisions are "unconstitutional in all of [their] applications." *Ezell*, 651 F.3d at 698. Plaintiff's arguments fall far short of meeting this standard.

*Government DEI Provisions.* Plaintiff's challenge to the Government DEI Provisions is a nonstarter. The Supreme Court has long held that "the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs." *Arnett v. Kennedy*, 416 U.S. 134, 168 (1974). Plaintiff has no colorable argument that there are no instances in which the Executive cannot—without congressional authorization—collect a list of government-wide DEI positions and programs or terminate any government-wide DEI programs and activities.

*Termination Provision.* With respect to the Termination Provision, as explained above, there are undisputably instances where agencies may terminate contracts or grants for convenience—*i.e.*, based on change in policy priorities. *See supra* IIA. Doing so, the Executive does not violate separation of powers. On this score, the D.C. Circuit's decision in *Allbaugh* is particularly instructive. There, plaintiffs challenged an executive order that provided that "to the extent permitted by law," no federal agency and no entity that receives federal assistance for a construction product could require or prohibit bidders or contractors from entering into a project labor agreement. *Allbaugh*, 295 F.3d at 33. Plaintiffs sued, claiming that the executive order exceeded the President's authority. *See id.* at 31-32. The D.C. Circuit rejected this argument, pointing out that the order "directs [agencies] how to proceed in administering federally funded

projects, but only '[t]o the extent permitted by law.'" *Id.* at 33. "Thus, if an executive agency, such as the FEMA, may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Id.* The court concluded that the "mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that" is "above suspicion in the ordinary course of administration." *Id.* (citing *Reno*, 507 U.S. at 301).

Similarly, here, the President's directive in the Termination Provision is limited to the "extent allowed by law," EO 14,151 § 2(b)(i), and thus a well-recognized "exercise of the President's supervisory authority over the Executive Branch." *Allbaugh*, 295 F.3d at 33. Moreover, the "mere possibility that some agency might make a legally suspect decision" in enforcing the directive in the Termination Provision "does not justify an injunction against enforcement of [the] policy." *Id.* at 33. Ultimately, if Plaintiff is dissatisfied with a specific determination in the future, its remedy is to sue over *that* determination using applicable legal process at some future time—not to enjoin the entire directive at the outset with respect to every federal grant and contract.

Plaintiff's argument—which relies on three inapposite cases—is unavailing. *See* PI, 11-12 (citing *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018); *Barr*, 961 F.3d; *and City & Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018)). In all three lawsuits, the Executive had conditioned certain funding to cities by requiring local officials to abide by certain *new* requirements and conditions. Here, the Termination Provision does not impose any obligation—let alone new ones.

## III.    THE REMAINING FACTORS COUNSEL AGAINST GRANTING THE REQUESTED RELIEF.

### A.  Plaintiff has not shown irreparable injury attributable to the EOs.

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis added). Plaintiff's argument with respect to irreparable harm is largely duplicative of its arguments on the merits, *see* TRO, 15; PI, 14, and therefore fails for similar reasons, *see supra* II.[7]

### B. The balance of the equities and public interest weigh squarely against relief.

Lastly, Plaintiff cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a preliminary relief. These final two factors merge in cases where relief is sought from the government. *Nken*, 556 U.S. at 435.

In arguing that the public interest weighs in its favor, Plaintiff mostly repackages its arguments on the merits, which are futile. *See supra* II. Meanwhile, on the other end of the balancing test, any injunction here would effectively disable defendant agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities. "Any time [the government] is enjoined by a court from effectuating [laws], it suffers a form of irreparable injury." *King*, 567 U.S. at 1303 (citation omitted). Moreover, the public would suffer harm if the government were enjoined from following the President's directive to enforce and effectuate antidiscrimination laws.

Additionally, where the government is legally entitled to make decisions about the disbursement or allocation of federal funds and contracts but is nonetheless enjoined from doing so, such funds may not be retrievable afterwards. By contrast, if Plaintiff's contracts are terminated

---

[7] Indeed, Plaintiff does not even attempt to allege irreparable financial harm—rightly so. If any of Plaintiff's funds or contracts are terminated, Plaintiff may have the opportunity to dispute the termination, and, if successful, might retain the funds. Notably, a termination for convenience provides for compensation to the contractor for termination costs and often a reasonable allowance for profit. 48 C.F.R. §§ 49.201, 31.205-42.

in accordance with their terms, they may be entitled to recovery of costs, or even reasonable profits. *See supra* 34 n.7. Relatedly, a broad preliminary injunction would have a significant chilling effect on the President's and his advisors' ability to lawfully direct and guide government spending decisions and enforcement priorities. Agencies may feel obligated to forgo pursuing legally permissible actions in furtherance of the President's policy priorities—independent of the EOs— for fear of risking contempt. Thus, the balance of equities favors the government and relief should be denied.

## IV. ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED AND PERMIT LAWFUL AGENCY ACTIVITY.

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Lewis v. Casey*, 518 U.S. 343, 360 (1996) (explaining that an injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties). In line with these principles, to the extent the Court intends to grant Plaintiff's request for a preliminary injunction, such relief should be narrowly tailored to apply only to CWIT and DOL, and to leave intact the Executive's discretion to engage in further consideration of the topic at hand and implement new policies consistent with law.

### A. Injunctive relief should be limited to CWIT and DOL.

Plaintiff advances a stunning request for the Court to enjoin "any and all federal agencies from taking action adverse to a federally funded contract, grant, or other implementing vehicle." *See* TRO, 18. Any such relief, which would effectively enjoin *nondefendants* from taking any action against *nonplaintiffs*, would contravene Rule 65(d), Article III, and principles of equity.

To begin with, any injunction against non-defendant agencies is a nonstarter. An injunction under Fed. R. Civ. P. 65(d)(2) "bind[s] only … (A) the parties; (B) the parties' officers, agents,

servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in [(A) and (B)]." Thus, it is longstanding, black-letter law that courts "may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law," *Regal Knitwear Co.* v. *N.L.R.B.*, 324 U.S. 9, 13 (1945), and "[a]n injunction binds no person but the parties to the suit," *Osborn* v. *Bank of United States*, 22 U.S. 738, 802 (1824). Moreover, in *Lujan*, the Supreme Court observed that an injury attributable to certain federal agencies was not redressable because these particular agencies were not parties to the case. 504 U.S. at 568 (plurality opinion); *see also Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) (reaffirming this principle and stating that an injunctive or declaratory judgment entered against a nonparty is not "legally enforceable" and "is little more than an advisory opinion"). That conclusion followed from the unremarkable proposition that the district court "could accord relief only against" the actual defendant. *Lujan*, 504 U.S. at 568. As for the other agencies, "[t]hey were not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced" with respect to the defendant agency. *Id.* at 569. And a plaintiff does not have Article III standing to seek relief against a nonparties that have not injured (or are not likely to injure) the plaintiff. For example, Plaintiff here does not have standing to seek injunctive relief against the entire federal government because it has not alleged that it has federal contracts or receives federal funding from all federal agencies.

Such an injunction on "the world at large" is also inconsistent with the "equitable principles" that govern injunctive relief. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (L. Hand, J.)); *see also* 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2956 (3d ed. 2012) ("Injunctions

36

purporting to bind the entire world or all those with notice of its provisions" are "invalid," and "persons who are not actual parties to the action or in privity with any parties may not be brought within the effect of a decree merely by naming them in the order."). Contrary to Plaintiff's view, in issuing an injunction, the Court "is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court." *Alemite*, 42 F.2d at 832-33; *see also Diversity Officers*, at 9 (Rushing, J., concurring) ("The scope of the preliminary injunction alone should raise red flags: the district court purported to enjoin *nondefendants* from taking action against *nonplaintiffs*.").

There is also no basis to extend emergency interim relief with respect to non-plaintiffs. The limited purpose of a preliminary injunction "is merely to preserve the relative position *of the parties* until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasis added). An injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties. *Lewis v. Casey*, 518 U.S. 343, 360 (1996). As the Seventh Circuit has explained, "injunctions that extend beyond the parties before the court . . . . present real dangers, and will be appropriate only in rare circumstances." *Barr*, 961 F.3d at 916.

Plaintiff makes no effort at even trying to show that the "rare" instance exists here—insisting, without more, that those "similarly situated" should share the benefit of a lawsuit they never filed. *See* TRO, 17. Plaintiff's reliance on *Sessions*, 888 F.3d, and *Barr*, 961 F.3d, is also unpersuasive. In *Sessions*, although the panel initially upheld the nationwide scope of the district court's preliminary injunction, the *en banc* panel of the Seventh Circuit subsequently vacated the nationwide scope of the injunction. *See City of Chicago v. Sessions*, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). The district court then entered a *permanent* injunction, which was upheld on appeal "to provide complete relief to Chicago itself."

37

*Barr*, 961 F.3d. at 931; *see also id.* at 911 (explaining that the panel was "presented again with the issue of the proper scope, although in the different context of a permanent rather than a preliminary injunction"). Here, Plaintiff fails to show that a nationwide preliminary injunction is needed to provide complete relief to itself.

Lastly, although Plaintiff names the President as a defendant, any injunction against the President himself would be improper. The Supreme Court has long recognized that courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 499, 501 (1866); *see also Dellinger v. Bessent,* 25-5028, Denial of Emergency Motion to Stay, 4 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (outlining the President's immunity from judicial encroachment).

Thus, per Plaintiff's request in the alternative, any preliminary relief should be limited to Plaintiff and its specific grants/contracts with DOL. *See* TRO, 18.

### B.  Relief should clarify that it preserves the Executive's discretionary authority.

If the Court enters Plaintiff's proposed request for relief, that order should be limited to mitigate (albeit not eliminate) the significant harms it would cause to the Executive's abilities to exercise its lawful statutory authority and discretion. To that end, Defendants respectfully request that any preliminary relief clarify that it does not prohibit the President from reissuing a different directive or Executive Order or limit the defendant agencies from taking actions pursuant to their legal authority to regulate in furtherance of the substantive policy priorities in the EOs.

Moreover, Defendants respectfully request that any preliminary relief be appropriately narrowly tailored to preserve the Executive's authority to enforce federal antidiscrimination laws. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021) ("[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the

discretion of the Executive Branch."). That is the normal equitable remedy, and anything broader would constitute a significant intrusion on the separation of powers.

## V.  ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Acting Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.[8]

Defendants also respectfully request that any injunctive relief accompany a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed.

## CONCLUSION

For these reasons, this Court should deny Plaintiff's Motions for a Preliminary Injunction and Temporary Restraining Order.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director

---

[8] The Court should exercise its discretion to convert "Plaintiff's request for a TRO . . . into a motion for preliminary injunction as [Defendants are] on notice of the request and ha[ve] been given an opportunity to respond." *Norfleet v. Illinois Dep't of Corr.*, 2017 WL 2623946, at *2 (S.D. Ill. May 4, 2017) (citing *Doe v. Village of Crestwood, Illinois*, 917 F.2d 1476, 1477 (7th Cir. 1990)).

MORRIS PASQUAL
United States Attorney

THOMAS P. WALSH
PATRICK JOHNSON
Assistant United States Attorneys

*/s/ Pardis Gheibi*
PARDIS GHEIBI (D.C. Bar No. 90004767)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: pardis.gheibi@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/ Pardis Gheibi*