**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO WOMEN IN TRADES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 25 C 2005** |
| | ) | |
| **PRESIDENT DONALD J. TRUMP,** | ) | |
| **DEPARTMENT OF LABOR, ACTING** | ) | |
| **SECRETARY OF LABOR VINCENT** | ) | |
| **MICONE, OFFICE OF MANAGEMENT** | ) | |
| **AND BUDGET, DIRECTOR OF THE** | ) | |
| **OFFICE OF MANAGEMENT AND** | ) | |
| **BUDGET RUSSELL VOUGHT, U.S.** | ) | |
| **DEPARTMENT OF JUSTICE, ATTORNEY** | ) | |
| **GENERAL OF THE U.S. DEPARTMENT** | ) | |
| **OF JUSTICE PAMELA BONDI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

In this order, the Court considers plaintiff CWIT's motion for a temporary restraining order. The order describes the lawsuit, the motion, and the basis for the Court's ruling.

**Background**

Chicago Women in Trades (CWIT) is a non-profit organization based in Illinois that operates in all fifty states. Compl. ¶ 38. CWIT is dedicated "to promoting diversity, equity, and inclusion within the skilled trades industry" through "preparing women across the country to enter and remain in high-wage skilled trades, including carpentry, electrical work, welding, plumbing, and others." *Id*. ¶ 12. Federal funding accounts for

roughly forty percent of CWIT's annual budget.  *Id.* ¶ 42.

On January 20, 2025, President Donald J. Trump signed Executive Order 14151 (J20 Order), which is titled "Ending Radical and Wasteful Government DEI Programs and Preferencing."  Exec. Order No. 14151, 90 Fed. Reg. 8339; Compl., Ex. A.  On January 21, the President signed Executive Order 14173 (J21 Order), which is titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."  Exec. Order No. 14173, 90 Fed. Reg. 8633; Compl., Ex. B.  The Court will discuss the relevant language of the two Orders in the body of this decision.

On January 21, 2025, the United States Office of Personnel Management (OPM) issued a memorandum to the "Heads and Acting Heads of Departments and Agencies" directing agency heads to, among other actions, "terminate any DEIA-related contractors" by January 22, 2025.  Off. of Personnel Mgmt., Initial Guidance Regarding DEIA Executive Orders (Jan. 21, 2025); Parker Decl., Ex. B at 1–2.

On January 22, 2025, CWIT received an email from the grant administrator at the Department of Labor (DOL) Women's Bureau, which issues one of CWIT's grants, stating that "[e]ffective immediately, all recipients of federal financial assistance are directed to cease all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under their federal awards, consistent with the requirements of the Executive Orders" and that the DOL was "reviewing all active federal awards and will take appropriate action, including terminating the awards, consistent with the Executive Orders."  Vellinga Decl., Ex. 1. That same day, CWIT received an identical email forwarded by the Illinois Department of Labor concerning a different grant.  Also on January 22, CWIT received a Training

2

and Employment Notice from DOL Acting Deputy Assistant Secretary Michelle Paczynski with the subject line "Immediate Implementation of Executive Orders." The Notice stated that "[e]ffective immediately, all recipients of federal financial assistance awards are directed to cease all activities related to 'diversity, equity and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under the federal awards, consistent with the requirements of the EOs." *Id.*, Ex. 2 at 1. DOL recirculated this email on March 20, 2025. None of these emails or notices defined "DEI" or "DEIA."

On January 23, 2025, CWIT received an email from Jobs for the Future (JFF), an organization that CWIT subcontracts with, regarding two of JFF's grants. The email stated that the executive orders required JFF "to pause immediately all activities directly tied to our federally funded work related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA)." *Id.*, Ex. 3 at 1. In response, JFF asked CWIT to stop "any further work" on its subcontracted DEI projects as well. *Id.*

On March 26, 2025, JFF informed CWIT via email that it would be terminating its contract with CWIT. JFF directly cited the executive orders as the basis for termination: "JFF contracted with [CWIT] expressly to engage in activities no longer 'allowable' under Federal guidelines, pursuant to Executive Orders 14151 and 14173." Pl.'s Second Mot. to Suppl. the Factual R., Ex. A at 1.

CWIT filed the present suit on February 26, 2025 against President Trump and the DOL, the Office of Management and Budget (OMB), the Department of Justice, and the heads of those agencies. CWIT alleges that five provisions of the J20 and J21 Orders violate its rights under the First and Fifth Amendments to the Constitution and also run afoul of the Constitution's Spending Clause and the separation of powers.

CWIT moved for a temporary restraining order (TRO) on March 18, 2025, arguing that it faces imminent, irreparable harm from various terms of the J20 and J21 Orders.

## A.      Standing

The Court first addresses CWIT's standing to assert its claims.  *See Freedom From Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1467 (7th Cir. 1988).  Standing has three elements:  a plaintiff must establish that it has (1) "suffered a concrete and particularized injury that is either actual or imminent," (2) "that the injury is fairly traceable to the defendant," and (3) "that it is likely that a favorable decision will redress that injury."  *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007).

In the First Amendment context, "[i]t is well established that preenforcement challenges are within Article III."  *ACLU v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (cleaned up).  A plaintiff may establish imminent injury prior to enforcement by showing either an "intention to engage in a course of conduct arguably affected by a policy," coupled with a "credible threat the policy will be enforced against" the plaintiff, or a "chilling effect" on its speech that is "objectively reasonable" and results in "self-censorship."  *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020).

The burden to demonstrate standing in connection with a motion for entry of a TRO is "at least as great as the burden of resisting a summary judgment motion."  *Id.* at 638 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990) (Blackmun, J., dissenting)).  The plaintiff must "set forth by affidavit or other evidence 'specific facts,' rather than general factual allegations of injury."  *Id.* (cleaned up).

### 1.      Section 2(b)(ii)(A) of the J20 Order & Sections 3(c)(iii) & 4(b) of the J21 Order

Section 2(b)(ii)(A) of the J20 Order requires each agency to "provide the Director

of the OMB with a list of all . . . agency or department DEI" activities and expenditures.
Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(ii)(A); Compl., Ex. A at 8339.
Section 3(c)(iii) of the J21 Order requires the OMB to "[t]erminate all 'diversity'" and
"equity" "mandates, requirements, programs, or activities."  Exec. Order No. 14173, 90
Fed. Reg. 8633, § 3(c)(iii); Compl., Ex. B at 8634.  Section 4(b) of the J21 Order
requires the Attorney General to "submit a report to the Assistant to the President for
Domestic Policy containing recommendations for enforcing Federal civil-rights law,"
including a "plan" to "deter DEI programs or principles . . . that constitute illegal
discrimination."  Exec. Order No. 14173, 90 Fed. Reg. 8633, § 4(b); Compl., Ex. B at
8635.  These provisions focus on internal government agency processes and programs
and reporting to the President from his subordinates.  CWIT, of course, is not an agency
within the executive branch of government, and it has not alleged that it conducts any
programming for the government.  And it is difficult to see how CWIT can be in imminent
danger of an injury based on a provision that simply requires a cabinet official to issue a
report at a future date.  For purposes of the present motion at least, the Court is
unpersuaded that CWIT can establish the required injury in fact with respect to these
provisions.

## 2. Section 2(b)(i) of the J20 Order & Section 3(b)(iv) of the J21 Order

Section 2(b)(i) of the J20 Order (Termination Provision) requires each agency to
"terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants."  Exec.
Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i); Compl., Ex. A at 8339.  Although the
government has not yet terminated CWIT's grants, CWIT has shown a sufficiently
imminent injury to allow a pre-enforcement challenge.  CWIT's grants appear to be

squarely targeted by this Termination Provision—the provision requires the termination of "equity-related" grants, and CWIT alleges that it is a grantee that provides programming "centered on equity." *See* Compl. ¶ 35. CWIT has also received several credible threats of enforcement, including from grant issuers, to "cease all activities related to [DEI] or [DEIA] under the federal awards, *consistent with the requirements of the Executive Orders.*" Vellinga Decl., Ex. 1 (emphasis added). This provision requires the termination of grants "within sixty days of this order," i.e., March 21, 2025, further indicating imminent injury. *See* Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i); Compl., Ex. A at 8339. Finally, CWIT just had one of its subcontracts terminated due to the executive orders. JFF, with whom CWIT subcontracts with for two of the grants at issue, has sent CWIT an email stating that "[b]ecause once-allowable activities are no longer allowable, corresponding funding is no longer available." Pl.'s Second Mot. to Suppl. the Factual R., Ex. A at 1.

Section 3(b)(iv) of the J21 Order (Certification Provision) states that each agency "shall include in every . . . grant award" a certification, enforceable via the False Claims Act, that the grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Exec. Order No. 14173, 90 Fed. Reg. 8633, § 3(c)(iv); Compl., Ex. B at 8634. CWIT alleges that it is a grantee that provides programs promoting employment opportunities for women, so there is a strong basis to believe that its conduct might be considered by the government to fall within the scope of this provision. And, as discussed above, CWIT has received credible threats of enforcement—as well as actual termination of a subcontract—from grantors.

In addition, CWIT has alleged a pressure to self-censor in response to the

Orders, underscoring the chilling effect of the orders on grantees..  For example, "one of the pass-through entities with which CWIT works informed CWIT that subsequent to the Executive Orders, its contract with DOL had been unilaterally modified to remove all references to 'DEI' and 'DEIA.'"  Suppl. Vellinga Decl. ¶ 14.  This pass-through entity "threatened to terminate CWIT's subgrant unless it self-censored and . . . eliminate[d] any references to 'DEI' and 'DEIA' for an upcoming technical assistance program."  *Id.* ¶ 15.  CWIT further contends that the "pass-through entity has rejected CWIT's proposed training materials that retained the words 'Diversity and Equity' in the title, though the materials did not otherwise mention diversity, equity, or inclusion."  *Id.* Despite this, CWIT alleges that it has received no guidance from the entity on how to modify its materials to comply with the amended contract requirement.  *Id.* ¶ 16. Similarly, CWIT says that one of its contractors contacted CWIT to ask if any presentations could be made without DEI content.  According to CWIT, "[t]he contractor suggested that it asked these questions because of the Executive Orders."  Vellinga Decl. ¶ 46.  CWIT contends that such instances represent the sort of self-censorship pressure that it faces and will continue to face under the threat of the J20 and J21 Orders.

These injuries are imminent enough to constitute concrete injuries in fact that support standing to challenge the Termination and Certification Provisions.  In addition to the fact that the Orders themselves, and the communications CWIT (and others) has received, indicate that enforcement is imminent, the provisions essentially put grantees like CWIT in the position of having to take action now to avoid adverse consequences in the near future.  Among other things, compliance with the Certification Provision—which

requires a verification by the grantee that none of its programs (not just its programs under government grants) "promot[e] DEI"—calls upon a grantee like CWIT to modify its activities and advocacy *now* so that it can make an appropriate certification to avoid having the axe fall.

The imminent injuries are also fairly traceable to the defendants.  Specifically, the Termination and Certification Provisions are part of executive orders signed by the President that, by their terms, require implementation by DOL and other federal agencies.  Finally, a restraining order preventing these provisions from being enforced would prevent the injury from taking place.

In sum, the Court is persuaded that CWIT has standing to pursue its challenges to section 2(b)(i) of the J20 Order and section 3(c)(iv) of the J21 Order.

**B.     Ripeness**

The government also argues that CWIT's challenges are not ripe.  "Much like standing, ripeness gives effect to Article III's Case or Controversy requirement by 'preventing the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'"  *Sweeney v. Raoul*, 990 F.3d 555, 559–60 (7th Cir. 2021) (quoting *Abbott Laby's v. Gardner*, 387 U.S. 136, 148 (1967)).  In assessing ripeness, courts consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Id.* at 560 (quoting *Abbott Laby's*, 387 U.S. at 149).

The government contends that CWIT's claims are not ripe as its claims are based on "*possible* actions that agencies *might* take under the EOs."  Defs.' Resp. at 13.  But as discussed above, a plaintiff may bring a pre-enforcement action when First

Amendment rights are at stake. *See Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) ("A party who is the target of an unconstitutional law need not expose himself to liability before challenging its constitutionality . . . ."). And based on CWIT's affidavits, CWIT faces serious harm if consideration of its challenges is withheld—every day that passes increases the risk of termination of its grants and, correspondingly, increases the pressure to self-censor its speech. In fact, JFF has already informed CWIT that it is terminating its subcontracts with CWIT due to the executive orders. *See* Pl.'s Second Mot. to Suppl. the Factual R., Ex. A at 1.

The government attempts to rebut this by arguing that under the Orders, only illegal actions by grantees are prohibited, not First Amendment-protected speech. But, as discussed below, the orders do not define "DEI," so determining what "DEI programs" are legal or considered to be legal is left to the imagination of grantees.

The Court therefore is persuaded that CWIT's challenges to the Termination and Certification Provisions are ripe for review.

**C.      Temporary restraining order**

To obtain injunctive relief, the movant "must establish that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When, as here, the government is a party to the suit, "assessing the harm to the opposing party and weighing the public interest . . . merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because injunctive relief is "an extraordinary and drastic remedy," the party seeking a

TRO "carries the burden of persuasion" on each of these points. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

### 1. Likelihood of success on the merits

"In First Amendment cases, the likelihood of success . . . will often be the determinative factor" in granting an injunction. *Alvarez*, 679 F.3d at 589 (cleaned up).

### a. Termination Provision

CWIT brings a facial challenge regarding the Termination Provision of the J20 Order. CWIT alleges that, as written, the provision violates its First Amendment right to engage in protected speech and expressive conduct—specifically, to use its grants to implement its mission, involving women-focused apprenticeship and training programs.

To succeed on a facial challenge under the First Amendment, CWIT must ultimately show that the law or regulation at issue "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)). In conducting this facial analysis, the first step is to assess the enactment's scope. *Id.* at 724. The J20 Order's Termination Provision is plainly broad—it orders "[e]ach agency, department, or commission head" to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions . . . ; all 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees." Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b); Compl., Ex. A at 8339.

The next step in a First Amendment facial challenge "is to decide which of the [enactment's] applications violate the First Amendment, and to measure them against

the rest." *Moody*, 603 U.S. at 725. This analysis requires "explor[ing] the . . . full range of applications—the constitutionally impermissible and permissible both—and compar[ing] the two sets." *Id.* "[T]he First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or . . . through private intermediaries." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024). Although government officials may "forcefully condemn[] views with which they disagree," "the First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech." *Id.* at 189, 198 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

As a starting point, in this case, the government contends that there is a clear divide between any constitutionally impermissible enforcement of the Termination Provision and its clearly legitimate sweep because the provision limits termination "to the maximum extent allowed by law." Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i); Compl., Ex. A at 8339. Accordingly, the government argues, anything that violates current Federal anti-discrimination laws may be terminated, and anything that does not violate such laws may not be terminated. As such, the government's position is that the *Moody* balancing test comes out in its favor.

But the provision's limiting language cabining termination "to the extent allowed by law" does not insulate the government to the extent it contends. *See Vullo*, 602 U.S. at 196 ("[T]he conceded illegality of the NRA-endorsed insurance programs does not insulate Vullo from First Amendment scrutiny . . . ."). The Supreme Court has made clear that the government may not use the "threat of invoking legal sanctions and other

means of coercion" to suppress disfavored speech, as such coercive action would violate the First Amendment. *Id.* at 189.

To determine whether a challenged communication—here, the Termination Provision of the J20 Order—"is reasonably understood to be a coercive threat," a court considers four factors under a totality-of-the-circumstances analysis. *Id.*; *see also Backpage.com, LLC v. Dart*, 807 F.3d 229, 230–32 (7th Cir. 2015). These factors include: "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and perhaps most importantly, (4) whether the speech refers to adverse consequences." *Vullo*, 602 U.S. at 189 (quoting *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 715 (2d Cir. 2022)); *see also Backpage.com*, 807 F.3d at 230–32 (considering the same factors in a totality-of-the-circumstances analysis).

The J20 Order is likely a coercive threat under this test. First, the word choice and tone of the J20 Order indicates that the government will terminate "illegal and *immoral* discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)," and empowers government officials to terminate "*all* DEI [and] DEIA . . . officers and positions . . . ; *all* 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and *all* DEI or DEIA performance requirements for employees, contractors, or grantees." Exec. Order No. 14151, 90 Fed. Reg. 8339, §§ 1, 2(b)(i) (emphases added); Compl., Ex. A at 8339. This is strong language. Second, because CWIT's grants are federally funded, the government has the ability to terminate them. Finally, there are explicit adverse consequences for noncompliance with the J20 Order: termination of federally funded grants or contracts. On the other hand, the

language limiting termination authority "to the maximum extent allowed by law" arguably reduces the perception that the Termination Provision is a coercive threat.  Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i); Compl., Ex. A at 8339.  Still, the totality of the circumstances reflect that the J20 Termination Provision may reasonably be understood as a coercive threat—and has been understood as such, as indicated by the actions subcontractors have taken vis-à-vis CWIT—selectively targeting speech regarding DEI, DEIA, and equity based on a belief that such programs are "immoral," i.e., disfavored by the government.

The Termination Provision's vagueness gives rise to additional First Amendment issues.  An enactment may be unconstitutionally vague under the First Amendment if it regulates protected speech but the scope of its applications is uncertain, which "tend[s] to produce large chilling effects."  *See Brown*, 86 F.4th at 771 (citing *NAACP v. Button*, 371 U.S. 415, 432–33 (1963)); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("[W]here a vague statute abut(s) upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms.  Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden area were clearly marked." (citations and internal quotation marks omitted)).

CWIT contends that it is not possible to know whether the Termination Provision prohibits a substantial amount of protected speech relative to its legitimate sweep because there is no way for grantees to identify what falls under the provision to begin with.  Specifically, CWIT argues that the J20 Order targets "DEI," "DEIA," "environmental justice," "equity," and "equity action plans," but provides no definition of

13

these terms. According to CWIT, the lack of definitions inhibits its ability to understand what conduct is permissible. CWIT is thus concerned that some of its programs may violate the J20 Termination Provision, but it cannot be certain of the extent of potential violations. It contends that, as a result, it is forced to refrain from exercising its protected speech rights for fear that its grant will be terminated because a program it operates may run afoul of the J20 Order. This is particularly so given that one of its subgrants now *has* been terminated.

Returning to the steps outlined in *Moody*, if an enactment is written in such vague terms that it is not possible to determine its full range of applications, thus producing a large chilling effect, then the balancing test described in *Moody* is difficult to execute. At base, though, it seems that if the full range of the Termination Provision's applications is undefined such that it chills any protected speech that might touch upon whatever the government now contends to be "DEI," "DEIA," or "equity," then the full range of the provision's applications would be constitutionally impermissible.

The government argues that any alleged vagueness in the J20 Termination Provision does not support CWIT's claim because any vagueness prohibition is not as stringent when a criminal statute is not involved. The government is correct that "[t]he degree of vagueness that the Constitution tolerates" is dependent on the "nature of the enactment." *See Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). It relies on *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), to argue that the Termination Provision is sufficiently clear in the context of government grants.

*Finley*, however, is distinguishable. In *Finley*, the plaintiff brought a facial

14

challenge to language in the National Foundation on the Arts and Humanities Act directing the grantor to "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public" when issuing a grant. *Finley*, 524 U.S. at 572 (quoting 20 U.S.C. § 954(d)(1)).  The Supreme Court noted that "[t]he terms of the provision are undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns."  *Id.* at 588.  The Court went on to state, however, that it was unlikely "that speakers will be compelled to steer too far clear of any 'forbidden area' in the context of grants of this nature" and therefore any concerns over chilled speech due to vagueness were "not constitutionally severe."  *Id.* at 589; *see id.* at 590 (finding that the challenged language "merely adds some imprecise considerations to an already subjective selection process").

Here, unlike in *Finley*, it is likely that a speaker *would* feel compelled to steer clear of a "forbidden area":  DEI.  In fact, that is precisely what CWIT contends it now must do to ensure it does not violate the J20 Termination Provision.  Its fear is justified—just yesterday, on March 26, 2025, CWIT had a subcontract pursuant to a grant given to JFF terminated based on JFF's determination that the executive orders and ensuing enforcement emails "restrict[ed] activities related to DEI and DEIA" and made "corresponding funding . . . no longer available."  Pl.'s Second Mot. to Suppl. the Factual R., Ex. A at 1.  Therefore, the vagueness at issue in the Termination Provision goes squarely to the Court's concerns in *Finley* even under a less stringent vagueness standard.  The Termination Provision, although not in a criminal statute, does appear to "lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the

forbidden area were clearly marked." *Grayned*, 408 U.S. at 108. As described in more detail below, the Order provides no definition or even an example of what is considered "illegal DEI" that would be permissibly terminated, and the government has been unwilling or unable to clear it up during this litigation. Therefore, limiting termination to the maximum extent allowed by law offers no real protection, as the extent to which CWIT's programs may violate the law remains unclear.

The government further contends that it may, "without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). That is true. But *Vullo* makes clear that there is a line between the government enacting its policy goals by serving as patron in granting federal funding and suppressing disfavored speech through coercive threats or sanctions. Here, the government is not selectively funding some programs but not others; it is indicating an entire area of programming that is disfavored as "immoral" (as well as illegal) and threatening the termination of funding unless grantees bring their conduct into line with the government's policy agenda. Based on the totality-of-circumstances analysis above, eliminating federal funds for DEI, DEIA, and equity-related speech falls on the coercive threat side of the line. Accordingly, the present case is notably different from *Finley* and *Rust*.

The Court concludes that CWIT has shown it is likely to succeed on the merits of its claim against the Termination Provision on First Amendment grounds and thus need not address CWIT's remaining claims relating to this provision.

### b. Certification Provision

CWIT argues that section 3(b)(iv) of the J21 Order unconstitutionally infringes on its First Amendment rights because the order effectively regulates CWIT's conduct outside of the contours of the federal grants. "[F]unding condition[s] can result in an unconstitutional burden on First Amendment rights" when the government goes beyond "defining the limits of the Government spending program" and extends to "leverag[ing] funding to regulate speech outside of the contours of the federal program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 206 (2013).

The government conceded at oral argument that the Certification Provision attempts to regulate grantees' speech outside of their federally-funded programs. The provision on its face makes clear that a counterparty must certify that it does not operate *any* programs that promote DEI, irrespective of whether the program is federally funded.

The government contends that the Certification Provision is permissible, as it simply requires certification that the grantee is not breaking the law. Because a grantee has no constitutional right to violate the law, the government argues, its receipt of funds may appropriately be conditioned upon its certification that it abides by anti-discrimination laws. In this regard, the government emphasizes that the Certification Provision requires acknowledging only that the grantee does not operate any DEI programs that "violate any applicable Federal antidiscrimination laws." Exec. Order No. 14173, 90 Fed. Reg. 8633, § 3(c)(iv); Compl., Ex. B at 8634.

The problem, however, is that the meaning of this is left entirely to the imagination. The Order that contains the Certification Provision does not define the

term "DEI" itself, and it does not refer to any other source indicating what the term means as used in the Order—let alone what might make any given "DEI" program violate Federal anti-discrimination laws.  And although the government emphasized, both in its brief and at oral argument, that the Certification Provision implicates only *illegal* DEI programs, it has studiously declined to shed any light on what this means.  The answer is anything but obvious.  Indeed, the thrust of the Orders is that the government's view of what is illegal in this regard has changed significantly with the new Administration—even though the government has not (in the Orders) and has been unwilling to (in its briefs or at argument) define how it has changed.

Against this backdrop, the Certification Provision puts CWIT (and other grantees) in a difficult and perhaps impossible position.  They have received multiple communications from the DOL directing them to ensure compliance with the J20 and J21 Orders.  As it relates to the Certification Provision, and in particular its application to programs that are *not* federally funded, this means that CWIT or any other grantee must either take steps now to revise their programmatic activity so that none of it "promote[s] DEI" (whatever that is deemed to mean), decline to make a certification and thus lose their grants, or risk making a certification that will be deemed false and thus subject the grantee to liability under the False Claims Act.  The J21 Order's reference to "programs promoting DEI," moreover, is fairly read as an *express* reference to First Amendment-protected speech and advocacy, even if cabined to promoting whatever the government may now contend is "illegal DEI."  *Cf. Virginia v. Black*, 538 U.S. 343, 359 (2003) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe

18

advocacy . . . of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

For these reasons, the Court concludes that CWIT has shown that it is likely to succeed on the merits of its claim challenging the Certification Provision.

## 2. Irreparable harm

Given the Court's finding that CWIT has established a likelihood of success on its claims that the Termination and Certification Provisions violate its First Amendment rights, it has made a sufficient showing of irreparable harm that would result from enforcement of these provisions. *See Alvarez*, 679 F.3d at 589 ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))). Further, when First Amendment rights are at stake, the "quantification of injury is difficult and damages are therefore not an adequate remedy." *Id.* (citation omitted).

## 3. Balancing of the harms & public interest

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Id.* (citation omitted). Accordingly, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Id.* at 589–90. Further, because both Orders contain a severability clause, the unchallenged provisions of the Orders will remain in effect even if the Court issues a TRO. *See* Exec. Order No. 14151, 90 Fed. Reg. 8339, § 3 ("If any provision of this order . . . is held to be invalid, the remainder of this order and the application of its

provisions to any other persons or circumstances shall not be affected thereby."); Exec. Order No. 14173, 90 Fed. Reg. 8633, § 6 (same); Compl., Exs. A–B. Finally, issuance of a TRO will not prevent the government from enforcing existing anti-discrimination laws.

For these reasons, the balance of harms and public interest weighs in favor of granting the TRO.

## D.    Scope

CWIT seeks to enjoin enforcement of the relevant provisions of the Orders across the board, not just for itself but also for other grantees. It contends that the Termination and Certification Provisions are particularly appropriate for a nationwide injunction because the government relies on a categorical policy and the facts would not require different relief for other federal grantees.

The Seventh Circuit has held that a district court has discretion to grant a nationwide injunction "to provide complete relief to plaintiffs, to protect similarly-situated nonparties, and to avoid the chaos and confusion that comes from a patchwork of injunctions." *City of Chicago v. Barr*, 961 F.3d 882, 916–17 (7th Cir. 2020) (citation omitted); *see also id.* at 916 ("[B]oth historical and current practice lends support to a determination that the courts possess the authority to impose injunctions that extend beyond the parties before the court."). Still, the Seventh Circuit has made clear that nationwide injunctions "present real dangers." *Id.* at 916. In particular, they "can truncate the process of judicial review" by "elevating the judgment of a single district court," and thus may create "the potential for forum shopping." *Id.* Such broad injunctive relief is therefore "appropriate only in rare circumstances." *Id.*

20

The Court finds that a temporary restraining order precluding any enforcement of the Certification Provision is warranted to ensure that CWIT is provided complete relief and to prevent broader impending violations against others who are similarly situated. *See id.* at 920–21 ("[A] court may impose the equitable relief necessary to render complete relief to the plaintiff . . . ."); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established . . . ."); *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011) ("When the court believes the underlying right to be highly significant, it may write injunctive relief as broad as the right itself." (citation omitted)). This situation appears to be the type of "exceptional circumstances" in which "the proper scope" of the temporary restraining order is nationwide. *Barr*, 916 F.3d at 917 ("Any number of factors could influence a court's determination as to the proper scope of an injunction, including the nature of the violation, the extent of the impact, the urgency of the situation, the multiplicity of litigation, and the ability of others to even access the courts.").

CWIT does not just work alone, but in conjunction with other organizations that may be deemed to provide DEI-related programming. The Certification Provision requires grant recipients to certify that they do "not operate any programs promoting DEI." In other words, as a result of this provision, CWIT will not be able to work with other recipients of government grants unless those grantees also satisfy this provision by cutting any DEI-related efforts.

As explained previously, the impact of this provision on CWIT and other grantees is likely to result in self-censorship. CWIT has already lost its JFF subcontract due to

JFF's concern that it would run afoul of the executive orders by working with CWIT. To afford CWIT complete relief, other entities it works with must be protected from the Certification Provision as well.

Indeed, the concern that other similarly situated grant recipients may be targeted by the Certification Provision is anything but speculative. On March 20, 2025, roughly sixty organizations, including CWIT, received an email from DOL instructing them to "immediately cease all award activities related to DEI," "consistent with the requirements of the EOs." Mot. to Suppl. to the Factual R., Ex. A at 1–2. Therefore, a nationwide temporary restraining order protects similarly situated non-parties as well and ensures that CWIT is provided complete relief.

Further, the fact that the Certification Provision reaches speech beyond the federally-funded program supports a broad injunction. Every grant recipient is expected to certify that it does not engage in *any* programs involving "illegal DEI" (not just federally funded programs) without knowing what programs fall under that umbrella. Rather than spend their resources to challenge their patron in court or risk False Claims Act litigation, it is likely that many of these grantees will take the safer route and choose to simply stop speaking on anything remotely related to what the government might consider to promote DEI or equity. A nationwide restraining order is appropriate to protect grantees who cannot afford the risks inherent in biting the hand that feeds them.

The Court reaches a different conclusion, however, regarding the Termination Provision. First of all, the record does not reflect significant evidence that CWIT will not be provided complete relief without a nationwide injunction on this provision. Once this provision is enjoined against CWIT, its government grants will be safeguarded.

In addition, the risk that other affected grantees will not challenge enforcement of this provision against them is likely far less than for the Certification Provision. A grantee whose funding is terminated would appear to have an ample incentive to challenge the termination so that it can retain funding; it is less likely that they will simply turn and walk away. Although there certainly is a risk that grantees will remove broad swaths of programs to avoid the potential for termination, the Court is not persuaded at this juncture that this risk outweighs the concerns with nationwide restraining orders with respect to the Termination Provision. Rather, the Court will limit its restraining order with regard to the Termination Provision to CWIT and any federal grantee through which CWIT holds a subcontract or is a subrecipient of federal funds, including JFF.

Finally, these temporary restraining orders are limited to enjoining DOL, and not other defendants. DOL administers CWIT's grants—and also administers grants to other recipients who work with CWIT. And it is with regard to DOL that CWIT has shown a risk of imminent harm, as illustrated by the emails DOL has recently sent to CWIT and other grant recipients. The Court therefore limits the reach of its temporary restraining order to DOL, at least at this juncture.

## Conclusion

For the reasons stated above, the Court grants in part CWIT's motion for a temporary restraining order [dkt. no. 40]. The Court will separately enter a temporary restraining order.[1] The preliminary injunction briefing schedule is advanced as follows:

---

[1] The Court notes that the order's language as it is being entered does not fully cover the intended scope of the TRO concerning the Termination Provision, specifically concerning the TRO's operation with regard to grants, etc. to other entities that contract with CWIT. The parties are to promptly propose modified language to cover this.

any further response by the government to the motion for preliminary injunction must be filed by April 3, 2025, and any further reply by the plaintiff must be filed by April 7, 2025. The preliminary injunction motion is set for an in-person hearing on April 10, 2025 at 10:00 a.m.

Date:  March 26, 2025

MATTHEW F. KENNELLY
United States District Judge