UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHICAGO WOMEN IN TRADES,                    )
                                            )
                     Plaintiff,             )
                                            )        No. 25 C 2005
             v.                             )
                                            )        Judge Kennelly
PRESIDENT DONALD J. TRUMP, *et al*.,        )
                                            )
                     Defendants.            )

**DEFENDANTS' SECOND MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 1

I.     The Termination Provision does not violate the First Amendment. .................................. 1

II.    Any preliminary injunction should be limited to CWIT and DOL. ................................. 9

     A.     Any preliminary injunction should be limited to DOL. ......................................... 9

           i.     Any injunction against nondefendants would be inconsistent with Rule 65(d). ....................................................................................................... 10

                1.     Nondefendant agencies are not in "active concert or participation" with DOL. ............................................................. 10

                2.     Nondefendant agencies are not in privity with defendant agencies. ....................................................................................... 11

           ii.     Any injunction against non-defendant agencies would be inconsistent with Article III. .................................................................. 13

           iii.     An injunction against nondefendants is inconsistent with traditional principles of equity and the principles underlying preliminary injunctive relief. ................................................................. 14

     B.     Any injunction should be limited to CWIT. .......................................................... 15

CONCLUSION ..................................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AID*),
  570 U.S. 205 (2013) ............................................................................................ 2, 8

*Alemite Mfg. Corp. v. Staff*,
  42 F.2d 832 (2d Cir. 1930) ...................................................................................... 14

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) .................................................................................... 17

*Backpage.com, LLC v. Dart*,
  807 F.3d 229 (7th Cir. 2015) ............................................................................... 6, 9

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ............................................................................................... 6, 9

*Barr v. East Bay Sanctuary Covenant*,
  140 S. Ct. 3 (2019) .................................................................................................. 17

*Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*,
  824 F.3d  (9th Cir. 1987) ........................................................................................... 9

*CASA DE Maryland, Inc. v. Trump*,
  971 F.3d 220 (4th Cir.), *reh'g en banc granted*, 981 F.3d 311 (4th Cir. 2020) ........................ 17

*City of Chicago v. Barr*,
  961 F.3d 882 (7th Cir. 2020) ................................................................. 15, 16, 17

*City of Chicago v. Sessions*,
  2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, 2018 WL 4268814 (7th Cir. Aug. 10, 2018)...................................................................................................................... 17

*Construction Trades Department, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ................................................................................ 3, 4

*DHS v. New York*,
  140 S. Ct. 599 (2020) ......................................................................................... 16, 17

*East Bay Sanctuary Covenant v. Barr*,
  934 F.3d 1026 (9th Cir. 2019) .................................................................................. 15

*Future Motion, Inc. v. Lai*,
  2025 WL 265818 (D. Or. Jan. 7, 2025) .................................................................... 10

*Garland v. VanDerStok*,
  144 S. Ct. 44, (2023) ................................................................................................ 17

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ................................................................... 6

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) ................................................................. 13

*Havens v. James*,
    76 F.4th 103 (2d Cir. 2023) ............................................... 10, 11

*Kennedy v. Warren*,
    66 F.4th 1199 (7th Cir. 2023) ................................................... 9

*Labrador v. Poe*,
    144 S. Ct. 921 (2024) ............................................................. 17

*Leathers v. Medlock*,
    499 U.S. 439 (1991) ................................................................. 5

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..................................................... 12, 13, 14

*McHenry v. Texas Top Cop Shop, Inc.*,
    145 S. Ct. 1 (Jan. 23, 2025) ................................................... 17

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1866) .................................................. 11

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024) ........................................................... 13

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ................................................................. 6

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    No. 25-1189, Dkt. 29 (4th Cir. Mar. 14, 2025) ................... *passim*

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    144 S. Ct. 1316 (2024) .......................................................... *passim*

*Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v.*
    *Nat'l Spiritual Assembly of Baha'is of U.S., Inc.*,
    628 F.3d 837 (7th Cir. 2010) ........................................ 10, 11, 12

*Nat'l Urban League v. Trump*,
    No. 25-cv-471 (D.D.C.) .......................................................... 16

*Northrop Grumman Corp. v. United States*,
    46 Fed. Cl. 622 (2000) ............................................................. 7

*Okwedy v. Molinari*,
  333 F.3d 339 (2d Cir. 2003) ........................................................................... 9

*Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*,
  699 F.3d 962 (7th Cir. 2012) ......................................................................... 5

*Regal Knitwear Co. v. NLRB*,
  324 U.S. 9 (1945) ........................................................................................... 13

*Rust v. Sullivan*,
  500 U.S. 173 (1991) .............................................................................. 2, 4, 5

*San Francisco AIDS Foundation v. Trump*,
  No. 25-cv-01824 (N.D. Cal.) ........................................................................ 16

*S.E.C. v. Homa*,
  514 F.3d 661 (7th Cir. 2008) ....................................................................... 10

*State of Texas v. Holder*,
  2012 WL 13070110 (D.D.C. June 8, 2012) ................................................ 12

*Taylor v. Sturgell*,
  553 U.S. 880 (2008) ...................................................................................... 14

*Tice v. Am. Airlines, Inc.*,
  162 F.3d 966 (7th Cir. 1998) ....................................................................... 12

*Trump v. Hawaii*,
  583 U.S. 1009 (2017) .................................................................................... 17

*Trump v. Hawaii*,
  585 U.S. 687 (2018) ...................................................................................... 17

*Trump v. Int'l Refugee Assistance Project*,
  582 U.S. 571 (2017) ...................................................................................... 17

*United States v. Am. Library Ass'n*,
  539 U.S. 194 (2003) ........................................................................................ 5

*United States v. Texas*,
  599 U.S. 670 (2023) ...................................................................................... 17

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ...................................................................................... 14

*Va. Soc'y for Human Life, Inc. v. FEC*,
  263 F.3d 379 (4th Cir. 2001), *overruled on other grounds by*
  *Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012) ................... 15

*Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC,*
  985 F. Supp. 2d 23 (D.D.C. 2013)..........................................................12

*Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC,*
  776 F.3d 1 (D.C. Cir. 2015)..................................................................12

*Whole Woman's Health v. Jackson,*
  595 U.S. 30 (2021)................................................................................14

*Wolf v. Innovation Law Lab,*
  140 S. Ct. 1564 (2020)..........................................................................17

*Ysursa v. Pocatello Educ. Ass'n,*
  555 U.S. 353 (2009)................................................................................7

**REGULATIONS**

Ending Radical & Wasteful Government DEI Programs & Preferencing,
  Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ......................3

Ending Illegal Discrimination & Restoring Merit-Based Opportunity,
  Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ......................3

**RULES**

Fed. R. Civ. P. 65................................................................................9, 10

**OTHER AUTHORITIES**

Harold Leventhal, *A Modest Proposal for a Multi-Circuit Court of Appeals,*
  24 Am. U. L. Rev. 881 (1975)..............................................................15

Harvard Law Review, *Chapter Four District Court Reform: Nationwide Injunctions,*
  137 Harv. L. Rev. 1701 (2024)..............................................................18

Michael Coenen & Seth Davis, *Percolation's Value,*
  73 Stan. L. Rev. 363 (2021) ..................................................................18

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction,*
  131 Harv. L. Rev. 417 (2017)..........................................................15, 16

## INTRODUCTION

This Court issued a Memorandum Opinion and Order on March 27, 2025, granting in part Plaintiff Chicago Women in Trades' (CWIT) motion for a Temporary Restraining Order (TRO) and entering interim relief based on CWIT's First Amendment claims with respect to the Termination and Certification Provisions. The TRO enjoined the Department of Labor (DOL) from enforcing the Termination Provision against CWIT and from enforcing the Certification Provision against any grantee or contractor. The TRO further enjoined the government from initiating any False Claims Act enforcement action against CWIT pursuant to the Certification Provision.

For the reasons outlined in Defendants' initial response to Plaintiff's Motion for a Temporary Restraining Order and Motion for a Preliminary Injunction, this Court should reject Plaintiffs' First Amendment, Fifth Amendment, and separation-of-powers challenges to all five challenged provisions. *See* Dkt. 44. Defendants incorporate the arguments presented in their initial response in full and avoid repeating them here. Defendants take this opportunity to address two additional matters raised in the Court's TRO Memorandum Opinion. Dkt. 52.

First, Defendants request that this Court reconsider its analysis of the Termination Provision, which relies in part on a misunderstanding of Defendants' argument and the Supreme Court's inapposite holding in *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 1316 (2024).[1] Second, Defendants request that the Court appropriately tailor any preliminary injunction to CWIT and DOL only.

## ARGUMENT

### I.    The Termination Provision does not violate the First Amendment.

---

[1] Defendants also request that the Court reconsider its prior analysis of the Certification Provision. In making this request, Defendants rest solely on the arguments raised in their initial response. *See* Dkt. 44 at 25-28.

1

This Court should reconsider its analysis of the Termination Provision, which relies in part on a misunderstanding of the government's argument with respect to the Termination Provision and the Supreme Court's inapposite holding in *Vullo*, 144 S. Ct. 1316.

As Defendants explained in their initial response, *see* Dkt. 44 at 22-35, the Termination Provision comports with the First Amendment because it does not attempt to regulate speech by recipients on their "own time and dime." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AID*), 570 U.S. 205, 218 (2013). The provision merely provides for the termination of "equity-related" government contracts and grants (so long as such termination is otherwise consistent with applicable laws). This realignment of government funding priorities is consistent with decades of Supreme Court precedent providing that the government does not penalize or otherwise infringe on speech simply because it chooses not to pay for it. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).

In issuing a TRO with respect to the Termination Provision, this Court stated that the government is arguing that the Termination Provision provides that "anything that violates current Federal anti-discrimination laws may be terminated, and anything that does not violate such laws may not be terminated." Dkt. 52 at 9. That is incorrect.[2] As is relevant for entities such as CWIT,

---

[2] To the extent the Court's understanding of Defendants' argument stems from any representations made by Defendants' counsel during the TRO hearing, counsel apologizes for the confusion. Counsel's discussion of "DEI programs that violate federal antidiscrimination laws" pertained to the Certification Provision, not the Termination Provision. *See* TRO Tr. 38-45 (attached hereto as Ex. A).

Relatedly, counsel for Defendants takes this opportunity to make two additional clarifications. First, with respect to the Certification Provision, counsel for Defendants inadvertently stated that antidiscrimination laws in the Executive Orders refer to laws that "existed the day the executive order was issued." *Id.* at 38. Counsel meant to convey that the Executive Orders "do not put forth a new definition for federal antidiscrimination laws," *id.* at 38, not that antidiscrimination laws may not change after the Executive Orders were issued. The Executive Orders refer to *existing* antidiscrimination laws, which may—at some point in the future—differ from antidiscrimination laws at the time the Executive Orders were issued. But regardless, as explained during the hearing, nothing in the Executive Orders themselves alters existing antidiscrimination laws. *Id.*

which receive federal "grants or contracts," the Termination Provision directs federal agencies to "terminate, to the maximum extent allowed by law . . . all . . . 'equity-related' grants or contracts." Ending Radical & Wasteful Government DEI Programs & Preferencing, Exec. Order No. 14,151, § 2(b)(i), 90 Fed. Reg. 8339 (Jan. 20, 2025) (EO 14,151). The provision's instruction that any termination occur to the "maximum extent allowed by law" is a restriction on the government's *legal authority* to terminate a contract or grant, which does not depend on whether the equity-related activity is "legal" or "illegal." In this way, the qualifier mirrors the one that appeared in the Executive Order at issue in *Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002). There, the Executive Order "provided that, to the extent permitted by law, no federal agency, and no entity that receives federal assistance for a construction project, may either require bidders or contractors to enter, or prohibit them from entering, into a project labor agreement (PLA)." *Id.* at 30. As the *Allbaugh* court recognized, the permitted-by-law qualifier "instructs the agency to follow the law." *Id.* at 33. By way of example, the court explained, "if an executive agency, such as the FEMA, may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order,"

---

Second, during the hearing, the Court asked counsel about Section 3(c)(ii) of Executive Order 14,173. As counsel explained, Plaintiff has not challenged that provision. TRO Tr., 60. But, to clarify, as the Court correctly noted, this provision has "outward facing" effects. *Id.* The provision directs the Director of the Office of Management and Budget to: "Excise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures to streamline those procedures, improve speed and efficiency, lower costs, and comply with civil-rights laws." Ending Illegal Discrimination & Restoring Merit-Based Opportunity, Exec. Order No. 14,173, § 3(c)(ii), 90 Fed. Reg. 8633 (Jan. 21, 2025) (EO 14,173). The federal procedures listed pursuant to this directive would not be fully internal to the government. Private parties subject to government agreements may be required to follow some of the relevant federal procedures, which, at times, are also specified in the agreements' terms and conditions. Counsel apologizes for any confusion any of her statements regarding the Executive Orders may have caused.

3

then it may not. *Id.* The court went on to conclude that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration." *Id.*

The same is true here. The Termination Provision limits any termination to the extent that termination is independently permitted by law—i.e. relevant statutes, rules, regulations, and terms of the contract/grant that may govern termination. As in *Allbaugh*, "[i]n the event that an agency does contravene the law in a particular instance, [CWIT] may seek redress through any of the procedures ordinarily available to it: [such as] a motion for administrative reconsideration, or an action in the district court challenging that specific decision." *Id.* Because the Termination Provision explicitly instructs federal agencies to follow any applicable laws before terminating any contract or grant, the Provision provides ample safeguard against any "unlawful" future termination that may worry CWIT.

In sum, nothing in the Termination Provision directs federal agencies to make termination decisions based on whether the activity funded by a federal contract or grant violates antidiscrimination laws; rather, it "directs the termination of grants, subject to applicable legal limits, based only on the ['equity-related'] nature of the grant-funded activity itself." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189, Dkt. 29, at 7 (4th Cir. Mar. 14, 2025) (*Diversity Officers*) (Harris, J., concurring). In this way, the Termination Provision, consistent with Supreme Court precedent, allows the government to "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust*, 500 U.S. at 193.

Indeed, as Plaintiff's counsel admitted during the TRO hearing, the government may generally make funding determinations based on nature of the funded activity itself. *See* TRO Tr., 6. That admission was proper; the Supreme Court has long made clear that such funding determinations based on the content of the funded activities do not violate the First Amendment. *See, e.g.*, *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "'decision not to subsidize the exercise of a fundamental right does not infringe the right'" (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights").

Plaintiff, however, seems to argue that while the Constitution does not prohibit the government from making content-based funding determinations in a *pre*-funding posture, it prohibits the government from making such funding determinations *post*-funding by terminating already granted federal funds. TRO Tr., 6-8. That is a distinction without a difference and finds no support in the caselaw. The constitutionality of both pre-funding and post-funding determinations are analyzed under *Rust*'s "unconstitutional conditions" doctrine. The Seventh Circuit reaffirmed this principle in *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, where it analyzed the constitutionality of a *defunding* statute pursuant to *Rust*'s unconstitutional conditions doctrine. 699 F.3d 962, 987-88 (7th Cir. 2012).

During the TRO hearing, Plaintiff's counsel pointed to *Vullo* as the "best case" in support of the proposition that post-funding determinations somehow trigger a different legal standard than *Rust*'s (while also admitting that the case "is not quite on all fours" with this one). TRO Tr., 8. That admission makes sense— the "coercion" at issue in *Vullo* radically differs from the directive in the Termination Provision.

5

For starters, the Supreme Court made clear that its decision in *Vullo* "does not break new ground." 144 S. Ct. at 1332. Instead, the Court "only reaffirm[ed] the general principle from *Bantam Books*" that "coercive threats aimed at punishing or suppressing disfavored speech" implicate the First Amendment. *Id.* at 1332 (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)). The coercive conduct at issue in *Bantam Books* and *Vullo* fundamentally differ from the directive in the Termination Provision. Importantly, in both *Bantam Books* and *Vullo*, the government's coercive threats were tied to threats to "initiate investigations and refer cases for prosecution." *Vullo*, 144 S. Ct. at 1329; *see also Backpage.com, LLC v. Dart*, 807 F.3d 229, 235 (7th Cir. 2015) (coercion included the threat of prosecution). In other words, in "coercing" the plaintiffs, the government was acting in its capacity as "sovereign." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998).[3] Here, the Termination Provision does not trigger the

---

[3] This Court distinguished *Finley* by stating that the recipients here, unlike the recipients in *Finley*, "*would* feel compelled to steer clear of a 'forbidden area.'" *See* Dkt. 52 at 15. Defendants respectfully disagree with this reading of *Finley*. The "forbidden area" language in *Finley* refers to *prohibited* conduct. The Termination Provision—much like the provision in *Finely*—is merely a funding provision that does not prohibit any conduct or speech to begin with.

The "forbidden area" language in *Finley* comes from *Grayned v. City of Rockford*, 408 U.S. 104 (1972). In *Grayned*, the Court explained that vague laws that do not distinguish between legal conduct and illegal conduct do not properly inform the public to steer clear of a "forbidden area"— i.e., prohibited conduct. *Id.* at 108-109. In *Finley*, the Court distinguished the "undeniably opaque," but constitutional, funding provision (that did not prohibit any conduct) from the vague criminal statutes and regulations in *Grayned* and its prodigy, which sought to prohibit conduct (or identify a "forbidden area"). *See Finley*, 524 U.S. at 588-89 (collecting cases). Vagueness does not raise concerns in the funding context because in making grant funding determinations, the government is not "forbidd[ing]" any conduct to begin with. At most—as *Finley* itself acknowledged—a vague funding provision may encourage recipients to "conform their speech" to what they think the government would fund. *Id.* at 589. Doing so, however, is not akin to steering clear of a "forbidden area" under *Grayned* because the recipient would be "conform[ing] [its] speech" in order to be selected by the government for funding—not to avoid prosecution or penalty. In sum, the *Finely* Court distinguished *Grayned* and its prodigy (where the government was identifying a "forbidden area" by prohibiting conduct through criminal statutes and regulations) from government funding where "the Government is acting as patron rather than as sovereign." *Id.* Where, as here, the Termination Provision outlines the government's funding decisions as "patron," *Finley*'s vagueness analysis controls. As such, any decision by CWIT to "conform [its] speech" by steering

government's authority as sovereign—i.e., it does not direct federal agencies to initiate investigation against, refer for prosecution, or regulate the conduct of any recipient simply because that recipient previously received "equity-related" contracts or grants from the government. Rather, it merely directs federal agencies (as permitted by law) to terminate federal funding for activities that no longer align with the government's policy priorities. Any interpretation that would equate termination of federal funding—to the extent permitted by law—to "coercion" would upend decades of precedent providing the government ample leeway in making funding determinations. Notably, any such interpretation would run contrary to long-established caselaw providing that "[t]he Government's right to terminate a contract for convenience is broad." *Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 626 (2000). Indeed, as Plaintiff's counsel admitted during the TRO hearing, the government has wide discretion to terminate contracts "for any reason." TRO Tr., 10 ("I will concede on contracts, this is a much tougher argument because contracts -- government contracts typically include a termination for convenience clause. They can be terminated for any reason."). And yet, Plaintiff fails to explain why the First Amendment inquiry is any different for government *grants*—it is not. Both government contracts and grants are federal "funds," and therefore trigger the caselaw on government funding. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that the government "is not required to assist others in funding the expression of particular ideas"). Thus, any limitation on the government's authority to terminate a particular grant (that does not exist with respect to its authority to terminate

---

clear of equity-related activities in order to receive federal funding is not akin to steering clear of a "forbidden area" to avoid prosecution or penalty.

To be clear, Defendants do not invoke *Finley* for purposes of the Certification Provision or the Reporting Provision, which pertain to the government's authority as sovereign. *See* Dkt. 44 at 3, 25-31.

contracts) would stem either from the terms of the grant agreement itself or potentially relevant statutes and regulations—not the First Amendment.[4]

Unsurprisingly, the government "coercion" in *Vullo* had little to do with *government funding* of the relevant activity—i.e., New York was not attempting to terminate its own funding of NRA's promotion of gun rights. Rather, New York targeted NRA's *non-government* funding by third parties. New York—which had no authority to cut off NRA's business relationships with private entities—sought to do so anyway by improperly leveraging its authority as sovereign over those entities (through threats of adverse consequences, such as prosecution) in order to coerce them away from supporting the NRA. *Vullo* thus stands for the "principle that a government official cannot do indirectly what she is barred from doing directly." 144 S. Ct. at 1328. By contrast, here, the government is entitled—directly—to make determinations about *its own* funding of "equity-related" activities. The relevant standard for evaluating the constitutionality of the government's own funding determinations is not "coercion" under *Vullo*, *Bantam Books*, and *Backpage.com*—it is "unconstitutional condition" under *Rust*. And in the First Amendment context, the unconstitutional condition doctrine requires the court to ask whether the government is "leverag[ing] funding to regulate speech *outside* the contours of the programs itself." *AID*, 570 U.S. at 214-15 (emphasis added). Here, the answer is no. The Termination Provision does not "authorize the termination of grants based on a grantee's speech or activities outside the scope of the funded activities." *Diversity Officers*, at 7 (Harris, J., concurring). As such, the Termination Provision does not violate the First Amendment.

---

[4] Once again, to the extent that any such legal limitation on grant termination exists, the Termination Provision itself instructs the agency to yield to that legal limitation and refrain from terminating the relevant grant.

Lastly, putting aside the "funding" nature of the Termination Provision, the coercion framework is a particularly poor fit in the context of Presidential directives to subordinates. Courts have primarily applied this framework with respect to communications from the government to *specific* parties. In analyzing the communications, courts have sought to discern whether they amount to lawful "attempts to convince" or unlawful "attempts to coerce" the communication's recipient. *See, e.g.*, *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam) (using framework to determine whether a letter from a city borough president to a company amounted to a coercive threat); *Kennedy v. Warren*, 66 F.4th 1199 (7th Cir. 2023) (letter from a United States Senator to online retailer's chief executive officer); *Backpage.com*, 807 F.3d (letters from a county sheriff to credit card companies); *Bantam Books*, 372 U.S. (letters from a commission to distributors); *Carlin Commc'ns, Inc. v. Mountain States Telephone & Telegraph Co.*, 824 F.3d 1291 (9th Cir. 1987) (letter from a public attorney to a telephone company). The Termination Provision is neither an attempt to coerce nor to persuade anyone; it is merely a directive from the President to his own subordinates regarding funding priorities.

For these reasons, Defendants respectfully request that the Court reconsider its earlier analysis of the Termination Provision.

## II.    Any preliminary injunction should be limited to CWIT and DOL.

If the Court enters a preliminary injunction, any relief should be limited to CWIT and DOL. Defendants' initial response preserved several considerations for narrowing any relief, including limitations imposed by Article III, Fed. R. Civ. P. 65(d), equitable principles, and cautionary decisions by the Seventh Circuit and Supreme Court. Dkt. 44 at 35-39. Defendants supplement those arguments with additional considerations below.

### A.   Any preliminary injunction should be limited to DOL.

This Court should outright reject any invitation by Plaintiff to enjoin nondefendant agencies. *See* Dkt. 41, 2.[5] Any such injunction would go far beyond a "nationwide" injunction, which generally provides nationwide relief to *nonplaintiffs*. An injunction that *enjoins* nondefendants who did not have the chance to defend themselves goes far beyond one that provides *relief* to nonplaintiffs who did not request it. The former is a nonstarter due to limitations imposed by Rule 65(d), Article III, binding Supreme Court precedent, and principles of equity.

       i.      *Any injunction against nondefendants would be inconsistent with Rule 65(d).*

Under Federal Rule of Civil Procedure 65(d)(2), an injunction "bind[s] only … (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in [(A) and (B)]." Under binding precedent from the Seventh Circuit, an injunction under Rule 65(d) can only bind two categories of nondefendants: those (1) "in active concert or participation" or (2) "in privity" with the enjoined defendants. *See Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Baha'is of U.S., Inc.*, 628 F.3d 837, 848 (7th Cir. 2010). Nondefendant agencies do not fall under either category.

       1.  Nondefendant agencies are not in "active concert or participation" with defendant agencies.

The phrase "active concert or participation," as used in Rule 65(d)(2)(C), has been analyzed under an aiding-and-abetting standard. *See S.E.C. v. Homa*, 514 F.3d 661, 674 (7th Cir. 2008); *see also Future Motion, Inc. v. Lai*, 2025 WL 265818, at *1 (D. Or. Jan. 7, 2025) ("Courts typically interpret 'active concert or participation' to mean 'aiding and abetting.'"). Pursuant to this aiding-

---

[5] While Plaintiff requests relief with respect to nondefendant agencies in its Motion for a Temporary Restraining Order, *see* Dkt. 41, 2 (requesting a relief against all "federal executive branch agencies, departments, and commissions, and their heads, officers, agents, subdivisions, contractors, and grant recipients"), it does not make the same request in its Motion for a Preliminary Injunction, *see* Dkt. 26, 15 (requesting "nationwide *relief*") (emphasis added).

10

and-abetting standard, a nondefendant agency "acts 'in active concert or participation'" with a defendant agency if it "aids and abets [the defendant agency's] violation of the injunction." *Havens v. James*, 76 F.4th 103, 116 (2d Cir. 2023). In other words, the defendant agency "must, in essence, be the principal or the intended beneficiary of the [nondefendant agency]'s conduct." *Id.* at 113. This makes sense: an enjoined party cannot use a third-party to accomplish what *itself* could not do directly.

Interpreting the phrase "active concert or participation" as covering the entire Executive Branch makes little sense within this aiding-and-abetting framework. After all, nondefendant agencies do not "aid" DOL in violating the injunction when they terminate or include a Certification Requirement in any of *their own* contracts/grants.

Moreover, the Court should not adopt any maximalist holding that non-defendant agencies "aid" the President in violating the injunction. Although the President is a named defendant, well-established precedent prevents the federal judiciary from enjoining the President. *See Mississippi v. Johnson*, 71 U.S. 475, 499, 501 (1866). And any injunction that would capture those "in active concert or participation" with the President would create an end-run around *Mississippi v. Johnson*'s longstanding precedent. Separately, the logical extension of such a theory is extraordinary: a party can effectively enjoin the entire Executive Branch by simply naming the President as a defendant. There is no support in the caselaw for such a brazen shortcut to an injunction against the Executive Branch at large.

2. Nondefendant agencies are not in privity with defendant agencies.

As the Seventh Circuit has made clear, nonparty "privity" is "ultimately bounded by due process, which starts from a presumption that each person has a right to her day in court." *Nat'l Spiritual Assembly*, 628 F.3d at 849 (citations omitted). "The caselaw suggests that when it comes

to injunctions, the concept of nonparty privity has at least two subcategories." *Id.* The first category "holds that an injunction will bind nonparty successors in interest to an enjoined party." *Id.* This category is plainly inapplicable here. The second category looks to whether the "nonparty is otherwise 'legally identified' with the enjoined party." *Id*. This is a high bar, as "serious due process problems would arise if the . . . nonparty were barred from her own day in court." *Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 971 (7th Cir. 1998). Accordingly, to satisfy the "legal identification" prong, "due process requires an extremely close identification" between the non-party and the defendant. *Nat'l Spiritual Assembly*, 628 F.3d at 854. This occurs, for example, when the non-party "completely controls [the defendant]," *Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 776 F.3d 1, 10 (D.C. Cir. 2015), or is "so identified in interest with [the defendant] that [the defendant] represents precisely the same legal right in respect to the subject matter involved in the injunction." *Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 985 F. Supp. 2d 23, 30 (D.D.C. 2013); *Nat'l Spiritual Assembly*, 628 F.3d at 854 (analogizing "legal interest" test to the "piercing-the-corporate-veil doctrine").

Plaintiff cannot show "privity" under the "complete control" theory either. Indeed, courts have repeatedly rejected attempts to imply that one agency has control over another for purposes of the Federal Rules such that the entire federal government could be considered one party. *See, e.g.*, *State of Texas v. Holder*, 2012 WL 13070110, at *3 (D.D.C. June 8, 2012) (three-judge panel) (DOJ lacked control over documents held by DOD, DHS, DOS, VA, and SSA, and the plaintiff should have served a Rule 45 subpoena for such documents instead of a document request directed to DOJ); *see also id.* at *2 n.1 ("Texas has failed to cite any authority for the proposition that, even if the United States is the real party in interest, an opposing party has the right to obtain without a Rule 45 subpoena any documents in the possession of any and all federal agencies, particularly

12

where those agencies are not at all involved in the pending litigation."); *cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.4 (1992) ("We need not linger over the dissent's facially impracticable suggestion . . . that one agency of the Government can acquire the power to direct other agencies by simply claiming that power in its own regulations and in litigation to which the other agencies are not parties.").

Given the lack of privity, any injunction against nondefendant agencies would be improper as it would "make punishable the conduct of [agencies] who act independently and whose rights have not been adjudged according to law." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13 (1945).

        ii.    *Any injunction against nondefendant agencies would be inconsistent with Article III.*

Plaintiff has not established Article III standing with respect to any federal agency other than DOL; as such, this Court lacks jurisdiction to enjoin those agencies. After all, although Plaintiff requests relief against all federal agencies, it has not alleged that it has contracts or grants with every one of the 400 plus agencies and sub-agencies that it wants this Court to enjoin. Rather, it has five contracts, grants, sub-contracts, or sub-grants—all with DOL. Dkt. 26, 5-7. As the Supreme Court clarified this past Term, "for every defendant, there must be at least one plaintiff with standing to seek an injunction." *Murthy v. Missouri*, 144 S. Ct. 1972, 1988 (2024). In analyzing standing with respect to each defendant, the court must not "treat[] the defendants … as a unified whole." *Id.* And yet, that is precisely what Plaintiff urges this Court to do by enjoining hundreds of federal agencies and sub-agencies as one "unified whole."

Moreover, in *Lujan*, the Supreme Court observed that an injury attributable to certain federal agencies was not redressable because these particular agencies were not parties to the case. 504 U.S. at 568 (plurality opinion); *see also Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) (reaffirming this principle and stating that an injunctive or declaratory judgment entered against a

nonparty is not "legally enforceable" and "is little more than an advisory opinion"). That conclusion followed from the unremarkable proposition that the district court "could accord relief only against" the actual defendant. *Lujan*, 504 U.S. at 568. As for the other agencies, "[t]hey were not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced" with respect to the defendant agency. *Id.* at 569.

This Court should decline Plaintiff's invitation to bind nondefendant agencies over whom it lacks subject-matter jurisdiction.

> iii. *An injunction against nondefendants is inconsistent with traditional principles of equity and the principles underlying preliminary injunctive relief.*

Lastly, Plaintiff's request for relief against the entire Executive Branch, *see* Dkt. 41 at 2, is incompatible with traditional equitable principles applicable to preliminary injunctions and the "deep-rooted historic tradition that everyone should have his own day in court." *Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008) (citation omitted). The limited purpose of a preliminary injunction "is merely to preserve the relative position *of the parties* until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasis added). Plaintiffs' sought injunction, however, goes far beyond that: it protects nonparty plaintiffs from nonparty defendants that act independently from DOL. *See Diversity Officers*, at 9 (Rushing, J., concurring) ("The scope of the preliminary injunction alone should raise red flags: the district court purported to enjoin *nondefendants* from taking action against *nonplaintiffs*."). Such an injunction on "the world at large" is inconsistent with the "equitable principles" that govern injunctive relief. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (L. Hand, J.)). In issuing an injunction, the Court "is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court." *Alemite*, 42 F.2d at 832-33.

### B. Any injunction should be limited to CWIT.

This Court should also decline to provide any "nationwide" relief to nonplaintiffs. As Defendants explained in their initial response, various factors counsel against a nationwide injunction. *See* Dkt. 44, 35-38. But additional considerations—ones both general and particularly pronounced here—specifically warrant rejecting CWIT's request for an injunction that covers nonplaintiffs.

At the outset, an injunction beyond CWIT is not "necessary to provide complete relief to [CWIT] itself." *City of Chicago v. Barr*, 961 F.3d 882, 929 (7th Cir. 2020). To the extent CWIT is concerned about the termination of its grants or contracts—or even those where it is a sub-contractor or sub-grantee—that can be remedied by targeted relief, which this Court provided in its Amended TRO. *See* Dkt. 55. And any injury to CWIT caused by the Certification Provision can be remedied by—at most—an order with respect to CWIT and entities for whom CWIT serves is a sub-contractor or sub-grantee. Such relief would be consistent with instructions from the Seventh Circuit as "the narrowest relief that will redress [CWIT's] injury" and "provide complete relief to [CWIT] itself." *Barr*, 961 F.3d at 929-30.

Other factors also counsel against nationwide relief here. Nationwide relief might prevent percolation of the issues in district and reviewing courts, which could undermine "'a healthful difference that may balance the final result.'" Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 461 (2017) (quoting Harold Leventhal, *A Modest Proposal for a Multi-Circuit Court of Appeals*, 24 Am. U. L. Rev. 881, 907 (1975)); *see also East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029-30 (9th Cir. 2019) (criticizing nationwide injunctions for depriving parties of the ability to litigate issues in other forums, interfering with judicial decision-making, and preventing percolation); *Va. Soc'y for Human Life, Inc. v. FEC*, 263

F.3d 379, 393 (4th Cir. 2001) (remanding nationwide injunction for its encroachment on other circuits' ability to develop precedent), *overruled on other grounds by Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 550 n.2 (4th Cir. 2012).

The benefits of additional percolation are particularly apparent here given the fact that courts in at least three other jurisdictions are currently considering nearly identical challenges to the same Executive Orders.[6] *Cf. Barr*, 961 F.3d at 920 (finding the benefits of percolation to be diluted after five federal circuits had already weighed in on the issue). Moreover, these pending lawsuits increase the risk of "conflicting injunctions." Bray, *supra*, at 462. Indeed, conflicting relief is already present. In a preliminary ruling, the Fourth Circuit's three-judge panel in *Diversity Officers* "unanimously agree[d]" that Defendants—including DOL—were "likely to succeed in demonstrating that" the provisions "do not violate the First and Fifth Amendments." *Diversity Officers*, at 9 (Rushing, J., concurring). This Court's nationwide relief with respect to DOL and the Certification Provision effectively overruled the Fourth Circuit in its own jurisdiction on that score.

Federal courts in different jurisdictions may, of course, disagree with one another on the merits. But principles of judicial restraint provide that the scope of relief be appropriately tailored to avoid "conflicting" injunctions with disagreeing courts. *See DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (describing risks of "conflicting nationwide injunctions"). As such, Defendants respectfully request that this Court reconsider its nationwide relief with respect to the Certification Provision. Consistent with instructions from the Seventh Circuit "to provide

---

[6] *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir.) (the court of appeals has stayed the PI pending resolution of the PI appeal; Defendants' opening appellate brief is due on April 8); *Nat'l Urban League v. Trump*, No. 25-cv-471 (D.D.C.) (the parties have concluded district-court briefing on the PI motion; oral argument was heard on March 19); *San Francisco AIDS Foundation v. Trump*, No. 25-cv-01824 (N.D. Cal.) (the parties are briefing plaintiffs' PI motion before the district court; oral argument is scheduled for May 22).

complete relief to [CWIT] itself," *Barr*, 961 F.3d. at 931, this Court should—at most—limit any injunction against DOL's implementation of the Certification Provision with respect to CWIT and "other recipients of government grants" that CWIT "work[s] with." Dkt. 52 at 21. Doing so would ensure "complete relief" to CWIT while also minimizing the dangers of conflicting injunctions.

More general considerations also counsel against nationwide relief. Numerous judges and academics have described such injunctions as "legally and historically dubious," *Trump v. Hawaii*, 585 U.S. 687, 721 (2018) (Thomas, J., concurring), "patently unworkable," *New York*, 140 S. Ct. at 600 (Gorsuch, J., joined by Thomas, J., concurring), "not good for the rule of law," *Arizona v. Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring), and likely to "ris[k] the perception of the federal courts as an apolitical branch," *CASA DE Maryland*, *Inc. v. Trump*, 971 F.3d 220, 261 (4th Cir.), *reh'g en banc granted*, 981 F.3d 311 (2020). Nationwide relief can also "sweep up nonparties who may not wish to receive the benefit of the court's decision." *Id.* at 702; *see also Arizona*, 40 F.4th at 396 ("Nationwide injunctions" sometimes "give States victories they do not want.").[7]

The preliminary posture of this case should further dissuade the Court from entering nationwide relief. "By their nature" alone, "universal injunctions tend to force judges into making rushed, high-stakes, low-information decisions." *New York*, 140 S. Ct. at 600 (Gorsuch, J.,

---

[7] Notably, both the Supreme Court and the Seventh Circuit have granted complete or partial stays or vacaturs of nationwide injunctions ordered by lower courts. *See McHenry v. Texas Top Cop Shop, Inc.*, 145 S. Ct. 1 (Jan. 23, 2025); *Garland v. VanDerStok*, 144 S. Ct. 44, (2023); *Labrador v. Poe*, 144 S. Ct. 921 (2024); *Wolf v. Innovation Law Lab*, 140 S. Ct. 1564 (2020); *New York*, 140 S. Ct. 599; *Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019); *Trump v. Hawaii*, 583 U.S. 1009 (2017); *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017) (per curiam); *City of Chicago v. Sessions*, 2018 WL 4268817 (7th Cir. June 4, 2018) (vacating the panel's order "insofar as it sustained the district court's decision to extend preliminary relief nationwide" pending *en banc* review), *vacated*, 2018 WL 4268814 (7th Cir. Aug. 10, 2018) (dismissing the pending *en banc* appeal of the preliminary injunction after the district court announced its intent to impose a permanent injunction).

concurring). They can "fast-track[] to the Supreme Court issues that have not 'ha[d] the benefit of varying court of appeal decisions based upon multiple records'" or require the court to review a grant of preliminary relief "'without a well-developed sense of the consequences of its decision.'" Harvard Law Review, *Chapter Four District Court Reform: Nationwide Injunctions*, 137 Harv. L. Rev. 1701, 1705 (2024) (quoting Michael Coenen & Seth Davis, *Percolation's Value*, 73 Stan. L. Rev. 363, 382 (2021)). Such concerns are especially heightened here because CWIT presses facial (as opposed to discrete, as-applied) challenges. *See* Dkt. 44, 9-13; *see also Diversity Officers*, at 8 (Rushing, J., concurring) (noting that the "case does not challenge any particular agency action implementing the [EOs]" and instead arises from "evidence of how various agencies are implementing, or may implement," them, which "highlights serious questions about the ripeness of this lawsuit and plaintiffs' standing to bring it as an initial matter"); *id.* at 5 n.2 (Diaz, C.J., concurring) ("[T]he Orders only purport to direct executive policy and actors.").

Moreover, federal agencies are still in the process of evaluating and implementing the EOs; they have already issued additional guidance, and the factual record here—to the extent it is relevant to the pending claims—is evolving. On the evening prior to the Court's March 25, 2025, TRO hearing, for example, CWIT sought and was granted leave to supplement the factual record with a March 20, 2025, DOL email. Dkts. 45-47. But the email in question was sent out in error, as DOL clarified in a subsequent email sent out to Plaintiff and others on March 25, 2025. *See* DOL March 25, 2025, Email (attached hereto as Ex. B). Later, on March 26, 2025, Plaintiff sought and was granted leave on March 27, 2025, to supplement the factual record with a March 26, 2025, email from a nonparty entity. Dkts. 49-51. But to the best of Defendants' counsel's current understanding, the nonparty entity *did not* receive the March 20, 2025, email that had been sent

18

out in error. Given the evolving factual posture, it would not be appropriate to issue nationwide relief on such a dynamic landscape.

## CONCLUSION

For these reasons, and the reasons outlined in Defendants' initial response, *see* Dkt. 44, this Court should deny Plaintiff's motion for a preliminary injunction.

<div style="margin-left: 40%;">

Respectfully submitted,

YAAKOV M. ROTH

Acting Assistant Attorney General

Civil Division

JOSEPH E. BORSON

Assistant Branch Director

MORRIS PASQUAL
United States Attorney

THOMAS P. WALSH
PATRICK JOHNSON
Assistant United States Attorneys

*/s/ Pardis Gheibi*

PARDIS GHEIBI (D.C. Bar No. 90004767)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: pardis.gheibi@usdoj.gov

*Attorneys for Defendants*

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2025, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.


*/s/ Pardis Gheibi*