# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHICAGO WOMEN IN TRADES,<br><br>     Plaintiff,<br><br>v.<br><br>PRESIDENT DONALD J. TRUMP, DEPARTMENT OF LABOR, ACTING SECRETARY OF LABOR VINCENT MICONE, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE PAMELA BONDI,<br><br>     Defendants. | Case No. 1:25-cv-02005<br><br>Judge: Hon. Matthew F. Kennelly<br><br>JURY TRIAL DEMANDED |

# REPLY MEMORANDUM IN SUPPORT OF
# <u>MOTION FOR PRELIMINARY INJUNCTION</u>

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................1

ARGUMENT .....................................................................................................2

I.     THE TERMINATION PROVISION VIOLATES THE FIRST
AMENDMENT....................................................................................3

      A.      This Court Correctly Held that the Termination Provision's
Limiting Language Does Not Protect It from Being
Chilling or Coercive.................................................................3

      B.      The Court Correctly Ruled the Anti-Diversity EOs are
Coercive Under *Vullo* .............................................................5

      C.      The Court Correctly Ruled *Finley* Is Inapplicable....................7

      D.      The Court Correctly Ruled *Rust* Is Inapposite .........................8

      E.      The Supreme Court's Ruling in *California v. U.S.
Department of Education* Has No Bearing on CWIT's First
Amendment, Due Process, and Equal Protection Clause
Challenges.............................................................................10

      F.      The Termination Provision's Vagueness Infringes on
CWIT's First Amendment Rights, Warranting Injunctive
Relief....................................................................................11

II.    THE CERTIFICATION PROVISION VIOLATES THE FIRST
AMENDMENT..................................................................................12

III.   THE J20 AND J21 EXECUTIVE ORDERS VIOLATE DUE
PROCESS ........................................................................................13

IV.   THE J20 AND J21 EXECUTIVE ORDERS VIOLATE
CONSTITUTIONAL SEPARATION OF POWERS..........................14

V.     CWIT HAS ESTABLISHED IRREPARABLE HARM AND THE
PUBLIC INTERESTS JUSTIFY A PRELIMINARY
INJUNCTION ..................................................................................14

VI.   A NATIONWIDE INJUNCTION IS NECESSARY FOR CWIT
TO OBTAIN COMPLETE RELIEF AND TO PREVENT
BROADER VIOLATIONS AGAINST OTHERS WHO ARE
SIMILARLY SITUATED ..................................................................15

VII.   THIS COURT SHOULD REJECT THE GOVERNMENT'S
REQUESTS FOR BOND AND A STAY............................................19

CONCLUSION..................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Backpage.com v. Dart*,
807 F.3d 229, 230-32 (7th Cir. 2015) ...........................................................5, 6, 20

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)...........................................................................................5, 6

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972)...........................................................................................14

*Bernard v. Illinois Dep't of Corr.*,
Case No. 3:20-cv-50412, 2023 WL 8650374 (N.D. Ill. Dec. 14, 2023)....................1

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)...........................................................................................11

*Brown v. Kemp*,
86 F.4th 745 (7th Cir. 2023) ...............................................................................11

*California et al. v. U.S. Dep't of Educ., et al.*,
No. 1:25-cv-10548, 2025 WL 725103 (D. Mass. Mar. 6, 2025) ............................11

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ...............................................................................4

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) ..........................................................................16, 18

*Cnty. of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017) ..................................................................16

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021)............................................................................11

*FCC v. Fox Television Studios*,
567 U.S. 239 (2012)...........................................................................................13

*Greyned v. City of Rockford*,
408 U.S. 104 (1972)...........................................................................................11

*Habitat Educ. Center v. U.S. Forest Service*,
607 F.3d 453 (7th Cir. 2010) ...............................................................................19

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ........................................................................5, 16

*Humanitarian L. Project v. U.S. Treasury Dep't*,
    578 F.3d 1133 (9th Cir. 2009) ............................................................................13

*J.P. Morgan Chase Bank, N.A. v. McDonald*,
    760 F.3d 646 (7th Cir. 2014) ..............................................................................16

*Leathers v. Medlock*,
    499 U.S. 439 (1991)..............................................................................................9

*Legal Services Corp. v. Velazquez*,
    531 U.S. 533 (2001)..........................................................................................9, 10

*NAACP v. Button*,
    371 U.S. 415 (1963)............................................................................................11

*Nat'l Inst. of Fam. & Life Advocs. v. Raoul*,
    685 F. Supp. 3d 688 (N.D. Ill. 2023) .................................................................20

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024)................................................................................... *passim*

*National Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998)..........................................................................................7, 8

*National Urban League et al. v. Trump et al*,
    1:25-cv-00471-TJK, ECF No. 44 (D.D.C. Mar. 17, 2025)....................................2

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................................20

*PFLAG, Inc. v. Trump*,
    Civil No. 25-337-BAH, 2025 WL 685124 (D. Md. Mar. 4, 2025)....................4, 20

*Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*,
    699 F.3d 962 (7th Cir. 2012) ................................................................................9

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)............................................................................................10

*Rust v. Sullivan*,
    500 U.S. 173 (1991)......................................................................................1, 8, 9

*S.E.C. v. Homa*,
    514 F.3d 661 (2008)............................................................................................16

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
  508 F. Supp. 3d 521 (N.D. Cal. 2020) ...................................................................13

*Tennessee v. Becerra*,
  739 F. Supp. 3d 467 (S.D. Miss. 2024)....................................................................18

*Trump v. Int'l Refugee Assistance Project*,
  582 U.S. 571 (2017).................................................................................................18

*U.S. Department of Educ. v. California*,
  No. 24A910, 604 U.S. ____ (2025). ..................................................................10, 11

*United States v. Am. Library Ass'n*,
  539 U.S. 194 (2003)...................................................................................................9

*United States v. LaFleur*,
  971 F.2d 200 (9th Cir. 1991) ..................................................................................12

*Washington v. Trump*,
  Case No. 2:25-cv-00244-LK, 2025 WL 659057 (W.D. Wash Feb. 28, 2025) ........19

**Statutes**

29 U.S.C. § 2503 .............................................................................................................10

**Rules**

Fed. R. Civ. P. 7 ..............................................................................................................20

Fed. R. Civ. P 7(b)(1).......................................................................................................20

Fed. R.Civ. P. 65(d)(2).....................................................................................................16

**Other Authorities**

2 C.F.R. § 200.340(a).......................................................................................................14

Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. 1065,
  1080 (2018) ..............................................................................................................18

Spencer E. Amdur & David Hausman, Response, *Nationwide Injunctions and
  Nationwide Harm*, 131 Harv. L. Rev. .....................................................................17

iv

## INTRODUCTION

Nothing has changed since this Court's issuance of a TRO. Chicago Women in Trades' ("CWIT's") grants remain "squarely targeted" by the J20 EO's Termination Provision, for which CWIT has received "credible threats of enforcement" via multiple instructions to cease all activities related to diversity, equity, and inclusion. ECF No. 52 at 6. And the government still has not explained the meaning of "illegal DEI." In its latest filing, the government has not even tried.

Indeed, the government does not dispute the Court's determination that CWIT has standing to challenge the Termination and Certification Provisions. And the government advances no additional arguments with respect to the Certification Provision. Instead, the government asks the Court, in a footnote, to "reconsider its prior analysis," without explanation. ECF No. 57 at 1 n.1.

As a result, the bulk of the government's brief is devoted to insisting the Court's analysis of the Termination Provision was incorrect because (1) *Rust v. Sullivan*, 500 U.S. 173 (1991), allows the government to place conditions on what it funds and (2) the anti-diversity EOs do nothing more than highlight the need to conform with anti-discrimination law. But as the Court correctly concluded in issuing the TRO, the issues here implicate CWIT's First Amendment rights. ECF No. 52 at 8-9. Specifically, "every day that passes increases the risk of termination of [CWIT's] grants and, correspondingly, increases the pressure [on CWIT] to self-censor its speech." *Id*. at 9. Further, the Termination Provision "chills any protected speech that might touch upon whatever the government now contends to be 'DEI,' 'DEIA,' or 'equity.'" *Id*. at 14. This chilling effect makes pre-enforcement action permissible because "First Amendment Rights are at stake." *Id.* The Court is correct, and the government still has not demonstrated otherwise.

To obtain preliminary injunctive relief, CWIT must establish the same factors this Court evaluated in CWIT's TRO motion. *Bernard v. Illinois Dep't of Corr.*, Case No. 3:20-cv-50412, 2023 WL 8650374 (N.D. Ill. Dec. 14, 2023). Here, it has. There is no reason for this Court to

1

disturb its findings and conclusions set forth in its TRO opinion. However, a nationwide preliminary injunction, covering all federal agencies, is appropriate. Alternatively, the Court should at least enjoin all the federal agencies currently before the Court.

## ARGUMENT

A preliminary injunction is necessary and appropriate because in its absence, the government will continue to enforce the Termination and Certification Provisions of the anti-diversity EOs notwithstanding the clear violation of the First Amendment rights of CWIT and other similarly situated entities. Actions by the Department of Labor ("DOL") in response to the anti-diversity EOs confirm this. On January 22, DOL issued TEN No. 21-24, directing CWIT (and at least 60 other DOL grantees) to cease all DEI-related activities, absent further explanation of any "activities" about which it was concerned. ECF No. 26-9, ¶¶ 42-43, Ex. 2 (ECF No. 26-11). DOL rescinded TEN No. 21-24 on February 27, 2025 in response to an injunction by a Maryland District Court, but reissued it on March 20, 2025, shortly after that injunction was stayed by the U.S. Court of Appeals for the Fourth Circuit. ECF No. 47. Coinciding with the issuance of the Court's TRO here, DOL rescinded TEN No. 21-24 again (though oddly referencing the Maryland District Court Injunction again as the reason for doing so). Second Supplemental Declaration of Jayne Vellinga ("Second Supp. Vellinga Decl."), ¶ 6. DOL's actions confirm the need for an injunction because absent Court intervention, the government will enforce the vague and overbroad terms of the anti-diversity EOs, just as DOL has done with CWIT.[1]

Moreover, that injunction, at least with respect to the Certification Provision, should be nationwide, extending not just to DOL but to all federal agencies. The language of the Certification Provision is impossibly vague, and in its latest filing the government has made clear that it has no

---

[1] *See, e.g.*, *National Urban League et al. v. Trump et al*, 1:25-cv-00471-TJK, ECF No. 44 at 11 (D.D.C. Mar. 17, 2025) (listing funding cut by the government).

intention of providing clarification here or anywhere else. The reason for not doing so is clear: to chill **all DEI-related speech, programming and training**. Given DOL's actions (and DOJ's defense of them), it is a near certainty that other federal agencies will impose the Certification Provision uniformly and without guidance as to the meaning of "illegal DEI." Under the unique circumstances of this case, nothing more needs to "percolate." A nationwide injunction of the Certification and Termination Provisions, covering all federal agencies, is appropriate. Alternatively, the Court should at least enjoin all the federal agencies currently before the Court, not just DOL.

## I. THE TERMINATION PROVISION VIOLATES THE FIRST AMENDMENT

### A. This Court Correctly Held that the Termination Provision's Limiting Language Does Not Protect It from Being Chilling or Coercive

In issuing its TRO, the Court explained that the Termination Provision's limiting language that equity-related grants should be terminated "to the maximum extent allowed by law" "does not insulate" the Termination Provision from First Amendment scrutiny because it represents a "threat of invoking legal sanctions" "to suppress disfavored speech." *See* ECF No. 52 at 11-12 (*citing Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 196 (2024)). The government disagrees, claiming that because the Termination Provision "explicitly instructs federal agencies to follow any applicable laws before terminating any contract or grant" it "provides ample safeguard against any 'unlawful' future termination that may worry CWIT." ECF No. 57 at 4. But in the next sentence, the government states as follows:

> In sum, ***nothing in the Termination Provision directs federal agencies to make termination decisions based on whether the activity funded by a federal contract or grant violates antidiscrimination laws***; rather, it directs the termination of grants, subject to applicable legal limits, based only on the [equity-related] nature of the grant-funded activities itself.

ECF No. 57 at 4 (emphasis added).

***This is exactly the problem***—the Termination Provision is a threat of legal sanctions for disfavored speech absent any limiting principles or guideposts. The government expressly states that federal antidiscrimination laws ***are not*** the test for what the government will terminate.[2] As the Court has already explained, "the [J20] Order provides no definition or even an example of what is considered 'illegal DEI' that would be permissibly terminated, and the government has been unwilling or unable to clear it up during this litigation."[3] ECF No. 52 at 16. In the absence of the clarity the government steadfastly refuses to provide, CWIT's speech (and that of all similarly situated grantees and contractors) is chilled, in clear violation of the First Amendment.

In addition, a "savings clause" in executive orders cannot insulate orders from judicial review. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018) (holding that "consistent with law" clause "cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language"); *see also PFLAG, Inc. v. Trump*, Civil No. 25-337-BAH, 2025 WL 685124, at *18 (D. Md. Mar. 4, 2025) (rejecting government's reliance on *Allbaugh*, reasoning that "boilerplate" "consistent with applicable law" language does not "inoculate[] an otherwise unconstitutional executive order from judicial review").

The government tries to distinguish *City & Cnty. of San Francisco*, arguing that "the Termination Provision does not impose any obligation—let alone new ones." ECF No. 44 at 33. But that interpretation would ignore the "strong language" of the J20 EO that directs the

---

[2] And in any event, CWIT already must comply with federal laws. *See* Second Supp. Vellinga Decl. ¶ 12.

[3] The government's refusal in its latest brief to even try to articulate what it means by "equity-related" or "illegal DEI" is even more remarkable as this Court noted that this was one of the infirmities of the anti-diversity EOs. ECF No. 52 at 16. It highlights that the government wishes unfettered discretion to enforce the anti-diversity EOs without guardrails. It highlights the extent of the First Amendment injury.

government to "terminate 'illegal and *immoral* discrimination programs, going by the name 'diversity, equity, and inclusion,'" and to terminate all "'equity-related' grants or contracts." ECF No. 52 at 12. By labeling DEI as "immoral," the government's viewpoint is clear and the resulting terminations are not bound by law, but by the government's view of morality. By arguing that the Termination Provision imposes no "new" obligations, the government essentially renders the Termination Provision meaningless. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (rejecting government's attempt to "immunize the [Executive] Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order" (citation omitted)).

### B. The Court Correctly Ruled the Anti-Diversity EOs are Coercive Under *Vullo*

In concluding the Termination Provision was impermissibly coercive, the Court applied a "totality of the circumstances" test. *See* ECF No. 52 at 12. Citing *Vullo*, 602 U.S. at 189, and *Backpage.com v. Dart*, 807 F.3d 229, 230-32 (7th Cir. 2015), this Court identified three factors to reach its conclusion: (1) the "strong language" of the Termination Provision, *e.g.*, the instruction to terminate "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion'"; (2) the government's ability to terminate CWIT's grants; and (3) the "explicit adverse consequences for noncompliance with the J20 EO: termination of federally funded grants or contracts." ECF No. 52 at 12.

The government does not question this analysis. Instead, it argues that *Vullo* does not apply. *See* ECF No. 57 at 5-8. In so doing, the government acknowledges that *Vullo* "reaffirmed the general principle" that "coercive threats aimed at punishing or suppressing disfavored speech"— which the Termination Provision inarguably includes—"implicate the First Amendment." ECF No. 57 at 6. Nonetheless, the government argues that the coercion in *Vullo*, in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), and in *Backpage.com* "fundamentally differ" from the government's

coercive conduct here because those cases related to "the government's authority as sovereign," whereas here, the government is merely threatening to terminate federally funded speech. *See id*. at 5-6. But this is merely a regurgitation of the government's "patron versus sovereign" argument. That distinction is nowhere to be found in *Vullo*,[4] which employed a totality of the circumstances analysis to assess whether conduct was coercive. *See Vullo*, 602 U.S. at 189-94; *see also Bantam Books*, 372 U.S. at 69-72; *Backpage.com*, 807 F.3d at 21-37. And most importantly here, ***the Court already rejected this argument***, explaining that "*Vullo* makes clear that there is a line between the government enacting its policy goals by serving as patron . . . and suppressing disfavored speech through coercive threats or sanctions[,]" and that "eliminating federal funds for DEI, DEIA, and equity-related speech falls on the coercive threat side of the line." ECF No. 52 at 16.

Still, the government claims it seeks to "make determinations about ***its own*** funding," ECF No. 57 at 8 (quoting *Vullo*, 602 U.S. at 190) (emphasis in original), while "*Vullo* stands for the 'principle that a government official cannot do indirectly what she is barred from doing directly.'" *Id.* (citation omitted). But this is simply the "patron versus sovereign" argument repackaged yet again. By threatening to defund CWIT's grants, the government ***is directly coercing CWIT's speech***. Nothing in *Vullo* suggests the government's actions here are permissible, or that the government's speech in *Vullo* would have been permissible had the government in that case been acting as a "patron." In its TRO Opinion, this Court, as *Vullo* requires, assessed whether the Termination Provision is coercive. This analysis remains applicable and correct.[5]

---

[4] The words "patron" and "sovereign" do not appear in *Bantom Books* or *Backpage.com*, either.
[5] The government also argues that the *Vullo* coercion analysis is improper because the Termination Provision impacts the conduct of any covered entities that receive federal grants and is not targeted at specific parties. *See* ECF No. 57 at 9. This argument appears to be that coercion that could impact many Americans receives less constitutional protection than coercion that can only impact a few. This is precisely the wrong conclusion to draw. The fact that the Executive Branch is coercing many entities makes the urgency of this analysis greater.

*Vullo* is about the constitutional harm of viewpoint discrimination by the government, which is exactly what the anti-diversity EOs embody. In declaring DEI not only illegal, but **immoral**, the government is targeting a viewpoint, not an act that violates any existing law. As the unanimous *Vullo* Court held, "[a]t the heart of the ***First Amendment's Free Speech Clause*** is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Id*. at 187 (emphasis added). This Court correctly applied *Vullo* to this clear case of viewpoint discrimination.

### C.      The Court Correctly Ruled *Finley* Is Inapplicable

The government argues *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), not *Vullo*, applies to this case absent any cogent explanation as to why. *See* ECF No. 57 at 2, 5-9. As this Court explained, *Finley* is distinguishable from the facts here because "unlike in *Finley*, it is likely that a speaker [here] ***would*** feel compelled [due to the Termination Provision] to steer clear of a 'forbidden area': DEI." ECF No. 52 at 15 (emphasis in original). "In fact," this Court stated, "that is precisely what CWIT contends it now must do to ensure it does not violate the J20 Termination Provision." *Id*. Today, it remains true that CWIT is forced to work in a climate of fear and uncertainty because equity is the throughline of their programs, trainings, partnerships, and more. *See* Second Supp. Vellinga Decl. ¶ 11.

The government responds that the Court misreads *Finley* because the term "forbidden area" in *Finley* refers only to "vague laws that do not distinguish between legal conduct and illegal conduct." ECF No. 57 at 6 n.3 (quoting *Greyned v. City of Rockford*, 408 U.S. 104 (1972)). But in *Finley*, the Supreme Court stated that vague language "in a criminal statute ***or [a] regulatory scheme*** . . . could raise substantial vagueness concerns." *Finley*, 524 U.S. at 588 (emphasis added). The criminal-only limitation that the government attempts to advance has no basis. ECF No. 57 at 6 n.3. Additionally, the government's refusal to define DEI or DEIA ***does*** risk serious penalty—

criminal investigations by the Department of Justice or liability under the False Claims Act. J21 EO, §§ 3(b)(iv)(A), 4(b). These risks cannot be trivialized.

Additionally, the government responds that the Court improperly distinguishes *Finley* because "in making grant funding determinations, the government is not 'forbidding' any conduct to begin with." ECF No. 57 at 6 n.3 (brackets removed). This is untrue: the Termination Provision, by its terms, forbids existing grantees from engaging in DEI or DEIA (however it defines those terms). Thus, this Court's analysis in the TRO Opinion—that *Finley* does not apply here because speakers like CWIT feel compelled to steer clear of topics such as DEI due to the Termination Provision—was correct.

Finally, the First Amendment and vagueness issues here are unlike those in *Finley*, and much more acute. Here, **Congress** authorized the grants for the purposes of promoting equity. *See, e.g.,* the Women in Apprenticeship and Nontraditional Occupations Act, Pub. L. No. 102-530, 106 Stat 3465 § 2 (1992) (identifying the Act's "purpose" as "to encourage employment of women in apprenticeable occupations and nontraditional occupations" by requiring DOL to "provid[e] grants to community-based organizations to deliver technical assistance to employers and labor unions to prepare them to recruit, train, and employ women in apprenticeable occupations and nontraditional occupations"); *see also* ECF No. 1 ¶¶ 45-53 (detailing authorizing statutes). Now, the executive branch, contravening congressional authorization and intent, has declared diversity, equity, and inclusion are "immoral and illegal," and thus, equity-related grants, even ones that are congressionally authorized, should be terminated. Definitionally the anti-diversity EOs are "vague laws that do not distinguish between legal conduct and illegal conduct." ECF No. 57 at 6 n.3.

### D. The Court Correctly Ruled *Rust* Is Inapposite

The government also argues that while *Vullo* is inapplicable, *Rust v. Sullivan*, 500 U.S. 173 (1991) applies. *See* ECF No. 57 at 2, 5-9. Again, in its TRO Opinion, this Court reached the

opposite conclusion, explaining that "[h]ere," unlike in *Rust*, "the government is not selectively funding some programs but not others; it is indicating an entire area of programming that is disfavored as 'immoral' (as well as illegal) and threatening the termination of funding unless grantees bring their conduct into line with the government's policy agenda." ECF No. 52 at 16. The Court concluded the facts of this case were "notably different" from *Rust*. *Id.*

The government responds that the Termination Provision is just a "realignment of government funding priorities," which *Rust* and its progeny permit. *See* ECF No. 57 at 2; *see also id.* at 5 (citing *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) and *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 970 (7th Cir. 2012)).[6] Of course, this does not address the Court's explanation of *Rust's* inapplicability.

*Rust* and its progeny are also distinguishable because in those cases the ***legislative branch***, not the executive branch, imposed the conditions in question. *Rust*, 500 U.S. at 178-80 (Congress); *Am. Library Ass'n*, 539 U.S. at 199-201 (Congress); *Planned Parenthood of Indiana, Inc.*, 699 F.3d at 969-72 (Indiana House).[7] By contrast, here the legislative branch has made the funding decision, and it is the executive branch that is imposing compliance with an entirely new and different viewpoint against a threat of defunding.

This case is more analogous to *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001). In *Legal Services Corp.*, the Supreme Court assessed whether Congress could distribute funds for grantees to provide legal assistance in noncriminal proceedings so long as those funds were not

---

[6] As part of this argument, the government also cites *Leathers v. Medlock*, 499 U.S. 439, 450 (1991). *See* ECF No. 57 at 5. But this case is not relevant to the unconstitutional conditions line of precedent. It instead addresses the permissibility under the First Amendment of imposing sales taxes on some entities and not others. *See Leathers*, 499 U.S. at 450.

[7] The government argues that *Planned Parenthood of Indiana, Inc.*, establishes that grants can be defunded after being awarded. But that case did not involve an Executive Branch decision, nor was there a claim that the condition was vague. *See generally* 699 F.3d 962 (7th Cir. 2012).

used in cases seeking to amend or alter the existing welfare laws. *See* 531 U.S. at 536-37. The Supreme Court held that such conditions were unconstitutional because they restrict what types of legal challenges grant recipients could raise, thus "implicating central First Amendment concerns." *Id*. at 547-48. The Court explained that where such "private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Id.* at 548-49.

The facts in *Legal Services Corp.* are similar to the case at bar: Congress has, for example, passed the Women in Apprenticeship and Nontraditional Occupations ("WANTO") Act, which requires the Secretary of Labor to make grants that include "developing outreach and orientation sessions to recruit women into . . . apprenticeable occupations and nontraditional occupations[.]" 29 U.S.C. § 2503. Just as Congress was not allowed to prohibit "ideas thought inimical to the Government's own interest" when disbursing funds for general noncriminal legal services, the government may not withdraw funds from certain grantees just because the viewpoint of those certain recipients suddenly becomes "inimical to the Government's own interest." *Legal Services Corp.*, 531 U.S. at 549 (citation omitted). Such conduct violates the First Amendment because "government regulation may not favor one speaker over another." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (citation omitted). The Termination Provision is unconstitutional.

### E. The Supreme Court's Ruling in *U.S. Department of Education v. California* Has No Bearing on CWIT's First Amendment, Due Process, and Equal Protection Clause Challenges

On April 7, 2025, the government filed a Notice of Supplemental Authority to highlight the Supreme Court's April 4, 2025 *per curiam* ruling in *U.S. Department of Educ. v. California*, No. 24A910, 604 U.S. ____ (2025). ECF No. 62-1. The government argues the ruling supports "Defendants' argument that Plaintiff's claim as to the Termination Provision is not ripe for review"

because "there are serious questions about whether this Court would have jurisdiction to review Plaintiff's future post-termination claims (if any)." *Id.* at 1. *California* has no application here. That case addresses only whether the government's termination of the grants at issue violated the Administrative Procedures Act (s*ee California et al. v. U.S. Dep't of Educ., et al.*, No. 1:25-cv-10548, 2025 WL 725103 (D. Mass. Mar. 6, 2025), Compl. for Declaratory and Injunctive Relief, ¶¶ 161-186).

Here, as CWIT has explained, application of the anti-diversity EOs violates the First Amendment, due process, and separation of powers. (And CWIT has not brought an APA claim.) Longstanding precedent makes clear that district courts have jurisdiction to hear Constitutional claims against the executive branch. *See Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) ("[t]he Claims Court does not have the general equitable powers of a district court to grant prospective relief. Indeed, we have stated categorically that 'the Court of Claims has no power to grant equitable relief.'") (citing *Richardson v. Morris,* 409 U.S. 464, 465, (1973) (*per curiam*); *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1351 (Fed. Cir. 2021) (discussing *Bowen* and confirming that in cases seeking equitable relief, "the doubtful and limited relief available in the Claims Court is not an adequate substitute for review in the District Court."). Nothing in the Supreme Court's April 4, 2025 ruling contradicts this precedent.

**F.    The Termination Provision's Vagueness Infringes on CWIT's First Amendment Rights, Warranting Injunctive Relief**

The Court acknowledged CWIT's argument that the "Termination Provision's vagueness gives rise to [] First Amendment issues" because it produces chilling effects. *See* ECF No. 52 at 13-14. For the purposes of the First Amendment, this is a sufficient and proper basis to issue a preliminary injunction. *See e.g. Brown v. Kemp*, 86 F.4th 745, 711 (7th Cir. 2023); *NAACP v. Button*, 371 U.S. 415, 432-33 (1963); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

11

Based on the facts available at this preliminary injunction stage, the Court should do so here. *See* Supp. Decl. of Jayne Vellinga ¶¶ 50-51, Mar. 18, 2025, ECF No. 41-1.

## II.     THE CERTIFICATION PROVISION VIOLATES THE FIRST AMENDMENT

The government makes no new arguments in defense of the Certification Provision, and requests only that the Court "reconsider its prior analysis" based upon the government's "initial response." ECF No. 57 at 1 n.1.

This Court has already assessed Defendants' arguments as to the Certification Provision and rejected them. *See* ECF No. 52 at 17-19. Because Defendants only raise arguments that have already been addressed and rejected, the Court should summarily hold that the Certification Provision violates the First Amendment for the same reasons that it relied on in the TRO Opinion. *See e.g.*, *United States v. LaFleur*, 971 F.2d 200, 212 (9th Cir. 1991) ("The appellants make the same argument for a due process violation that they made in support of their cruel and unusual punishment contention. Because we have already addressed that argument, we summarily state here that there is simply no procedural or substantive due process violation in § 1111(b)'s mandate of a mandatory life sentence."). The Certification Provision still "attempts to regulate grantees' speech outside of their federally funded programs." ECF No. 52 at 17.

The Certification Provision also still rests on an undefined definition of DEI that "is left entirely to the imagination." ECF No. 52 at 17. And the Certification Provision still "puts CWIT (and other grantees) in a difficult and perhaps impossible position" because CWIT must "either take steps now to revise [its] programmatic activity so that none of it promote[s] DEI (whatever that is deemed to mean), decline to make a certification and thus lose [its] grants, or risk making a certification that will be deemed false and thus subject the grantee to liability under the False Claims Act." *Id*. at 18 (cleaned up).

12

## III.    THE J20 AND J21 EXECUTIVE ORDERS VIOLATE DUE PROCESS

The government first contends that due process does not apply here as "'the Orders only purport to direct executive policy and actors.'" ECF No. 44 at 15 (quoting *Diversity Officers*, at 5 n.2 (Diaz, CJ., concurring)). Moreover, according to the government, vagueness requires "'fair notice' of the conduct a **statute** prescribes." ECF No. 44 at 15 (quoting *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality) (emphasis added).

Not so. Due process applies to government action, including the acts of the Executive Branch. It applies to executive branch regulations. *See, e.g., FCC v. Fox Television Studios*, 567 U.S. 239, 253 (2012) (FCC regulations). It applies to executive orders. *See, e.g., Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146 (9th Cir. 2009) (evaluating executive orders for vagueness); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 545 (N.D. Cal. 2020) (holding "that Plaintiffs have demonstrated a likelihood of success on their Due Process claim challenging . . . the Executive Order as void for vagueness").[8]

The government further argues that the executive orders do not implicate an interest that due process protects as "Plaintiff has not shown that it has any constitutionally protected entitlement-like contracts/grants that will be subject to termination." ECF No. 44 at 18. Defendants' argument is premised on the assertion that government contracts/grants "generally

---

[8] In fact, the government ultimately concedes this point. However, it does try to offer that due process has been applied only when there is "direct regulations of primary conduct." ECF No. 44 at 15. Whatever that might mean, CWIT has shown that the Executive Orders directly regulate its primary conduct. DOL has issued multiple instructions to CWIT regarding its grants. ECF No. 52 at 2-3. It directly invoked the anti-diversity EOs in so doing. *See e.g., id.* at 2 ("CWIT received an email from the [DOL]" stating that "'all recipients of federal financial assistance are directed to cease all activities related to [DEI] . . . consistent with the requirements of the Executive Orders.""). JFF, an organization that CWIT subcontracts with, informed CWIT that it would terminate its contract with CWIT and cited the J20 and J21 EOs as the basis for termination. *Id.* at 3. As the anti-diversity EOs have been directly enforced against CWIT, the Constitution's due process requirements apply.

allow for '[t]ermination at the convenience of the government.'" *Id*. (citing 2 C.F.R. § 200.340(a)(4)). The government characterizes this impermanence as "the antithesis of a constitutionally protected entitlement." *Id*. at 18-19.

First, the premise asserted is wrong. At the least, CWIT has "an interest in continued receipt" of grants "that is safeguarded by procedural due process." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-77 (1972). Second, the government cannot terminate the grants at issue for convenience. Applicable regulations cabin the government's discretion. *See* 2 C.F.R. § 200.340(a). Nothing in those regulations allows the Executive Branch to unilaterally defund congressionally authorized programs simply because it does not like them. As the regulation only allows agencies to terminate "to the extent authorized by law," it cannot authorize actions that contravene statutory requirements, like the anti-diversity EOs do. *See* ECF No. 1, ¶¶ 44-57 (describing the statutes setting forth the purposes of the grants at issue).

## IV.  THE J20 AND J21 EXECUTIVE ORDERS VIOLATE CONSTITUTIONAL SEPARATION OF POWERS

As explained in CWIT's opening brief, there are separation of powers concerns where the Executive Branch ignores Congress and goes its own way when implementing the democratically enacted laws. *See* ECF No. 26 at 12-13 (citing *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018), *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020), and *City & Cnty of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018)).[9] The government offers no response to this argument.

## V.  CWIT HAS ESTABLISHED IRREPARABLE HARM AND THE PUBLIC INTERESTS JUSTIFY A PRELIMINARY INJUNCTION

As the Court previously explained, because "CWIT has established a likelihood of success

---

[9] This is also why the distinction between terminating funds *pre*-funding or *post*-funding matters. *See* ECF No. 57 at 5. Post-funding terminations violate separation of powers. *See* ECF No. 26 at 12-13.

on its claims that the Termination and Certification Provisions violate its First Amendment rights, it has made a sufficient showing of irreparable harm that would result from enforcement of these provisions." ECF No. 52 at 19 (citing *ACLU v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012). CWIT remains likely to succeed on its First Amendment claims, and thus, still makes a sufficient showing of irreparable harm that would result from the government's enforcement of the Termination and Certification Provisions.

This Court has already balanced the harms and public interest at issue in this case. ECF No. 52 at 19-20. The Court correctly concluded that "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Id.* (quoting *Alvarez,* 679 F.3d at 590) (citation omitted). The government contends that a preliminary injunction would "effectively disable defendant agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities." ECF No. 44 at 34. This Court rejected that argument, concluding that "issuance of a TRO will not prevent the government from enforcing existing anti-discrimination laws." ECF No. 52 at 20. The government offered no further argument in its opposition. ECF No. 57.

## VI.    A NATIONWIDE INJUNCTION IS NECESSARY FOR CWIT TO OBTAIN COMPLETE RELIEF AND TO PREVENT BROADER VIOLATIONS AGAINST OTHERS WHO ARE SIMILARLY SITUATED

In issuing its TRO, the Court acknowledged the need to restrain the government from enforcing the Certification Provision against "similarly situated non-parties," including "grantees who cannot afford the risks inherent in biting the hand that feeds them." ECF No. 52 at 22. But the Court declined "at [that] juncture" to issue a nationwide restraining order as to the Termination Provision. *Id.* at 23. Now, as the Court considers the scope of a preliminary injunction, it has the opportunity (and the authority) to prevent the government from inflicting irreparable injury on all similarly situated federal grantees engaged in work that could be defined as DEI. For the reasons

15

below and in CWIT's opening papers in support of the preliminary injunction and TRO, the Court should seize that opportunity.

First, it is settled that "both historical and current practice lends support to a determination that the courts possess the authority to impose injunctions that extend beyond the parties before the court." *City of Chicago*, 961 F.3d at 916. Second, a nationwide injunction that extends to non-parties may be particularly "appropriate" where, as here, "the government relies on a 'categorical policy,' and when the facts would not require different relief for others similarly situated to the plaintiffs." *HIAS Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)); *see also Cnty. of Santa Clara v. Trump,* 250 F. Supp. 3d 497, 539 (N.D. Cal. 2017) ("where a law is unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide injunction is appropriate") (citing *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979)).

In opposing a preliminary injunction that provides relief to grantees beyond CWIT and enjoins agencies beyond the DOL, the government offers several "additional considerations." ECF No. 57 at 10-19. The Court should reject them all.

First, the government asserts that the Court has no power to enjoin non-parties. ECF No. 57 at 10-14. As noted above, this Court clearly has the power to enjoin nondefendants. *See*, *e.g.*, *City of Chicago*, 961 F.3d at 916; *S.E.C. v. Homa*, 514 F.3d 661, 674 (2008) (affirming district court's injunction over "nonparties," because without authority to enjoin nonparties "named parties could easily thwart the injunction by operating through others"); *see also* F.R.C.P. 65(d)(2). Further, "[a]s a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit." *J.P. Morgan Chase Bank, N.A. v. McDonald*, 760 F.3d 646, 653 (7th Cir.

16

2014) (quoting *Washington v. Daley,* 173 F.3d 1158, 1167 (9th Cir. 1999)). The DOJ, which represents multiple federal agencies here already, offers no reason why it cannot adequately do the same on behalf of nondefendant agencies when the issues before the Court relate entirely to the legality of the anti-diversity EOs, and DOJ is litigating these questions before multiple courts in the exact same way—*e.g.*, by refusing to provide a definition of "illegal DEI."

Next, the government argues that a preliminary injunction should be limited to CWIT because a broader injunction is not needed to provide relief to CWIT; would prevent healthy "percolation" of the issues in other jurisdictions and the "risk of 'conflicting injunctions;'" scholars have found universal injunctions "dubious"; and federal agencies' evaluation of the anti-diversity EOs is "evolving." ECF No. 57 at 15-19. At bottom, none of the arguments overcome the fact that the scope of the constitutional violation is nationwide and affects all similarly situated grant recipients and sub-recipients.

The government speculates that "[n]ationwide relief ***might*** prevent percolation of the issues in district and reviewing courts." ECF No. 57 at 15 (emphasis added). This argument ignores the events that occurred in the parallel litigation challenging the anti-diversity EOs. Even after the Maryland District Court issued a nationwide preliminary injunction in *Diversity Officers*, that injunction was subsequently stayed by the Fourth Circuit. The practical impact forced CWIT to apply for a TRO in this Court and ***did not*** "depriv[e] parties" from "litigat[ing] issues in other forums." *See* ECF No. 57 at 15 (citing *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029-30 (9th Cir. 2019). Percolation of the issues in different courts ***is*** taking place even after a district court afforded nationwide relief. *See also* Spencer E. Amdur & David Hausman, Response, *Nationwide Injunctions and Nationwide Harm*, 131 Harv. L. Rev. F. 49, 53 n.27 (2017) (providing examples of nationwide injunctions that did not foreclose percolation).

The government also raises the specter of "conflicting injunctions," arguing that it "counsel[s] against nationwide relief," and contending that "conflicting relief is already present." ECF No. 57 at 15-16. This is wrong. As mentioned above, in *Diversity Officers*, the Fourth Circuit *stayed* the preliminary injunction in that case pending appeal. As it stands, because that injunction is stayed, in this case, the nationwide relief afforded to nonplaintiffs does not conflict with any active injunction.

Despite the government's challenge to the proprietary of nationwide injunctions, numerous courts have imposed them. *See e.g.*, *City of Chicago*, 961 F.3d at 913-14 (discussing legal scholarship concluding "the use of injunctions that extend beyond the plaintiff go[es] back over a century, from a Supreme Court decision in 1913 to the present") (citing Mila Sohoni, *The Lost History of the "Universal" Injunction*, 133 Harv. L. Rev. 920, 924-25 (2020)); *Tennessee v. Becerra*, 739 F. Supp. 3d 467 (S.D. Miss. 2024) (issuing nationwide injunction blocking enforcement of Affordable Care Act Section 1557 regulations prohibiting discrimination on the basis of gender identity). This Court recognized and discussed this jurisprudence when fashioning the scope of the TRO. *See* ECF No. 52 at 20 (citing *City of Chicago*, 961 F.3d at 914); *see also e.g.*, *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581, 583 (2017) ("the equitable balance" may favor extending injunctive relief to "parties similarly situated to" the plaintiffs); Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. 1065, 1080 (2018) ("tradition and precedent suggest that broad remedial injunctions are constitutionally permissible, and in some cases essential, as a means of enabling the courts to check the political branches").

Finally, the government points to the "evolving" factual record and contends that "[t]he preliminary posture" of the case "should further dissuade the Court from entering nationwide relief." ECF No. 57 at 17-18. But this is not a situation where the Court is being "forc[e]d" to make

a "rushed" and "low-information decision." *Id*. at 17 (citation omitted). To the contrary, this Court will have had the benefit of multiple briefs from both CWIT and the government and multiple oral arguments to come to a well-reasoned decision. As to the "evolving" factual record contention, the government cites to no case law that courts weigh such a factor in considering whether nationwide relief is proper or not. If the factual record requires an amendment to the scope of the injunction, the government can move this Court to do so.

Alternatively, the factual record before the Court also supports enjoining, on a nationwide basis, all federal agency Defendants as to both the Termination and Certification Provisions. Each Defendant is before the Court, represented by counsel, and alleged to have authority to enforce the anti-diversity EOs against CWIT and similarly situated grant recipients and sub-recipients.

## VII.  THIS COURT SHOULD REJECT THE GOVERNMENT'S REQUESTS FOR BOND AND A STAY

The Court should either waive the bond requirement or impose a nominal bond of zero dollars. The government argues a bond should accompany any injunctive relief that this Court orders because "any preliminary relief would ***potentially*** mandate that the Executive spend money that may not be recouped once distributed." ECF No. 44 at 39 (emphasis added). The government does not elaborate on what money the Executive would be mandated to spend because of an injunction. *See Habitat Educ. Center v. U.S. Forest Service*, 607 F.3d 453, 458 (7th Cir. 2010) (district court may "waive the requirement of an injunction bond" when "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction"); *see also Washington v. Trump*, Case No. 2:25-cv-00244-LK, 2025 WL 659057, at *28 n.29 (W.D. Wash Feb. 28, 2025) ("Defendants' assertion that 'any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed,' is unsupported and speculative") (internal citation omitted).

Even more, courts routinely waive the bond requirement when issuing injunctive relief to protect a party's First Amendment rights. *See Backpage.com, LLC*, 807 F.3d at 239 (reversing lower court, granting plaintiff's motion to enjoin First Amendment violation, and directing that plaintiff "shall not be required to post a security bond"); *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 695 (N.D. Ill. 2023) (enjoining enforcement of statute violating First Amendment and holding that "plaintiffs need not post a bond"). There should be no price tag or bond attached to defending the fundamental right to free speech.

The Court should also deny the government's request for a stay pending the disposition of appeal, which would alter the status quo under the TRO. ECF No. 44 at 39. This request is procedurally improper under Federal Rule of Civil Procedure 7. *See* Fed. R. Civ. P 7(b)(1) ("A request for a court order must be made by motion."); *PFLAG, Inc.*, 2025 WL 685124, at *32.

Even if the request were procedurally proper, this Court should deny it. A stay would undermine this Court's finding that CWIT would suffer "irreparable harm . . . from [the] enforcement" of the Termination and Certification Provisions. ECF No. 52 at 19. Should the Court consider a stay, CWIT respectfully requests for this Court to allow the parties to brief the issue.[10]

## CONCLUSION

For these reasons, CWIT respectfully requests that the Court grant its motion for a preliminary injunction.

---

[10] As the party requesting a stay, the government "bears the burden of showing that the circumstances justify an exercise of [the Court's] discretion" to grant a stay pending appeal. *Nken v. Holder*, 556 U.S. 418, 433-34 (citations omitted) (2009). Four factors are relevant here: (1) "whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits" of the appeal; (2) "whether the applicant will be irreparably injured absent a stay"; (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." *Id*. at 434. The government satisfies none of these factors.

Dated: April 7, 2025

Respectfully Submitted,

/s/ *Jason P. Stiehl*
Jason P. Stiehl
CROWELL & MORING LLP
455 N Cityfront Plaza Dr.
Suite 3600
Chicago IL 60611
Tel: (312) 840-3108
jstiehl@crowell.com

/s/ *Anuj Vohra*
Anuj Vohra
Keith J. Harrison*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
avohra@crowell.com
kharrison@crowell.com

/s/ *Meshach Y. Rhoades*
Meshach Y. Rhoades
CROWELL & MORING LLP
1601 Wewatta Street
Suite 815
Denver, CO 80202
Tel: (303) 524-8660
mrhoades@crowell.com

/s/ *Warrington Parker*
Warrington Parker
CROWELL & MORING LLP
3 Embarcadero Center, 26th
Floor
San Francisco, CA 94111
Tel: (415) 986-2800
wparker@crowell.com

s/ *Sabrina A. Talukder*
Sabrina A. Talukder*
Kathryn J. Youker
Adria J. Bonillas
Olivia Sedwick
Gillian Cassell-Stiga
Lawyers' Committee for Civil Rights
Under Law
1500 K Street, N.W. Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
stalukder@lawyerscommittee.org
kyouker@lawyerscommittee.org
abonillas@lawyerscommittee.org
osedwick@lawyerscommittee.org
gcassell-stiga@lawyerscommittee.org

Elizabeth E. Theran
Adrienne DerVartanian
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
etheran@nwlc.org
adervartanian@nwlc.org

Lourdes M. Rosado
Rafaela Uribe
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Telephone: (212) 739-7583
lrosado@latinojustice.org
ruribe@latinojustice.org

Aneel L. Chablani (No. 6242658)
Ami D. Gandhi (No. 6282924)
Chicago Lawyers' Committee for
Civil Rights
100 N. LaSalle St., Ste. 600
Chicago, IL 60602
Telephone: (312) 630-9744

Facsimile: (312) 630-1127
achablani@clccrul.org
agandhi@clccrul.org

*Attorneys for Chicago Women in Trades*

*\*Pro hac vice motion forthcoming*