# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHICAGO WIMEN IN TRADES,<br><br>    Plaintiff,<br><br>v.<br><br>PRESIDENT DONALD J. TRUMP, DEPARTMENT OF LABOR, ACTING SECRETARY OF LABOR VINCENT MICONE, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE PAMELA BONDI,<br><br>    Defendants. | Case No. 1:25-cv-02005<br><br>Judge: Hon. Matthew F. Kennelly<br><br>JURY TRIAL DEMANDED |

# REPLY IN SUPPORT OF PLAINTIFF CHICAGO
# WOMEN IN TRADES' MOTION TO MODIFY THE PRELIMINARY INJUNCTION

## INTRODUCTION

The government does not dispute that the plain language of the statutes and appropriations reports make clear that, like its WANTO grant, each of CWIT's other grants at issue are equity-related grants intentionally funded by Congressional action.

Rather than disputing these facts, the government's argument is that this Court cannot review what the government has done. The government first declares its actions are immune from judicial review under *Dalton v. Specter*—an argument that has been repeatedly rejected by both the Seventh and Ninth Circuit Courts in cases involving funding and appropriations. The government next claims CWIT failed to assert a claim that could justify the relief—something this Court has already rejected as unfounded. Finally, the government looks for words like "may" in the statutes and claims—wrongly—that these words, taken out of context, empower the executive branch to thwart the will of Congress.

The government has not disputed the facts giving rise to CWIT's motion to modify because it cannot. CWIT asks that this Court grant its motion.

## ARGUMENT

**I.** ***Dalton v. Specter*** **Is Inapplicable, and This Court Should Reject the Government's Argument as Other Courts Have.**

The government incorrectly claims that *Dalton v. Specter*, 511 U.S. 462 (1994) forecloses review. ECF No. 82 at 2-3 (hereinafter, "Opp."). First, the government waived or forfeited this argument. The government had multiple different opportunities to raise this argument and did not. *See* ECF Nos. 44 and 57. This constitutes a waiver or forfeiture. *See Zoller v. UBS Sec. LLC*, Case No. 16 C11277, 2019 WL 2371724, at *1-2 (N.D. Ill. June 5, 2019) (Kennelly, J.) (stating that failure to raise an argument initially constitutes waiver or forfeiture); *see also Holder v. Ill. Dep't of Corr.*, 751 F.3d 486, 493 (7th Cir. 2014) (stating that "[w]hen a party

1

selects among arguments as a matter of strategy, he also waives those arguments he decided not to present.") (citing *U.S. v. Brodie*, 507 F.3d 527, 528-31 (7th Cir. 2007)).

Even were *Dalton* to be considered, it is simply inapplicable here. *Dalton* involved a specific statute that created unique procedures for base closures. 511 U.S. at 464-65. In *Dalton*, the Court held that judicial review was not available as to the President's decision to accept the recommendation of the Defense Base Closure and Realignment Commission to close the Philadelphia Naval Shipyard. *Id*. Presidential discretion was directly built into those statutory procedures—that is, the statute expressly provided for the President to approve or disapprove of the recommended base closures. *Id.* at 465. Because the President could approve or disapprove the Commission's action "for whatever reason he sees fit," the Court concluded that the President's unconstrained discretion was not subject to review. *Id.* at 476.

This case is entirely different. The *Dalton* statute made express that it "commit[ted] decisionmaking to the discretion of the President," which was a fact essential to the Court's finding that judicial review was not appropriate ***in that case***. *See id.* at 476-77. That essential feature of the *Dalton* case is not present here. The statutes, appropriation reports, or legislative history here do not delegate discretion to the executive branch to withhold funding. *See Sierra Club v. Trump*, 929 F.3d 670, 696-97 (9th Cir. 2019) (finding *Dalton* inapplicable because there, the statute at issue had "authorized unfettered discretion by the President" and therefore the Court "had no occasion to consider the constitutional implications of violating statutes").

Moreover, as the cases the government cites make clear, appropriations and funding are fundamentally different situations from *Dalton*, and executive actions related to appropriations and funding are not immunized from judicial review. *See* Opp. at 6-7 (citing cases). Indeed, the Seventh Circuit has found that *Dalton **supports*** judicial review of *ultra vires* acts such as those

2

alleged by CWIT where the executive acts without authority. *City of Chicago v. Barr*, 961 F.3d 882, 919 (7th Cir. 2020). In the Seventh Circuit's words, "[w]hether deemed a statutory or a constitutional violation, the executive's usurpation of the legislature's power of the purse implicates an interest that is fundamental to our government and essential to the protection against tyranny" because it is the "power of the legislature to determine spending and to set conditions on that spending," not the power of the executive branch. *Id.* at 919 (citing *Dalton*, 511 U.S. at 472); *see also City & Cnty of San Francisco v. Trump*, 897 F.3d 1225, 1234-35 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals. Because Congress did not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers.").

The Seventh Circuit does not stand alone in this interpretation of *Dalton*—the Ninth Circuit agrees. In *Sierra Club*, the Ninth Circuit found that *Dalton* had no application in a case involving the "reprogramming" of congressional appropriated funds, even where, unlike here, the statute at issue delegated some role for the executive branch. *Sierra Club,* 929 F.3d at 696-97. Simply put, *Dalton's* holding is a narrow one that does not apply here.

Here, the issue is clearly about funding and the executive branch's granting or withholding of appropriated Congressional funds. *See* CWIT Compl., ECF No. 1, ¶¶ 140-87 (alleging two counts of *ultra vires* violations of the Spending Clause and two counts of violation of Separation of Powers). Therefore, even if there were no waiver, this Court properly enjoined the government's termination of CWIT's WANTO grant on the grounds that the executive order would violate the separation of powers as to that grant. The Court should extend its injunction as to the other four grants for the same reasons.

3

## II. The Plain Language of the Authorizing Statutes, Particularly in Light of the Legislative Histories, Demonstrate Congress's Intent to Fund Equity-Related Grants Such as CWIT's

Rather than grapple with CWIT's evidence regarding the language of the appropriations bills and related statutes, the government asks that the Court ignore the plain language of the statutes and ignore the useful context that the legislative history provides. Opp. at 5-13. But in the very cases on which the government relies, the courts utilized statutory language, legislative history, and appropriations bills—*i.e.*, what CWIT points to here—to consider Executive discretion in light congressional intent. *See, e.g.*, *Train v. City of New York*, 420 U.S. 35, 47-49 (1975) (conducting an extensive review of legislative history to determine what Congress meant with regard to how a program should be funded and whether the executive branch had discretion to withhold funding). In fact, in a number of the cases cited by the government to argue this Court should ignore relevant legislative history, the courts in fact did exactly the opposite.[1] *See, e.g.*, *id.*; *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 644-45 (considering legislative history to conclude Congress did not grant executive branch discretionary authority claimed); *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189, 191-92 (1978) (analyzing legislative history to determine meaning of statute); *Int'l Union v. Donovan*, 746 F.2d 855, 860-64 (D.D.C. 1984) (recognizing that "[the] legislative history is relevant to our inquiry" and using it for context on how to interpret statutory text).

Next, the government mischaracterizes CWIT's argument. CWIT does not rely on the legislative record to "shoehorn" the statutes into an "'equity' bucket." *See* Opp. at 6. Rather, CWIT relies on the plain language of the statutes and appropriations reports to demonstrate the allocated funds were always intended for equity-related purposes. CWIT also uses the legislative

---

[1] And the fact these courts undertook such analysis directly refutes the government's assertion that this Court is "constitutionally incompetent," Opp. at 10, to do the same.

4

history to simply provide further support to demonstrate what Congress intended when it used the language it did in the appropriations bill and related statutes. *See* ECF No. 78 at 5-9.

The government further incorrectly argues that each of the four additional grants were funded by simple lump-sum appropriations with no restrictions on how the funds were to be spent, thereby affording the executive branch unfettered discretion to halt funding. *See, e.g.*, Opp. at 10-11. Against this backdrop, according to the government, were this Court to review the decision to defund, it would be passing a "value judgment" as to what grants should be funded by weighing in. Opp. at 11. This argument misses the point. CWIT is not asking the Court to find that a particular grant is or is not worthy of funding. Rather, CWIT is simply asking the Court to find that the government cannot terminate CWIT's grants ***by going directly against the exact reasons Congress funded those grants*** because it is legally improper to do so. *See New York v. HHS*, 414 F. Supp. 3d 475, 562 (S.D.N.Y. 2019) ("The agency, however, must exercise its delegated spending authority consistent with the specific congressional grant . . . . An agency may not withhold funds in a manner, or to an extent, unauthorized by Congress") (citations omitted); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 271, 282 (E.D. Pa. 2018) (stating that "[i]mposing grant conditions that Congress did not authorize . . . and denying duly appropriated funds for failure to satisfy those unilaterally imposed conditions is not the sort of 'faithful[] execut[ion]' of the laws that Article II requires of the Executive."); *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.D.C. 2011) ("Like the Commission here, a President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds.") (Kavanaugh, J.).

5

Finally, the government's arguments as to the individual grants are fundamentally flawed, because yet *again*, the government refuses to define, or identify definitions for, what it means or the executive orders mean by "equity-related." *See* Opp. at 5 n.2 (stating that "[f]or purposes of this filing, Defendants do not endorse or reject any particular definition of 'equity-related' contracts/grants by either this Court or Plaintiff—nor is such a definition necessary for resolution of Plaintiff's claims."). The government then turns around and argues that the texts of the statutes do not "restrict[] the use of these funds for equity-related grants/contracts." Opp. at 6. These positions are irreconcilable. The government cannot reasonably argue that the statutory texts are not equity-related when *it refuses to define what "equity-related" means*. For this reason alone, the government's arguments as to what the statutes say or mean should be ignored.

With these overarching principles in mind, the plain language of the authorizing statutes for each of the four additional grants, particularly in light of the context provided by the legislative history, demonstrate that the Termination Provision as applied to each violates the authorizing statute and separation of powers:

   1. **The TBII Grant**

The government acknowledges that the TBII grant comes through the Women's Bureau, Opp. at 11, which by statute is an entity solely focused on equity: the advancement of women. *See* 29 U.S.C. § 13 (establishing that the duty of the Women's Bureau is to formulate standards and policies which shall promote the welfare of wage-earning women, improve their working conditions, increase their efficiency, and advance their opportunities for profitable employment). Thus, by any reasonable definition, a grant authorized by the Women's Bureau to further its statutory mandate is an equity-focused grant.

6

Moreover, while the government claims that the Women's Bureau organic statute does not authorize or mandate funding of grants, Opp. at 12-13, it recognizes that the 2024 Further Consolidated Appropriations Act *did* authorize funding *through* the Women's Bureau. *See* Opp. at 11 (identifying the funding source of the TBII grant as Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Division D, Title I, Departmental Management (2024 Appropriation) and quoting the Act in relevant part:

> That ***the funds available to the Women's Bureau may be used for grants to serve and promote the interests of women in the workforce***: Provided further, That of the amounts made available to the Women's Bureau, not less than $5,000,000 ***shall*** be used for grants authorized by the Women in Apprenticeship and Nontraditional Occupations Act. (emphasis added).

Congress knew exactly what it was doing when it appropriated the funds at issue to the Women's Bureau because it authored the statute defining its mission. Congress has a legacy extending nearly a century of appropriating funding to the Women's Bureau to fulfill its equity-based statutory purpose. And Congress set a minimum level for funding that "shall" be provided for the equity-related grants at issue in this case. The government cannot divorce the two statutes to claim that the TBII grant is not an "equity-related" grant.

The government also seizes upon the word "may" from the 2024 Further Consolidated Appropriations Act, claiming that it "begins and ends" the inquiry, affording the Executive complete discretion to terminate the TBII grant. *See* Opp. at 11-12. Not so. The Termination Provision requires agencies to terminate *all* equity-related grants, including the TBII grant. Necessarily then, the practical effect of the Termination Provision is to make it so that funds available to the Women's Bureau *may not* be used for grants to serve and promote the interests of women in the first place, a clear "equity" purpose. The Termination Provision as applied to the

TBII grant thus goes much further than simply choosing between different projects or grants to fund—it fundamentally says the opposite of the statute.

### 2. The ABA Grant and the IDEA-M Grant

The government recognizes these two grants are funded by appropriations bills that make specific reference to "equity intermediaries." Opp. at 7-8. But the government again points to a particular word or phrase in the bills, in this instance the word "including," to claim that the Executive has full discretion to ignore that "equity intermediaries" appears in the statute. *Id.* at 8-9. Again, the Termination Provision as applied in this case has the practical effect of saying that equity intermediaries ***may not*** be funded. This flies directly in the face of the statute, which specifically says such intermediaries should be funded.[2]

The government also ignores that the appropriations bills funding these grants stated that such grants were to "expand opportunities." Consolidated Appropriations, 2021, Pub. L. No. 116-260, Division H, Title I, (G) (2021 Appropriation). As demonstrated by the legislative histories of the appropriations bills, *see* ECF 78 at 7-9, these bills were clearly aimed at equity issues and were a driving rationale for them, meaning that the phrase "expand[ing] opportunities" can be and must be read to include equity-related opportunities. The government's claim that the grants can be terminated because they are equity-related thus is directly incompatible with the funding statutes.

---

[2] The government claims that "Congress has not defined the phrase 'equity intermediaries.'" Opp. at 8. Putting aside that the government itself has refused to define "equity-related," the government's implied claim that "equity intermediaries" in the context of these appropriation bills do not clearly relate to "equity" at issue in this case must be rejected. The Court has already applied a plain language Merriam-Webster.com dictionary definition to the term "equity" which is equally applicable here. ECF No. 68 at 38.

### 3. The Apprenticeship USA Grant

As with the ABA Grant and the IDEA-M Grant, the appropriations bill for the Apprenticeship USA Grant included language stating that the funding was meant to "expand opportunities." Opp. at 5. As with the ABA Grant and the IDEA-M Grant, the legislative histories of the funding bill make clear that "expand[ing] opportunities" must be read to include equity-related opportunities. *See* ECF No. 78 at 7-9.

### CONCLUSION

For these reasons, CWIT respectfully requests that the Court grant its motion to expand the scope of the preliminary injunction to all of CWIT's equity-related grants.


Dated: May 1, 2025                                          Respectfully Submitted,


/s/ *Jason P. Stiehl*                                       /s/ *Anuj Vohra*
Jason P. Stiehl                                             Anuj Vohra
CROWELL & MORING LLP                                        Keith J. Harrison
455 N Cityfront Plaza Dr.                                   CROWELL & MORING LLP
Suite 3600                                                  1001 Pennsylvania Avenue, NW
Chicago IL 60611                                            Washington, DC 20004
Tel: (312) 840-3108                                         Tel: (202) 624-2500
jstiehl@crowell.com                                         avohra@crowell.com
                                                            kharrison@crowell.com


/s/ *Meshach Y. Rhoades*                                    /s/ *Warrington Parker*
Meshach Y. Rhoades                                          Warrington Parker
CROWELL & MORING LLP                                        CROWELL & MORING LLP
1601 Wewatta Street                                         3 Embarcadero Center, 26th
Suite 815                                                   Floor
Denver, CO 80202                                            San Francisco, CA 94111
Tel: (303) 524-8660                                         Tel: (415) 986-2800
mrhoades@crowell.com                                        wparker@crowell.com


s/ *Sabrina A. Talukder*                                    Elizabeth E. Theran
Sabrina A. Talukder*                                        Adrienne DerVartanian
Kathryn J. Youker                                           National Women's Law Center
Adria J. Bonillas                                           1350 I Street NW, Suite 700
Olivia Sedwick                                              Washington, DC 20005

9

Gillian Cassell-Stiga
Lawyers' Committee for Civil Rights Under Law
1500 K Street, N.W. Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
stalukder@lawyerscommittee.org
kyouker@lawyerscommittee.org
abonillas@lawyerscommittee.org
osedwick@lawyerscommittee.org
gcassell-stiga@lawyerscommittee.org

Aneel L. Chablani (No. 6242658)
Ami D. Gandhi (No. 6282924)
Chicago Lawyers' Committee for Civil Rights
100 N. LaSalle St., Ste. 600
Chicago, IL 60602
Telephone: (312) 630-9744
Facsimile: (312) 630-1127
achablani@clccrul.org
agandhi@clccrul.org

*Attorneys for Chicago Women in Trades*

*\*Pro hac vice motion forthcoming*

Telephone: (202) 588-5180
Fax: (202) 588-5185
etheran@nwlc.org
adervartanian@nwlc.org

Lourdes M. Rosado
Rafaela Uribe
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Telephone: (212) 739-7583
lrosado@latinojustice.org
ruribe@latinojustice.org

10